E filing

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name  Pertsoni          Ali
    (Last)       (First)      (Initial)

Prisoner Number ___ C48947 ___

Institutional Address  P.O. Box C48947, 3North 101

San Quentin State Prison, San Quentin, CA 949

**FILED**

APR - 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

================================================

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Ali Pertsoni
(Enter the full name of plaintiff in this action.)

      vs.

Robert Ayers Jr., Warden

_____

_____

_____
(Enter the full name of respondent(s) or jailor in this action)

Case No. _____
(To be provided by the clerk of court) **MHP**

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**  **(PR)**

================================================

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located.  If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1   <u>Who to Name as Respondent</u>

2       You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):

14           <u>San Francisco Superior Court</u>  <u>San Francisco</u>

15               Court                    Location

16           (b)    Case number, if known ___<u>106467</u>___

17           (c)    Date and terms of sentence <u>June 1982-25 years to life</u>
                                <u>plus 2 years</u>

18           (d)    Are you now in custody serving this term? (Custody means being in jail, on

19               parole or probation, etc.)        Yes <u>X</u>    No _____

20               Where?  San Quentin State Prison

21               Name of Institution: ___<u>San Quentin</u>___

22               Address: <u>San Quentin, California</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   <u>Petitioner was found suitable for parole but was reversed</u>

27   <u>by Governor. Petitioner is challenging this reversal.</u>

28   <u>This petition concerns parole.</u>

PET. FOR WRIT OF HAB. CORPUS     -2-

3. Did you have any of the following?

    Arraignment:                         Yes _x___        No _____

    Preliminary Hearing:              Yes _x___        No _____

    Motion to Suppress:             Yes _x___        No _____

4. How did you plead?

    Guilty _____     Not Guilty _x___   Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _x___     Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _x___        No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment              Yes _x___        No _____

    (b)    Preliminary hearing       Yes _x___        No _____

    (c)    Time of plea             Yes _____        No _____

    (d)    Trial                     Yes _x___        No _____

    (e)    Sentencing              Yes _x___        No _____

    (f)    Appeal                 Yes _x___        No _____

    (g)    Other post-conviction proceeding   Yes _____        No _____

8. Did you appeal your conviction?       Yes _x___        No _____

    (a)    If you did, to what court(s) did you appeal?

              Court of Appeal          Yes _x___    No _____

              Year: _1985_     Result:___not reversed_____

              Supreme Court of California    Yes _x___ No _____

              Year:_1986____    Result:___Denied_____

              Any other court          Yes _____  No _____

              Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS     - 3 -

| | | | | |
|---|---|---|---|---|
| 1 | | petition? | Yes _____ | No __x__ |
| 2 | (c) | Was there an opinion? | Yes _____ | No _____ |
| 3 | (d) | Did you seek permission to file a late appeal under Rule 31(a)? | | |
| 4 | | | Yes _____ | No __x__ |

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?                     Yes __x__    No _____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: _U.S. District Court of Northern CA_

19    Type of Proceeding: _Writ of Habeas Corpus_

20    Grounds raised (Be brief but specific):

21    a._All White Jury_

22    b._No translator provided_

23    c._not present at trial during dismissal of juror_

24    d._lost evidence_
       e._ineffective counsel_

25    Result: _dismissed due to lack of_    Date of Result: _1987_
       _exhaustion_

26    II.    Name of Court: _San Francisco Superior Court_

27    Type of Proceeding: _Writ of Habeas Corpus_

28    Grounds raised (Be brief but specific):

1    a. all white jury

2    b. no translator provided

3    c. not present at trial during dismissal of juror

4    d. lost evidence

5    ineffective counsel
     Result: denied                    Date of Result: 1987

6    III.   Name of Court: California Court of Appeal

7    Type of Proceeding: Habeas Corpus

8    Grounds raised (Be brief but specific):

9    a. same as in the superior court habeas corpus

10   b.

11   c.

12   d.

13   Result: denied                    Date of Result: 1988

14   IV.    Name of Court: California Supreme Court

15   Type of Proceeding: Habeas Corpus

16   Grounds raised (Be brief but specific):

17   a. same as in the superior court habeas corpus

18   b.

19   c.

20   d.

21   Result: denied                    Date of Result: 1988

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                     Yes _____    No  x

24   Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26        State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS         - 5 -

V. Name of Court: U.S. District Court of Northern, CA

Type of Proceeding: Habeas Corpus

Grounds raised:

a. all white jury

b. not present at trial

c. no translator provided

d. lost evidence

e, ineffective counsel

Result: denied          Date of Result January 1991

VI. Name of Court: U.S. 9th Circuit Court of Appeal

Type of Proceeding: Habeas Corpus

Grounds raised:

a. District court erred in dismissing without a hearing claim of unconstitutional jury selection

b. erred in finding his English disability too slight to required sua sponte judicial measures

c.

d.

Result: denied          Date of Result Nov, 1992

VII. Name of Court: U.S. Supreme Court

Type of Proceeding: Habeas Corpus

Grounds raised:

a. Denied Albanian translator

b,

c.

d,

Result: denied          Date of Result June 1993

VIII. Name of Court:  San Francisco Superior Court of California

Type of Proceeding:  Habeas Corpus

Grounds raised:

a. the same issues that are being presented to your court
   under  Ground I "Insert A" attached pages 6a-16 and
b. under Ground 2 "Insert B" attached pages 17a-22,

c. _____

d. _____

Result:  denied                         Date of Result  January 23, 2008
                                         see attached order dated 1/18/08

IX. Name of Court:  California State Court of Appeal

Type of Proceeding:  Habeas Corpus

Grounds raised:

a.    same as in the Superior Court above

b. _____

c. _____

d. _____

Result: Denied without opinion    Date of Result  January 31  2008 - see
                                                   attached order '

X. Name of Court:  Supreme Court of California

Type of Proceeding:      Petition for Review

Grounds raised:

a.    same issues presented in Superior Court and in the
      California Court of Appeal
b, _____

c, _____

d, _____

Result:  denied                    Date of Result   March 26, 2008
                                                     see attached order

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One:   SEE GROUND 1 "INSERT A" ATTACHED PAGES 6a-16

6            AND SEE GROUND 2 "INSERT B" ATTACHED PAGES 17a-22

7      Supporting Facts:_____

8  _____

9  _____

10 _____

11     Claim Two:_____

12 _____

13     Supporting Facts:_____

14 _____

15 _____

16 _____

17     Claim Three:_____

18 _____

19     Supporting Facts:_____

20 _____

21 _____

22 _____

23     If any of these grounds was not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 _____

26 _____

27 _____

28 _____

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4 _____

5 _____

6 _____

7 Do you have an attorney for this petition?                         Yes_____      No__X__

8 If you do, give the name and address of your attorney:

9 _____

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on __April 8, 2008__

14                Date                              Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 7 -

1

ENDORSED
F I L E D
San Francisco County Superior Court

2

JAN 2 3 2008

3

GORDON PARK-LI, Clerk
BY: _____ CARLOS BARRAZA

4

Deputy Clerk

5

6

7

8

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

9

Department No. 22

10

11

IN THE MATTER OF THE
APPLICATION OF                )
                              )
12                            ) Writ No. 5488
Ali Pertsoni,                 )
13                            )
          Petitioner,         )
14                            ) ORDER
FOR A WRIT OF HABEAS CORPUS   )
15                            )

16

17

18      A petition for writ of habeas corpus was filed with this

19  court on January 8, 2007.  Petitioner states that he is

20  incarcerated in San Quentin State Prison.  Petitioner was

21  convicted of first-degree murder with a firearm, on July 27,

22  1981.  Petitioner was sentenced to a term of twenty-five years

23  to life for the murder, with a two-year enhancement for use of

24  the firearm.  Petitioner's minimum term was set at twenty-eight

25

1

1   years, reduced to twenty-one years and four months after

2   application of good time credit.

3       On February 8, 2006, the Board of Parole hearings ("board")

4   granted parole.  By letter dated July 7, 2006, the Governor

5   reversed the Board of Parole Hearing's decision to grant parole.

6   Petitioner challenges the Governor's reversal of parole and

7   seeks review of the Governor's decision.

8       The Commitment Offense

9       Petitioner, an ethnic Albanian, emigrated from Kosovo,

10  Yugoslavia to the United States in 1975, when he was twenty

11  years old.  The victim, Fari Repishti, was a Serbian Communist.

12  Petitioner believed Repishti had been a member of the Communist

13  Secret Police in Yugoslavia.  Petitioner also knew Repishti to

14  be a violent man, who had hurt people in the past.  In 1979,

15  Repishti threatened to harm Petitioner because of their

16  political differences.

17      On July 27, 1981, Petitioner went to the Greek-American

18  Club in San Francisco, where he encountered Repishti.  Nick

19  Lambros, who was working behind the counter, witnessed the

20  shooting.  According to Lambros, there were approximately 12 to

21  14 patrons in the club when Petitioner entered and walked over

22  to where Repishti was sitting.  The two engaged in conversation,

23  and then Petitioner produced a gun and shot Repishti once in the

24  abdomen.  After Repishti fell to the ground, Petitioner fired

25

1    two more shots into the back of Repishti's head.   The first shot

2    was fired from a distance of approximately two inches from

3    Repishti's head.   The second shot to the head was fired five

4    seconds later.   Petitioner then turned with his gun drawn,

5    ordered the other patrons not to move, and fled.

6    ### Parole Grant and Reversal

7    On February 8, 2006, the board found that Petitioner met

8    all of the suitability factors for parole, and if released,

9    would not pose a risk of danger to society.

10   By letter dated July 7, 2006, the Governor reversed the

11   board's decision to grant parole.

12

13   The Governor relied on several reasons for the reversal.

14   First, Petitioner's criminal history included violent conduct,

15   which occurred over a short period of time from when he entered

16   the United States until he was incarcerated for the present

17   offense.   This included shooting at a man's car windows.

18   Petitioner admitted to aiming at the man in the car, but claimed

19   he was only trying to scare him.   Months before Repishti's

20   murder, Petitioner was convicted of a separate assault with a

21   deadly weapon.   Second, the commitment offense was especially

22   heinous because of the cold and calculated manner in which it

23   was carried out.   Additionally, Petitioner put multiple people

24   at risk of death or serious injury by firing a gun inside an

25   occupied club, then pointing the gun at the patrons as he made

1   his escape.   Third, the Governor found that the recurring

2   changes to Petitioner's account of the commitment offense showed

3   that he was unable or unwilling to fully grasp or fully accept

4   responsibility for the nature and magnitude of his actions.

5       The People of California have vested their Governor with

6   the power to override the Board's parole decisions in murder

7   convictions.   (Cal. Const., art. V, § 8, subd. (b).)   The

8   Governor may review decisions of the Board, and affirm, modify,

9   or reverse the Board's decision on the "basis of the same

10  factors which the parole authority is required to consider."

11  (Cal. Const., art. V, § 8, subd .(b); Pen.Code § 3041.2.)

12      The Board, and thus the Governor, may consider:

13      circumstances of the prisoner's social history; past
14      and present mental state; past criminal history,
        including involvement in other criminal misconduct
15      which is reliably documented; the base and other
        commitment offenses, including behavior before, during
16      and after the crime; past and present attitude toward
        the crime; any conditions of treatment or control,
17      including the use of special conditions under which
        the prisoner may safely be released to the community;
18      and any other information which bears on the
        prisoner's suitability for release.
19

20  (Cal.Code Regs., tit. 15, § 2402, subd. (b).)

21      Circumstances which indicate unsuitability for parole

22  include an inexplicable motive, or a motive very trivial in

23  relation to the offense; an unstable social history; and

24  engaging in serious misconduct in prison or jail.   (Cal.Code

25  Regs., tit. 15, § 2402, subds. (c)(1)(E), (c)(3) & (c)(6).)

4

1    Gubernatorial parole decisions are subject to *limited*
2  judicial review.  (*In re Rosenkrantz* (2002) 29 Cal.4th 616,
3  626.)  "[A] court is authorized to review the factual basis of
4  the Governor's decision only to determine whether it is
5  supported by some evidence relevant to the factors the Governor
6  is required to consider under article V, section 8(b) [of the
7  California Constitution]."  (*Ibid.*)  Courts may not undertake an
8  independent assessment of the merits of the parole decision, nor
9  demand "substantial evidence" supporting a gubernatorial parole
10  decision. (*Id.* at 665.)  Judicial review of the Governor's
11  parole decisions is "extremely deferential."  (*Ibid.*)  "Only a
12  modicum of evidence is required," and "[r]esolution of any
13  conflicts in the evidence and the weight to be given the
14  evidence are matters within the authority of the Governor."
15  (*Id.* at 677.) The Governor's decision "must reflect an
16  individualized consideration of the specified criteria and
17  cannot be arbitrary or capricious."  (*Ibid.*)

18    The court is limited in reviewing the Governor's decision.
19  It cannot grant relief to the petitioner simply because it may
20  disagree with the Governor's decision.  Here, the Governor's
21  parole decision is supported by "some evidence relevant to the
22  factors the Governor is required to consider under article V,
23  section 8(b) [of the California Constitution]."  (*In re
24  Rosenkrantz, supra,* 29 Cal.4th at 626.) Here, the Governor did
25  not rely solely on the commitment offense (although the facts of

1    this case may have allowed him to do so).  Furthermore, the

2    Governor recognizes the petitioner's accomplishments, although

3    he feels he is not yet suitable for parole.  It appears the

4    Governor has reviewed the petitioner's record, giving

5    "individualized consideration" to the "specified criteria."

6        Based on the above authorities, and a review of the

7    Governor's letter, the court concludes that the Governor did not

8    commit error or deprive the defendant of due process when he

9    reversed the grant of parole.  Therefore, the petition for a

10   writ of habeas corpus is DENIED.

11

12

13

14

15

16   _____          _____

17   Date                              Judge of the Superior Court

18

19

20

21

22

23

24

25

6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ALI PERTSONI, | A120474 |
| on Habeas Corpus. | (San Francisco County Super. Ct. No. 5488) |

BY THE COURT:

The petition for writ of habeas corpus is denied.

FILED

JAN 3 1 2008

. (Ruvolo, P.J., Reardon, J., and Sepulveda, J., joined in the decision.)

RUVOLO, P.J.

Date: _____JAN 3 1 2008_____    _____P.J.

Court of Appeal, First Appellate District, Div. 4 - No. A120474
**S160672**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ALI PERTSONI on Habeas Corpus

The petition for review is denied.

Corrigan, J., was recused and did not participate.

SUPREME COURT
**FILED**

MAR 2 6 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

## TABLE OF CONTENTS

**Page No.**

Background………………………………………………….. 1-5

Ground 1 (Insert A)………………………………………….6a-16

Ground 2 (Insert B)………………………………………… 17a-22

Exhibits attached from A-X

Exhibit Y – February 8, 2006 Board of Parole Hearings Transcript

# TABLE OF AUTHORITIES

**Cases**                                                        **Page No.**

Bair v. Folsom State Prison, 2005 at 2219220, 12n.3 (E.D.
Cal. 2005)                                                            11
In re Barker (2007) 151 Cal.App.4[th], 346                            9
Bermudez v. Duenas, 936 F.2d 1064, 1066 (9th Cir. 1991)            19

Biggs, 334 F.3d at 915                                             19,21
Biggs. 334 F.3d at 916                                               10
Biggs, 334F. 3d at 917                                              10
Biggs 334 F.3d at 919                                               11
Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003)              17

Bergen v. Spaulding, 881 F.2d 719, 721 (9th Cir. 1989)          17

Board of Pardons v. Allen, 482 U.S. 369, 377-78, 107 S.Ct. 2415,
2420-21, 96L.Ed.2d 303 (1987)                                       18

In re Dannenberg, 34Cal.4[th] pp.1071, 1984, 1095, fn.16            9

In re Elkins, 144 CA 4th 475 (2006)                              12
In re Gray (2007) 151 Cal.App. 4th 379                             9
Greenholtz v. Inmate of the Nebraska Penal & Correctional
Complex, 442 U.S. 1, 7, 99 S.t. 2100, 2104, 60 L.Ed.2d
699 (1979)                                                          17

Greenholtz, 442 U.S. at 12, at 2106                                18
Greenholtz, 442 U.S. at 15                                          12
Greenholtz, 442 U.S. at 16, 99 S.Ct. at 2108                       19
Hayward v. Marshall, U.S. 9th Circuit (Jan.3, 2008)             11
Hill, 472 U.S. at 455-56, 105 S.Ct. at 2774                        21

Irons, 358 F. Supp.2d at 947                                        22
Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d  11
936, 947 (E.D. Cal. 2005), Appeal docketed, No.05-15275 (9th
Cir. Feb.17, 2005)
Irons v. Carey, 479 F.3d 658 (9th Cir.Cal) March 6, 2007        11
Johnson, 2006 W.L. 195159 at fn.8                                   22

Kentucky Dept. of Corr. v. Thompson, 490 U.S. 454, 460, 109        17
S.Ct. 1904, 1908, 104L.Ed.2d 506 (1989)

# TABLE OF AUTHORITIES

| Cases | Page No. |
|---|---|
| In re Lee, 143 CA 4th 1400 (2006) | 12 |
| In re Lawrence (2007) 150 Cal. App.4th 1511, 1543 | 9 |
| Little v Hadden, 504 F. Supp. 558, 561 | 15 |
| Lupo v. Norton, 371 F. Supp. 156 (1974) | 15 |
| In re Martin, 431 F. Supp.2d 1038 (2006) | 12 |
| re Minnis, 7 Cal. 3d 639, 645 (1972) | 16 |
| McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) | 18 |
| McQuillion, 306 F.3d at 902 | 19 |
| Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1398 (9th Cir.1987) cert.denied, 484 U.S. 1017 (1988) | 19 |
| Powell v. Gomez, 33 F.3d 39,40 (9th Cir. 1994) | 21 |
| Rosas, 428 F.3d at 1232 | 21 |
| Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) | 21 |
| In re Rosenkrantz, 29 Cal. 4th at pp. 657-658, 675-677 | 9 |
| In re Rosenkrantz, (2002) 29 Cal. 4th 616, 653-654; Cal. Codes of Regs. tit 15 ("CCR-15") Section 2400-2411 | 13 |
| In re Rosenkrantz, 29 Cal.4th at 655 | 16 |
| Rosenkrantz, 29 Cal. 4th at 625-26; 128 Cal. Rptr. 2d at 115 | 20 |
| Scott II, 133 Cal. App. 4th at p.590 fn.6 | 9 |
| Scott II supra, 133 Cal. App. 4th at 594 | 9 |
| In re Scott, 119 Cal. App.4th 871, 899 (2004) | 16 |
| Scott, 133 Cal. App. 4th at 597-601 | 22 |
| In re Smith, 109 Cal. App. 4th 489, 501-02, 134 Cal. Rptr. 2d 781 (2003) | 20 |
| Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774,86L.Ed. 2d 356 (1985) | 20,21 |

**Page No.**

Penal Code Section 3041                                              16

Cal. Penal Code Section 3041.2(a)                                   20

Cal. Penal Code Sections 3041.5(a), 3041.7                         19

Cal. Penal Code Sections 3041(b) (2002)                            18

Cal. Penal Code Section 3041.5(b) (2002)                           20


15 CCR Section 2403 (b)                                          13, 14

CCR 15, Section 2403 (b) category 4D                               15

CCR-15, Section 2402 (b-d) 2002                                    18

Cal. Codes of Regs. tit.15 ("CCR-15") Section 2400-2411           13

## BACKGROUND

Mr. Pertsoni was born into a large ethnic Albanian European family in 1954 in

Gjakova, in the country of Kosova of former Yugoslavia, and was raised there

under the repressive Communist regime; Kosova was forcefully annexed against

the will of the Albanian nationals and kept as an occupied state by Yugoslavia. He

experienced oppression that was his family's heritage, for intense political strife

marked his upbringing as it marked Kosova for decades. At the time of the

Communist Serb regime ethnic Albanians were treated as second hand citizens and

were badly oppressed in many aspect, such as education, employment, economic,

social and political. There was no opportunity for education, gainful employment

or social advancement for Mr. Pertsoni who quit school after the fourth grade to

assist his father in his street-cleaning job, which literally involved shoveling horse

manure. As a young teenager he obtained work at a butcher shop, where he was

able to bring home scraps of meat for his family to eat, any money he earned he

turned over to his father. As an older teenager he became active with others to

protest the injustices and brutality against his people by involving himself in

protection of human and national rights for ethnic Albanians in the province of

Kosova. Consequently, Mr. Pertsoni was continuously pursued and mistreated by

the Serb Communist authorities in power at that time. Eventually, being seriously

threatened by the Serb Communist authorities in order to save his own family,

relatives and friends from any further problems, Mr. Pertsoni was forced to leave

1

and exile in Austria. He became a refugee and was soon granted asylum in the United States. Mr. Pertsoni lived largely within the Albanian community in the United States, first taking up residence in Chicago. He diligently worked in the butcher and restaurant businesses, regularly sending money home to his family, and met the woman Yuriko to whom he is still married. They moved to San Francisco, and then to Houston following threat and harassment from an antagonist (the eventual murder victim), and then back to San Francisco after Mr. Pertsoni spotted his antagonist in Houston. Trial testimony of Mrs. Colombo in Houston that Mr. Pertsoni had to leave because an Albanian was after him and he was afraid. **Exhibit A**.  However, Repishti did return to San Francisco. Pertsoni ran into Repishti at the Greek American club. Repishti pushed Pertsoni down a flight of steps, causing Pertsoni to break his nose,cut his eye and was bruised severely. Pertsoni didn't want trouble so he didn't fight with Repishti. The next day 2 Albanian friends told Pertsoni that Repishti was telling people that Repishti was going to kill Pertsoni. See **Exhibit B** for Declarations of Ejup Sulejamani and Declaration of Shaban Xhani.  Mr. Pertsoni called the F.B.I. seeking protection from  Repishti.  Pertsoni was told by a woman agent to stay away from Repishti. Other than that, the agency offered no other help or advice. The antagonist was an Albanian immigrant from Yugoslavia named Bajram Shaboni who went by several aliases. He went by the name of Fahri "Tony" Repishti in this country. He was an Albanian immigrant who held himself out as an agent of UDBA, the Communist

2

secret police in Kosova.  Trial evidence showed that he had a history of violence

and run-ins with the law in the United States and was known to carry a firearm.

**Exhibit C.**   On the night of the incident Repishti advanced on and confronted Mr.

Pertsoni  when they found themselves together in a club in San Francisco

frequented by Albanians. Mr. Pertsoni was taken by surprise when he went to the

club not expecting Repishti. Repishti rose from his seat at the table and advanced

on Mr. Pertsoni with loud angry words. **Exhibit D**.  Mr. Pertsoni believed that

Repishti made a move to pull a firearm and out of fear, overreacted to the threat

posed by Repishti by pulling out his own firearm. There was a struggle leading to a

shot to Repishti's stomach, causing him to fall.  Overwhelmed by the emotions and

events of the moment Mr. Pertsoni shot him two more times.   Mr. Pertsoni left the

club and surrendered to the police a few hours later. Friends encouraged him to

flee but Mr. Pertsoni insisted on surrendering himself and told his friends that he

had killed an Albanian brother and must be accountable for what he did.

Repishti's documents show that Repishti engaged in a life style in which he

repeatedly used threats, intimidation and violence to victimize others. Repishti was

known to be an armed and dangerous man, had a history of violence and run-in

with the law in the United States. Repishti the victim had been arrested in New

York in September 1977 for criminal mischief and harassment; he was reportedly

loud and abusive at the time. He again had been arrested in New York in May 1978

for possession of a loaded revolver, and was convicted of that offense. **Exhibit E**

Repishti had once again been arrested in New York March 1979 for assault with a

knife, with serious bodily injury that involved the stabbing puncture of a lung. **Exhibit**

**F.** Repishti pleaded guilty to second degree assault in September 1979 and was on

probation for 5 years in New York. **Exhibit G.** See also letter from the wife of the

victim in New York who was stabbed by Repishti. **Exhibit H.**   In November

1979, Repishti again had been arrested for rape in San Francisco – he raped a

young pregnant girl and there were bruises inflicted on her according to a doctor's

report. **Exhibit I.**   In April 1980 Oakland police investigated Repishti for rape and

number of other related charges. See Affidavit of Ahmad Rismanchi **Exhibit J**

and Oakland Crime Report 80-31976 concerning rape of the wife of Rismanchi

who was pregnant – Repishti beat Mrs. Rismanchi and forced her to drink his urine

at gun point, told her that he had killed 11 people. See page 9 of  **Exhibit  K.**  He

then stole all her money. General threats and harassment directed at them by

Repishti.

In May 1980, Repishti was again arrested in San Francisco, this time for resisting arrest in an incident where he as combative and rammed two policemen to the ground, after police were called to that scene because of Repishti's drunken and threatening conduct. One of the officers was injured during this incident and needed medical treatment. **Exhibit L.** In June 1981 Repishti was again arrested in San Francisco for assault in which he sprayed several people in a bar with tear gas. **Exhibit M.** In addition witnesses reported numerous other incidents of Repishti's violence including another rape that never came to the attention of the authorities and that he was known to carry a firearm.

In San Francisco 1981 there were 3 different episodes in which Repishti instigated fights at the Gold Mirror restaurant in one instance Repishti tried to kill Jim Saiti with a knife but Jim Sedie interevened and saved Saiti's life. See **Exhibit N** Mr. Mike Bushati who owned the Gold Mirror restaurant stated that Repishti caused problems in his restaurant. **Exhibit O**

5

INSERT A

## GROUND 1

The Governor's decision to reverse Petitioner's grant of parole is arbitrary and capricious and therefore violates petitioner's right to state and federal due process because it is not supported by "some evidence" and instead was on the same factors that went into formulating the guidelines for setting parole terms.

The issue is does the 25 year old commitment offense provide the "some evidence" to support the Governor's reason to REVERSE a parole grant, when all other factors support the Board's finding of suitability?

**INSERT A**

## GROUND 1

THE GOVERNOR'S DECISION TO REVERSE PETITIONER'S
GRANT OF PAROLE IS ARBITRARY AND CAPRICIOUS AND
THEREFORE VIOLATES PETITIONER'S RIGHT TO STATE
AND FEDERAL DUE PROCESS BECAUSE IT IS NOT SUPPORTED
BY "SOME EVIDENCE" AND INSTEAD WAS ON THE SAME
FACTORS THAT WENT INTO FORMULATING THE GUIDE-
LINES FOR SETTING PAROLE TERMS.

On February 8, 2006, the Board of Parole Hearings ("Board") Panel

concluded that Ali Pertsoni ("Petitioner") is suitable for parole and that he "would

not pose an unreasonable risk of danger to society or threat to public safety if

released from prison at this time." (**Exhibit P** Board Transcripts ("BT"), p. 116.)

The Board found that Petitioner "has a stable social history" (BT 117), "has

enhanced his ability to function within the law upon his release through his

participation in educational progress" (BT 117), "again enhanced ability to

function within the law via Petitioner's participation in a variety of self-help and

therapy programs..."(BT 118), "Petitioner has enhanced his ability to support

himself in the community in that the record does reflect that Petitioner has

completed vocational dry cleaning as well as developed marketable skills..." (BT

118). The Board also found that Petitioner "committed the crime as a result of

significant stress in his life in that appears that he was fearful of the victim as the

result of his belief that the victim was capable of violence and had demonstrated

6

**INSERT A**

that in the past" (BT119). The Board further found that "because of maturation, growth, greater understanding and advanced age the probability of recidivism have been reduced greatly…(BT119). The Board noted over 50 letters of support from his community in the City of Gjakova, in the country of Kosova (Europe) in former Yugoslavia and 26 offers of jobs in his city of Gjakova which consist of support letters from the Mayor of Kosova, from a judge in Kosova, from the public prosecutor, from a former public prosecutor all stating that they all take full responsibility for Mr. Ali Pertsoni and also they all guarantee that Mr. Pertsoni is not a threat to their community, as he actually has never been such in the past while he was living there in his hometown. **Exhibit Q.** Three United Nations victims organizations offering him jobs in Gjakova Kosova: the Kosovo Women Initiative – New Vision, the Kosovar Youth Council and NGO Resource Center. **Exhibit R.** Support letters from siblings, sister-in-laws, cousins, nieces and nephews all in Kosovo including a document signed by over 80 individuals all in Kosovo, supporting his release from prison and support from his wife of 30 years **Exhibit S,** as well as support from the community in California. Petitioner has a very, very strong and supportive network in his country and within California. (BT 119-120.)

Petitioner had maintained disciplinary free status for over 21 years. (BT 120.)

Psychological Evaluation was favorable and supported a finding of suitable for

parole. (BT 121-124.) See evaluations from Dr. Walker and Dr. Enaba – **Exhibit T**

Finally, the Board found that Petitioner's first degree murder fits the Matrix

category 2-B, and set his based term at 28 years. The Board applied the good-time

credit, which reduced his term to 21 years 4 months. (BT 130.) Petitioner is now 5

years past the terms calculated by the Board on February 8, 2006.

On July 7, 2006, Governor Arnold Schwarzenegger, relying on unchanging

circumstances of the commitment offense and over 20 year old prison misconduct,

reversed the parole grant. The Governor's reason is as follows:

> Yet, despite any factors tending to support Mr. Pertsoni's suitability for
> parole at this time, the first-degree murder he perpetrated was especially
> heinous because of the cold and calculated manner in which it was carried
> out. According to the probation report, Mr. Pertsoni entered the social club
> armed with a gun. He approached Mr. Repishti, and the two men exchanged
> words before Mr. Pertsoni pulled out his gun and shot Mr. Repishti once in the
> stomach at close range. As Mr. Repishti "slumped" to the floor, Mr. Pertsoni
> looked at him, and then shot him in the back of the head. A witness said that
> Mr. Pertsoni waited another five seconds before firing one final shot into the
> back of Mr. Repishti's head. Not only was this a callous crime, but Mr. Pertsoni
> put multiple people at risk of death or serious injury by firing a gun three times
> inside of the occupied club, and by pointing the gun at other patrons, telling them
> not to move, before fleeing the scene. The probation report stated that the
> shooting occurred in the presence of 12 to 14 other people. The gravity of the
> first –degree murder perpetrated by Mr. Pertsoni is sufficient for me to conclude
> presently that his release from prison would pose an unreasonable public safety
> risk.

(**Exhibit  U** - Governor's Decision, Via Facsimile and U.S. Mail.)

**INSERT A**

The Governor's reversal of parole grant and parole unsuitability must be supported by "some evidence" pertinent to "relevant standards" promulgated by Board of Hearings to comply with constitutional due process. (In re Rosenkrantz, 29 Cal.4th at pp. 657-658, 675-677; see also In re Dannenberg, 34 Cal.4th pp.1071, 1984, 1095, fn.16.) This requires the Governor's reversal of a parole grant to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p.590, fn.6.) As the administrative record of the Board's hearing and consideration of Petitioner suitability make clear, there simply is no such rational basis supporting the Governor's denial of Petitioner's parole. In re Barker (2007) 151 Cal.App.4th,346; In re Gray (2007) 151 Cal.App.4th 379; In re Lawrence (2007) 150 Cal.App. 4th 1511, 1543.

This is a classic case where, putting aside the commitment offense and more than twenty-plus year old misconduct, "all other factors clearly indicate that Petitioner is suitable for release on Parole." (Scott II, supra, 133 Cal.App.4th at 594.) As the Calfornia Court of Appeals (lst Appellate District) cautioned about a Governor reversal or parole grant based solely on the commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of a subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.]The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus denial of release soley on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the Governor "did not fulfill"

9

**INSERT A**

the requirement "to consider all other relevant factors," the decision to deny parole

cannot stand. (Id. at p 595) Such is the case here. In another case, the United

States Court of Appeals, Ninth Circuit, cautioned the Board of Prison Terms about

continued reliance on the gravity of the commitment offense and conduct prior to

the commitment offense.

> As in the present instance, the parole board's sole supportable reliance
> on the gravity of the offense and conduct prior to imprisonment to justify
> denial of parole can be initially justified as fulfilling the requirements set
> forth by state law. Over time, however, should Biggs continue to demon-
> strate exemplary behavior and evidence of rehabilitation, denying him a
> parole date simply because of the nature of his offense would rise serious
> questions involving his liberty interest.

Biggs, 334 F.3d at 916. The Ninth Circuit added that "[a] continued reliance in the

future on an unchanging factor, the circumstances of the offense and conduct prior

to imprisonment, runs contrary to the rehabilitative goals espoused by the prison

system and could result in a due process violation." Biggs, 334 F.3d at 917.

One district court has explained the rationale underlying this aspect of

Biggs as follows:

> Whether the facts of the crime of conviction, or other unchanged criteria,
> affect the parole eligibility decision can only be predicated on the "predictive
> value" of the unchanged circumstance. Otherwise, if the unchanged circum-
> stances per se can be used to deny parole eligibility, sentencing is taken out
> of the hands of the judge and totally reposited in the hands of the BPT. That is,
> parole eligibility could be indefinitely and forever delayed based on the nature
> of the crime even though the sentence given set forth the possibility of parole -
> a sentence given with the facts of the crime fresh in the mind of the judge.
> While it would not be a constitutional violation to forego parole altogether
> for certain crimes, what the state cannot constitutionally do is have a sham
> system where the judge promises the possibility of parole, but because of the
> nature of the crime, the BPT effectively deletes such from the system. Nor

10

can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstances, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstances must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counter-poised against the backdrop of prison events.

Bair v. Folsom State Prison, 2005 WL 2219220, 12 n. 3 (E.D.Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D. Cal. 2005).

In the circumstances of this case, the Governor's reliance upon the unchanging nature of Petitioner's crime to reverse Petitioner's grant of parole violated due process. Continued reliance upon the unchanging characterization of Petitioner's offense amounts to converting Petitioner's sentence of 25 years to life to a term of life without the possibility of parole. (Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D.Cal. 2005), appeal docketed, No. 05-15275 (9th Cir. Feb. 17, 2005.) Irons v.Carey, 479 F.3d 658 (9th Cir.Cal March 6, 2007), Hayward v. Marshall, U.S. 9th Circuit (Jan. 3, 2008).

Petitioner's case is exactly what Biggs envisioned when it stated that repeated refusal to grant a parole release date to an inmate with an exemplary post-conviction record may violate the prisoner's due process. Biggs, 334 F.3d at 919. The record in this case is replete with evidence of Petitioner's remorse and rehabilitation, including glowingly positive psychological reports, extensive self-improvement through completion of educational and vocational progress, as well

11

as therapy, and more than two decades of disciplinary-free incarceration. (Exhibit BT 118, 120, 121-123. The evidence of Petitioner's outstanding performance while incarcerated is particularly important.  As the United States Supreme Court has recognized, "[t]he behavior of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." Greenholtz, 442 U.S at 15. In re Wen Lee, 143 CA 4th 1400  (2006); In re Jeffrey Elkins, 144 CA 4th 475 (2006); In re Eulogio Martin, 431 F.Supp.2d 1038 (2006).

Furthermore, this case presents interesting issues concerning the procedures and guidelines used by the Board in reaching and explaining its decisions concerning parole. The issues arise because the Board has designed procedures (Pursuant to Cal. Code Section 3041 (a) that are suppose to promote rationality in its decision-making process and to enhance understanding of that process by all concerned, especially prisoners. The key ingredients of the procedures are (a) the use of a Matrix table of guidelines as an aid in deciding the appropriate length of time a prisoner should serve without good time credit, and if earned, then calculating the good-time credit toward that term; and (b) a requirement that a prisoner denied parole receive in writing the reason for the decision. These aspects of the Board's guidelines and

12

procedures are detailed in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, 653-654; Cal.

Codes of Regs. tit.15 ("CCR-15") Section 2400-2411. (**Exhibit V**, copy of CCR-15,

Article 11, Sections 2400-2429.)

The guidelines table (15-CCR- Section 2403(b) sets forth suggested length of

time to be served prior to parole for various combination of two variables: 1) the

severity  of the offense; and 2) the characteristics of the offender in relation with the

victim. The precise issue raised by this case are (a) whether, in determining

suitability for parole, the Board, and therefore Governor, must use the offense for

which the prisoner was convicted, one that allows the possibility of parole, or can

use the offense the Board, or Governor, concludes he or she has committed based on

their understanding of the facts that allegedly occurred, and (b) whether the board,

and therefore Governor, can use factors that went into formulating the guidelines for

setting terms (in mitigation or aggravation) as the stated reason for denying parole.

 Petitioner's term "shall normally" be set at his initial parole hearing which was held

in 1996. Petitioner's Minimum Eligible Parole Date (MEPD is set at August 31,

1997. (BT 1.) As admitted by the Board, "category 2-B is appropriate [,]" which is a

"term of 28 years" and with good-time credit that Petitioner that earned, his "total

term" should be 21 years. (**Exhibit W**, BT 130); Section 2410.)

The Board's and therefore Governor's, own guidelines requires them to

determine the category most closely related to the circumstances of the crime, and

impose the middle base term reflected in the matrix unless the panel finds

13

circumstances in aggravation or mitigation. The criteria set forth in CCR-15 Section

2403(b) describes four circumstances and victim situations to be used in determining

the category most closely related to the crime being reviewed for setting terms. The

Matrix of Base Terms for First Degree on or after November 8, 1978, category 2-B

describes the Circumstances and Offender's and Victim's Relationship that the

Board found to be appropriate to Petitioner's crime:

<div align="center">OFFENDER'S AND VICTIM'S RELATIONSHP</div>

II. Prior Relationship

Victim was involved in a personal relationship with prisoner (spouse,
family member, friend, etc.) which contributed to the motivation for
the act resulting in death. If the victim had a personal relationship but
prisoner hired and/or paid to commit the offense, see Category IV.

<div align="center">CIRCUMSTANCES</div>

B. Direct or Victim Contribution

Death was almost immediate or resulted at least partial from
contributing factors from the victim; e.g., victim initiated struggle
or had goaded the prisoner. This does not include victim acting in
defense or self or property.

(CCR-15, Section 2403(b), Matrix of Base Terms for First Degree Murder on or

after November 8, 1978.)

The Board's guidelines recognize that there will be adjustments to be made

for elements that go beyond what is necessary to convict for first degree murder.

These factors do not preclude a finding of suitability. In fact, even a crime that

involved the murder of police officer that was subjected to prolonged infliction of

<div align="center">14</div>

physical pain through the use of nondeadly force prior to act resulting to death,

allows a finding of suitability and Base Term of 31-32-33 years. (CCR-15,

Section 2403(b), category 4D.) With good time credit, even the most heinous of first

degree murderers described in the Maxtrix guidelines can be released after serving

21 years in prison.

The record shows that Governor did not follow the guidelines and Matrix.

Instead, the Governor based his decision to deny parole on the same factors that

went into formulating the guidelines.

In <u>Little v. Hadden,</u> 504 F. Supp. 558, 561, a federal court addressed the same

type of arbitrary and capricious acts seen in the instant case:

> [I]t is unreasonable and impermissible for the Commission to base
> a decision to continue beyond the guidelines on the same factors that
> went into formulating the guidelines in the first place. No one disputes
> that this was a serious crime, but the factors of seriousness indicated by
> this record are included in the guidelines themselves. ...It is clear to
> the Court from the record in this case that the Commission has attempted
> to continue Little in custody beyond the guidelines because of its ad hoc
> decision regarding the seriousness of the offense, but the factors relied
> upon are either unsupported by the record or were already considered in
> formulating the guidelines. ... in short, the Commissions' decision is
> arbitrary and capricious because it is not based on anything in the
> record before it.  Moreover, it reflects an abuse of discretion because
> it attempts to continue Little's confinement beyond the guidelines with-
> out the statutory required good cause.

(See also, <u>Lupo v. Norton,</u> 371 F. Supp.156 (1974).)

The California Supreme Court has consistently held the Governor "is under an

obligation to consider all relevant factors" and may not ignore postconviction factors

**INSERT A**

in its parole suitability determination.  In re Rosenkrantz, 29 Cal.4th at 655 (citing In

re Minnis, 7 Cal.3d 639, 645 (1972). Despite this mandate, the Governor has

inexplicably and unjustifiably ignored abundant, undisputed evidence contained in

Petitioner's post-conviction record showing Petitioner is suitable for release on

parole. In re Scott, 119 Cal. App.4th 871, 899 (2004).

Because there is no reliable evidence supporting the Governor's conclusion that

Petitioner is unsuitable for parole, the court should find that the Governor's

determination violates due process. (See Hill, 472 U.S at 455.) The Court should

reverse the Governor's decision and order Petitioner to be released on parole

immediately.

The Court should also grant any and all relief it deems fair and in the interest of

justice, including an injunction that 1) restrains the Governor from reversing Board

grant of parole until the Board starts regularly setting parole dates early in the

prisoner's term in accordance with the dictates of Penal Code Section 3041, and

2) requires the Governor to conform his practice of review or parole grants to the

dictates of section 3041 and all statutory, regulatory and constitutional requirements

as set forth in the decisions of the courts.

**INSERT B**

### GROUND 2

Based on all the evidence supporting suitability for parole, the Governor's reversal of petitioner's parole grant violated petitioner's federal constitutional protected liberty interest in parole release.

The issue is when the matrix guidelines provide examples of terms that go beyond the minimum elements to convict for first degree murder, does it violate due process to use the same criteria that went into formulating the guidelines in the first place?

**INSERT B**

## GROUND 2

BASED ON ALL THE EVIDENCE SUPPORTING
SUITABILITY FOR PAROLE, THE GOVERNOR'S
REVERSAL OF PETITIONER'S PAROLE GRANT
VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL
PROTECTED LIBERTY INTEREST IN PAROLE RELEASE.

The Fourteenth Amendment's due process clause provides that a person may

not be deprived of life, liberty, or property without due process of law. The Supreme

Court " examine[s] procedural due process questions in two steps: the first asks

whether there exists a liberty or property interest which has been interfered with by

the State, . . .; the second examines whether the procedures attendant upon that

deprivation were constitutionally sufficient." Kentucky Dept. of Corr. v. Thompson,

490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citation omitted);

Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003). "Accordingly, this Court must

first address whether petitioner has a constitutionally protected liberty interest in

parole." Biggs, 334 F.3d at 914.

A prisoner has "no constitutional or inherent right . . . to be conditionally

released before the expiration of a valid sentence." Greenholtz v. Inmate of the

Nebraska Penal & Correctional Complex, 442 U.S. 1,7, 99 S.Ct. 2100, 2104, 60

L.Ed.2d 699 (1979); Bergen v. Spaulding, 881 F.2d 719, 721 (9th Cir. 1989).

However, a state's parole scheme that uses mandatory language to "create a

presumption that parole release will be granted" when or unless certain designated

17

findings are made, can give rise to a liberty interest protected by the due process

clause. Greenholtz, 442 U.S. at 12, 99 S.Ct. at 2106;  Board of Pardons v. Allen, 482

U.S. 369, 377-78, 107 S. Ct. 2415, 2420-21, 96 L.Ed2d. 303 (1987); McQuillion v.

Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

At the time of Petitioner's parole hearing, California's parole scheme proved

that the Board:

> Shall set a release date unless it determines that the gravity of the current
> convicted offense or offenses, or the timing and gravity of current or past
> convicted offense or offenses, is such that the consideration of the public
> safety requires a more lengthy period of incarceration for this individual, and
> that a parole date, therefore, cannot be fixed at this meeting.

(Cal. Penal Code Section 3041(b) (2002).  The Board considers numerous factors in

making this determination, including:

> Petitioner's social history; past and present mental state; past criminal
> history, including involvement in other criminal misconduct which is
> reliably documented' the base and other commitment offenses, including
> behavior before, during and after the crime; past and present attitude
> toward the crime; any conditions of treatment or control, including the
> use of special conditions under which the Petitioner may safely be released
> to the community; and any other information which bears on the prisoner's
> suitability for release.

(CCR-15 Section 2402 (b-d) (2002).) Thus, "[u]nder the 'clearly established'

framework of Greenholtz and Allen, . . . California's parole scheme gives rise to a

**INSERT B**

cognizable liberty interest in release on parole." <u>McQuillion,</u> 306 F.3d at 902; <u>Biggs,</u> 334 F.3d at 914-15.

"Because the California parole scheme vests in every inmate a constitutionally protected liberty interest, [the Court] look(s) to the second step in the procedural due process analysis to see if adequate procedural protections were afforded [Petitioner]." <u>Biggs,</u> 334 F.3d at 915. "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.' '' <u>Greenholtz,</u> 442 U.S. at 12, 99 S.Ct. at 2106 (citations omitted); <u>Pedro v. Oregon Parole Bd.,</u> 825 F.2d 1396,1398 (9th Cir. 1987), <u>cert. denied,</u> 484 U.S. 1017 (1988). At a minimum, due process requires that state parole procedures must "afford an opportunity to be heard, and when parole is denied it must inform the inmate in what respects he falls short of qualifying for parole." <u>Greenholtz,</u> 442 U.S at 16, 99 S. Ct. at 2108; <u>Bermudez. v. Duenas,</u> 936 F.2d 1064, 1066 (9th Cir. 1991). Moreover, under California law,

> Prisoners are entitled to be present at the hearing, speak
> and offer evidence on their own behalf, and prisoners
> serving a life sentence are entitled to be represented by
> counsel at the hearing.

<u>Biggs,</u> 334 F.3d at 915 (citations omitted); Cal. Penal Code Sections 3041.5(a), 3041.7. Additionally, if a parole date is not set, an inmate is entitled to "a written statement setting forth the reason or reasons for refusal to set a parole date,

[including] suggest[ed] activities in which he or she might participate that will benefit his or her while he or she is incarcerated." Cal. Penal Code Section 3041.5(b) (2002). Moreover, the Board's decision "with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder" shall not become final for 30 days, during which time California's Governor may review the Board's decision. Cal. Const. Art. V, Section 8(b). However, California law "does not grant a Governor unfettered discretion over parole matters, but rather explicit requires his or her parole decision to be based upon the same factors that the Board is required to consider." In re Rosenkrantz, 29 Cal.4th at 625-26, 128 Cal. Rptr. 2d at 115; In re Smith 109 Cal. App.4th 489, 501-02, 134 Cal.Rptr.2d 781 (2003); Cal. Penal Code Section 3041.2(a); see also Cal. Const. Art. V, Section 8(b) ("The Governor may only affirm, modify, or reverse the [Board's] decision . . . on the basis of the same factors which the [Board} is required to consider.") Further, if, as here, California's Governor decides to reverse the Board's parole decision, he must provide written decision specifying his reason. Cal. Penal Code Section 3041.2(b).

The Governor's decision reversing the Board's grant of parole to Petitioner is not supported by "some evidence," and therefore denied Petitioner due process of law. The Governor's decision satisfies due process only if "some evidence supports the decision[.]" Superintendent, Mass. Corr.Inst. v. Hill,472 U.S. 445, 455, 105 S.

Ct. 2768, 2774, 86 L.Ed2d 356 (1985); <u>Rosas v. Nielsen,</u> 428 F.3d 1229, 1232 (9th

Cir. 2005) (per curiam).  Although "[t]he 'some evidence' standard is minimally

stringent," <u>Powell v. Gomez,</u> 33 F.3d 39, 40 (9th Cir. 1994) (citation and internal

quotation marks omitted); <u>Hill,</u> 472 U.S. at 455-56, 105 S. Ct. at 2774, "the evidence

underlying the  Governor's decision must have some indicia of reliability."   <u>Biggs,</u>

334 F.3d at 915; <u>Rosas,</u> 428 F.3d at 1232.

In his decision reversing the Board's grant of parole to Petitioner, the

Governor gave several reasons for overturning the Board's decisions (1) "the first-

degree murder he perpetrated was especially heinous because of the cold and

calculated manner in which it was carried out"; (2) "not only was this a callous

crime, but Mr. Pertsoni put multiple people at risk of death or serious injury by firing

a gun three times inside of the occupied club and pointing the gun at the other

patrons, telling them not to move, before fleeing the scene"; 3) "regardless of

whether and to what amount Petitioner suffered, given the nature and circumstances

of the murder he committed, the existence of this factor does not now tip the scales

in favor or Mr. Pertsoni's parole suitability"; and (4) "that Mr .Pertsoni is either

unable or unwilling to fully grasp or fully accept responsibility for the nature and

magnitude of his actions." As explained in Ground one of this petition, The

Governor's continued reliance on the circumstances surrounding the murder to deny

**INSERT B**

Petitioner parole violates due process of laws. <u>Irons,</u> 358 F. Supp.2d at 947; <u>Scott,</u> 133 Cal.App.4th at 597-601; <u>see also</u> <u>Johnson,</u> 2006 WL 195159 at fn. 8 ("As recognized by the Board) the inhumanity of the murder will never change, it will not minimize in its shockingness over time. A later decision that the murder 'wasn't so bad' will never be made, and if it were, such a decision would be clearly arbitrary. Therefore, if the Governor's decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor with the power to resentence petitioner.

Furthermore, Mr. Pertsoni has an immigration hold. He signed his own waiver notarized dated 1/5/04 **Exhibit X,** never to return to the United States, to voluntary wish request to be deported back to Kosova immediately upon his release from the Department of Corrections. This waiver shows how sincere he is to return to his country because that's where his heart is. The immigration laws support his deportation.

For the foregoing reasons, the Court should grant the petition and order Petitioner's immediate release.

**FROM TRANSCRIPT**
**TESTIMONY OF MRS. SADIYE COLOMBO**
**JULY TRIAL 5/17/82, MONDAY AM**

Page 343
Line 1-22

Mrs. Colombo: And next day Ali Pertsoni one morning come in, says "I want a good-bye, and I can't ..." ---

Defense attorney: Let me stop you. Ali came to you and he wanted to say good-bye?

Mrs. Colombo: I told you "why you leave?" Because last time my husband told me you was, somebody you know tried to kill you?" He said "I don't want trouble. I got to leave."

Defense attorney: He said he wanted to leave.

Mrs. Colombo: That's right. He said, "I want no trouble, you know. I want to leave." I said, "where are you going?" He said, "I'm going to San Francisco,"and that is it.

Defense attorney: And did he tell you anything about the person?

Mrs. Colombo: No.

Defense attorney: Did he tell---

Mrs. Colombo: Just I asked that, I said "nationality". He told me Albanian. I don't know what for. I'm not asking, you know, because he's afraid, you know.

Defense attorney: Did he appear to be afraid?

Mrs. Colombo: Yes-He was afraid. He was good people, you know.



Exhibit A

Ali Pertsoni
C48947  L219
California Medical Facility
Post Office Box 2000
Vacaville, CA 95696

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**PEOPLE OF THE STATE CALIFORNIA,**

      Respondent,

vs.

**ALI PERTSONI,**

      Petitioner

<u>**AFFIDAVIT IN SUPPORT OF**</u>

<u>**FEDERAL HABEAS CORPUS RELIEF**</u>

I, Ejup Sulejamani, declare that I have a family and a resident of San Jose, California. I knew Fahri Repishti when he came from New York. Fahri Repishti told me that wanted to kill Ali Pertsoni. Why-I don't know. I also know Ali Pertsoni. Ali is a very nice person.

I declare under penalty of perjury that the above statement is true and correct.

DATE: 1-8-87

                                _Ejup Sulejamani_
                                     SIGNATURE

PLACE/ADDRESS:
EJUP SULEĞMANI
22390 DIERICK CT.
M. VIEW. #94040
                CA.

Exhibit B

00011

Ali Pertsoni
C48947  L219
California Medical Facility
Post Office Box 2000
Vacaville, CA 95696


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


PEOPLE OF THE STATE OF CALIFORNIA,

     Respondent,

vs.

ALI PERTSONI,

     Petitioner,

AFFIDAVIT IN SUPPORT OF

FEDERAL HABEAS CORPUS RELIEF


I, Shaban Xhani, declare that I know Ali Pertsoni.  Ali is
a very nice guy.  Ali always used to come at Greek-American
Club located at 161 Eddy Street, San Francisco, which is like
a second home to him.  His place of residence is near this club.
I knew the other man, Fahri Repishti, the victim, who came from
New York to San Francisco.  Fahri Repishti told me that he
wanted to kill Ali Pertsoni.

I declare under penalty of perjury that the above statement is true
and correct.

DATE: JAN 8, 1987

PLACE/ADDRESS:

    730 EDDY Street APt. 14
     SAN FRANCISCO, CA
         94102

XHANI SHABA

SIGNATURE

| ARREST NO. | SURNAME |
|---|---|
| 9937 | REPISHTI FAHRI SHERIF |

**PCT OF ARREST** 104

**ADDRESS (Include City & State)** 375 EIGHTH AVE NYC

**PHONE NO.**

| TIME OF ARREST | DATE OF ARREST | AGE | SEX | RACE | EYES |
|---|---|---|---|---|---|
| 1010 | 5/1/78 | 23 | M | W | BR |

**HEIGHT** 5 FT 6 IN.  **WEIGHT** 140  **HAIR** BR

**DATE OF BIRTH** 4/12/55

**PLACE OF BIRTH (City & State or Country)** ALBANIA

**CITIZEN** N/A

**DRUG USED (Type)** ONLY AM

**ADDICTION PROGRAM** N/A

**Serial Status** S

**CODE** 2

**FINGERPRINTED** XX YES  NO

**PHOTOGRAPHED** NOT REQ'D  FUTURE TIME  AT BORO

**ARRESTING/ASSIGNED OFFICER** CONIGILARO

**RANK** PO  **TAX REG. NO.** 6859  **SHIELD NO.** 6032  **COMMAND** 104

**ARREST MADE AS RESULT OF:** WARRANT XX  COMPLAINT  PICK/UP  COMP.  OTHER

**ARRESTED BY:** XX OFFICER  # BY OFFICER  ANTI CRIME  OFF DUTY  CIV CLOTHES

**VOUCHER NO'S** 325874  185531

**CMD** CBQ 104

**OCCUPATION** LABORER

**WHERE EMPLOYED** SEVEN-UP=  7-ELEVEN=  48th ST NYC

**LOCATION OF OCCURRENCE (following info. from Complaint Report Only)** 680 SENECA AVE. RIDGEWOOD

**SOC. SEC. NO.** 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 NONE

**DATE AND TIME OF OCCURRENCE** 5/1/78 1010

**TYPE OF PREMISES (Be Specific)** COFFEE SHOP

**AGENCY OF JURISDICTION CODE** NYPD  **PCT OF OCCUR** 104  **COMPLAINT NO.** 2887  **YEAR** 78

**LICENSES/PERMITS/IDENTIFICATION CARDS (Type and Serial Number)**

**COMPLAINANT'S NAME**

**AGE**

**ACC. NO.** N/A  **CMD.** N/A

**ADDED NO.** N/A

**COMPLAINANT'S RESIDENCE – BUSINESS** N/A

**PHONE NO'S**

**SCARS/MARKS, DEFORMITIES, SCARS, TATTOOS (Describe Fully & Give Location)** TATTOO HISCAMI RIGHT HAND

**COMPLAINANT'S ADDRESS**

**ADVISED OF CONSTITUTIONAL RIGHTS BY** A/O

**UNUSUAL M.O. AND/OR STATEMENTS USED**

**PRISONER'S TELEPHONE CALL (Time, Name and Number Called)** REFUSED

**ADDRESS VERIFIED BY** A/O

**PRISONER SEARCHED BY** A/O

| N/F NAME | HAND GUN INVOLVED (Type-Color) NONE | PRISONER'S AUTO (Color, Year, Make, Plate) NONE | ASSOCIATES (Name) | | ARREST NO. | B.NO/D.C.J.S. NO. |
|---|---|---|---|---|---|---|

XX REV  XX AUTO  XX SILVER  BLK.

**WARRANT CHECK (Name)** A/O  **ACTIVE WARRANT** YES  NO

**C DATE** NONE

**SPECIFIC OFFENSE/CHARGED**

**D/F POSS OF WEAPON 3**

**DEF. SOD. NOTIFIED**  **NAME**

| A | PL | SECTION 265.02/4 | CLASS. D4 |
|---|---|---|---|

1. 

2. 

3. 

**UNCARED FOR DEPENDENT ADULT/CHILD** A/O  **PCT.** N/A  **ADDED NO.** A/O

**MEMBER OF YOUTH GANG (Name)** N/A

**MOTHER'S MAIDEN NAME** N/A  **PRISONER'S MAIDEN NAME** N/A

**AMOUNT OF FUNDS** $10.00  **RETURNED** X YES  NO

**EXACT LOCATION OF ARREST** 680 EX SENECA AVE

**DATE SERIAL NO. – RETURN DATE**

**DETAILS**

DEF. WAS ARRESTED AT ABOVE LOCATION FOR POSSESSION OF A LOADED REVOVLER SER
#123426 HARRINGTON RICHARDSON ARMS CO NCIC CHECKED NEGATIVE RESULTS.

**SUPERVISOR CONFERRED WITH** LT. SERPICO  **204**  **PCT** 104

**ON SCENE** XX YES  NO

**PHYSICAL CONDITION** APPARENTLY  OTHER (Describe)  XX NORMAL

**DATE AND TIME RECORDED** 5/1/78  1313

**RANK** SGT

**TREATED AT**

**TIME – DISPOSITION OF PRISONER**

**TIME OUT – RETURNED**

**SIGNATURE OF DOCTOR**

**SIGNATURE OF DESK OFFICER** GALLAGHER

**ARREST REPORT – Sub. 2 for 136 (REV. 9/77)**
**300M-318090**

1. FORWARD TO: FAX UNIT → IDENT. SECT.

Exhibit C

Ex. A

'IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FOUR

PEOPLE OF THE STATE OF CALIFORNIA, )
                                )
     Plaintiff and Respondent, )   No. 1/A018123
                                )
   vs.                          )
                 **C 88**) **1025 RPP**
ALI PERTSONI,              )
                                )
     Defendant and Appellant. )
_____ )

### APPELLANT'S OPENING BRIEF

Appeal from the Judgment of the Superior
Court of the State of California for the
City and County of San Francisco

HONORABLE CLAUDE PERASSO, JUDGE

_____

JAMES LARSON
NINA WILDER
LARSON AND WEINBERG
396 Hayes Street, Suite Two
San Francisco, California  94102
Telephone:  (415) 431-3472

Attorneys for Appellant

Exhibit D

396 Hayes Street
San Francisco, California 94102
Telephone (415) 431-3472

Kosovo.   Repishti informed Appellant that he worked for this country and as a police agent for Yugoslavia (R.T. 203).   A couple of months before the charged incident, Appellant had a run-in with Repishti, in which Repishti threatened him, made suggestive remarks concerning Appellant's girlfriend, and slapped him in the face (R.T. 272-73, 299).   This encounter with Repishti caused Appellant to sometimes carry a gun out of fear (R.T. 273).

On the night of the incident, Appellant went to the Greek-American Club for the purpose of playing pinball, but was prevented from doing so because Repishti began walking toward him making a motion which Appellant interpreted as reaching for a gun (R.T. 308-4).   Mr. Pertsoni testified that he saw the handle of Repishti's weapon (R.T. 308-5).   Appellant became quite frightened and drew his own gun.   He remembered firing the first shot, but testified that he blacked out during the two additional shots (R.T. 308-6).

After the incident, Appellant threw away the gun, and contacted a fellow Albanian, Rook (Rocky) Coku, and asked to be taken to someone's house (R.T. 305, 308).   Rocky took Appellant to Jim Saiti's house, where arrangements were made for Appellant's surrender to the police (R.T. 306).

Appellant also testified to his experience during interrogation. According to Mr. Pertsoni, there was little to distinguish this interrogation from those he had endured in Yugoslavia.   He was brought to the interrogation room handcuffed, after not having slept or eaten for twenty-four hours.   The first thing he

-7-

ARREST NO 9937

SURNAME: REPISHTI FAHRI SHERIF   FIRST   MIDDLE

RESIDENCE CODE 2

PCT OF ARREST 104

ADDRESS (Include City & State) 375 EIGHTH AVE NYC

PHONE NO

APT NO 1

FINGERPRINTED: XX YES ☐ NO

D.N.O.

O.C.J.S. NO

STANDING NO

ARREST MADE AS RESULT OF:
☐ F.A.D. ☐ NAR DIV
XX C ☐ F.A.D.
☐ I.A.D. XX OTHER

TIME OF ARREST 1010

DATE OF ARREST 5/1/78

WEIGHT 140

HGHT 6    IN.

HAIR BR

DATE OF BIRTH 4/17/55

PLACE OF BIRTH (City & State or Country) ALBANIA

AGE 23

SEX M

RACE W

EYES BR

SKIN

BANK

FINGERPRINTED PHOTOGRAPHED

ARRESTING/ASSIGNED OFFICER PO CONTI GILARO

PHOTOGRAPHED ☐
N.C.I. ☐ FPO ☐
PRO'D ☐

FUTURE TIME ☐

ATJDOMO

ARRESTED BY:
XX OFFICER ☐ COMP. ☐ OTHER

DRUG USED (Type)

ADDICTION PROGRAM N/A

Segal Name

ALMXR AMXR

PAR REG. NO 68859

SHIELD NO 6112

COMMAND 104

# BY OFFICER:
☐ CRIM
XX COMPLAINT

# BY OFFICER:
☐ CRIM
☐ CIVIL

COMPLAINT
☐ OFF
☐ DUTY
☐ ON
☐ CLOTHES

OCCUPATION where Employed LABORER

SCHOOL SEVENTH-UP 48" ST NYC

CITIZEN

DATE AND TIME OF OCCURRENCE 5/1/78 1010

LOCATION OF OCCURRENCE 680 SENECA AVE RIDGEWOOD

TYPE OF PREMISES (Be Specific) COFFEE SHOP

VOUCHER NOS 325874 185531

C80 104

SOC SEC NO

LICENSES/PERMITS/IDENTIFICATION CARDS (Type and Serial Number)

AGENCY OF JURISDICTION LOCATION OF OCCUR NYPD

COMMAND NO 104

YEAR 2887

YEAR 78

ACC NO N/A

CMD N/A

PHONE NO. 5

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 R NONE

TATTOO—PHYSCIAL RIGHT HAND

SCARS, DEFORMITIES, SCARS, TATTOOS (Describe Fully & Give Location)

COMPLAINANT'S NAME

COMPLAINANT'S ADDRESS

AGE

ADJO NO.

ADVISED OF CONSTITUTIONAL RIGHTS BY

USED AUTO ASSOCIATE WAS USED

HAND GUN INVOLVED (Type, Color)
XX REV ☐ AUTO XX SILVER ☐ BLK

PRISONER'S AUTO (Color, Year, Make, Plate) NONE

PRISONER'S TELEPHONE CALL (Time, Name and Number Called)

ASSOCIATES (Name)

DEREFUSED

ARREST NO

D.AO./O.C.J.S NO

ADDRESS VERIFIED BY N/A

PRISONER SEARCHED BY N/A

TALC 265.024

GUSS 04

DESC OFFENSE CHARGED D/F POSS OF WEAPON S

SPEC OPERATION (Numbered Sign)

WARRANT CHECK (Name) A/O
☐ YES ☐ NO

ACTIVE WARRANT
☐ YES ☐ NO

DEF. SEED NOTIFIED A/O

NAME

DEF. WAS ARRESTED AT ABOVE LOCATION FOR POSSESSION OF A LOADED REVOLVER SER
#123426 HARRINGTON RICHARDSON ARMS CO NCIC CHECKED NEGATIVE RESULTS.

UNICARED FOR
OR INDIGENT
ADULT/CHILD (Name) N/A

PCT. N/A

ADJO NO

MEMBER OF YOUTH GANG (Name) N/A

MOTHER'S MAIDEN NAME N/A

PRISONER'S MAIDEN NAME N/A

WARRANT NO A/O
$10.00

AMOUNT OF FUNDS

ENTERED BY

EXACT LOCATION OF ARREST
680 BX SENECA AVE

DAT SERIAL NO – RETURN DATE

TIME – DISPOSITION OF PRISONER

1. FORWARD TO: FAX UNIT → IDENT. SECT.

DATE AND TIME RECORDED 5/1/78 1775 1313

RANK SGT

TREATED AT

TIME OUT – RETURNED

SIGNATURE GALLAGHER

ARREST REPORT PD244-141 (REV 8-72)
BOOK 318050

Exhibit E

ARREST NO. 8084

| | | |
|---|---|---|
| SURNAME | Repishti | FIRST Fahri | MIDDLE MIN |

PCT OF ARREST

ADDRESS (include City & State) 534 W. 47 St.

TIME OF ARREST 0315

DATE OF ARREST 4-12-77

PLACE OF BIRTH (City & State or Country) Albania

AGE 22   SEX M   RACE W

PHONE NO.   RES. PCT.   APT. NO.

HEIGHT 5 n 9 in.   WEIGHT 155   HAIR BRN   EYES BLN

SOCIAL STATUS S   ALIEN P.O.   CITIZEN

DRUG USED (Type) NONE   DAILY AMT.   ADDICTION PROGRAM

OCCUPATION AND WHERE EMPLOYED (Company and Address) NONE

SOC. SEC. NO. NONE

LICENSES/PERMITS/IDENTIFICATION CARDS (Type and Serial Number) NONE

PEDIGREE: DEFORMITIES, SCARS, TATTOOS (Describe Fully & Give Location) tattoo on right hand

SCAR ON UPPER PORTION OF STATEMENTS USED

CHARGES (Law, Section, Specific Offense, Class)

| | NICKNAME | | | |
|---|---|---|---|---|
| 1 | PL | 145.00 | Criminal Mischief | |
| 2 | PL | 240.25 | Harassment | |
| 3 | | | | |

DETAILS

Compl states T/P/O deft. did use a loud & abusive language which was directed toward him. Deft who was apparently intoxicated then hit his head against compl glass door causing same to crack. Deft had a laceration on his head & was removed to roosevelt hospital where he was given four stitches in his head by Dr. Fernow. Treated & released. ARRESTING OFFICER DID NOT WITNESS THE INCIDENT

NO DAM   NO ID

ASSOCIATES (Name)

COMPLAINANT'S NAME Sina Hudzma

COMPLAINANT'S ADDRESS 650 10th Ave

COMPLAINANT'S TELEPHONE CALL (Time, Name and Number Called) refused

DATE AND TIME OF OCCURRENCE 4-4-77 0310

LOCATION OF OCCURRENCE T/o 650 10th Ave

TYPE OF PREMISES Street

ARRESTING/ASSIGNED OFFICER Vincent G. Van Leuvan   RANK P.O.

TAX REG. NO. 867463   SHIELD NO. 29159   COMMAND MN

AGENCY OF RECORD — CODE   PCT OF OCCUR MN   COMPLAINT NO.

ADVISED OF CONSTITUTIONAL RIGHTS BY P.O Van Leuvon

ADDRESS VERIFIED BY

WARRANT CHECK (Name)

DEL. SQD. NOTIFIED

MOTHER'S MAIDEN NAME

TREATED AT Roosevelt   TIME IN 0400   TIME OUT — RETURNED 0510   DOCTOR Fernow

DAT SERIAL NO.— RETURN DATE

EXACT LOCATION OF ARREST f/o/ 650 10 ave

AMOUNT OF FUNDS F1.00

1.  FORWARD TO: FAX UNIT → IDENT. SECT.

SUPERVISOR COVERED WITH   CMD.

ON SCENE   YES   NO

PHYSICAL CONDITION   APPARENTLY NORMAL   OTHER (Describe) Intox & laceration on head

DATE AND TIME RECORDED 2-4-77   0730

SIGNATURE OF BOOKING SUPERVISOR

B. NO./D.C.J.S. NO.

ARREST REPORT—PD 244-140 (REV. 1/76)

REPISHTI, FAHRI

34 EAST 32 ST NYC, NY

NONE

DISHWASHER UNEMPLOYED

NONE

TATTOO ON LEFT WRIST ISLAM V.

ASSAULTED COMP WITH A KNIFE

S'ABAN

PL 220.10   01   C/F ASSAULT 1

PL 265.01   02   A/H POSS WEPN

3/9/70    8/22/55    23    M    W    BRO    ALBANIA

505  GREEN AVE ONDERDONK AVE ONS, NY

DET  JOHN O'HALLORAN

MORA, KALDARAS

GRO SENECA AVE RIDG-EWOOD, NY

REFUSED

31526

DEFT ARRESTED DID ASSAULT THE COMP AND CAUSED A SERIOUS PHYSICAL INJURY BY
STABBING THE COMP IN THE LUNG WITH A KNIFE WHICH WAS NOT RECOVERED.

1. FORWARD TO: FAX UNIT ⟶ DENT. SECT.'

PAA/GHP

Exhibit F

(EXTRACT FROM THE MINUTES)
(Judgment)

_OCQ-116 - 1600 - 411077 (71)_

At a Criminal Term of the Supreme
Court, held in and for Queens County at the Court House,
Kew Gardens, Queens County, N. Y., on the ...... 7th .. day
of .................. September 19 79

PRESENT:

Honorable  William C. Brennan ....................................................

Justice of the Supreme Court.

Indictment No.  567-79

THE PEOPLE OF THE STATE OF NEW YORK

vs.

Fahri Repishti

Defendant

Indicted for:  Assault 1st deg

Convicted: by guilty plea, ~~and on decision of the Court~~  7/11/79
            Assault 2nd de ;

Sentenced: 9/7/79  NYCC1  60 days as one condition of  5 year Probation
                   sentence.

Exhibit G

1/28/97.

61-23 Gates Ave
Ridgewood, NY.
11385

To whom it may concern,

    Please be advised that I have spoken on the telephone with Ms. Yuri Pertsoni and she has requested that I write a letter telling of the character of a deceased, Fahri Repishti.

    From personal experience, I can tell you that he was a vile, violent tempered, un-educated, ignorant coward. He came from behind and stabbed my husband with a kitchen knife. He was an Albanian man who needed to hurt others and to make others fear him to attain his "jollies."

    I do not know the man who killed Fahri Repishti, but I have to tell you that he needs to be thanked. I do not condone the death of any human being, far from it, but this was not a human being! His main goal in life was to hurt people and bring them suffering and pain.

    The documentation that you need for the stabbing of Boza Kaldaras may be obtained from the files of the

Exhibit H

Queen's D.A.'s office in N.Y. They only tell of the crime committed and the three months prison sentence that Repishti received, they tell nothing of the dispicable character of this animal.

I do not know the situation and circumstances that led to this homicide but I can tell you this — Fahri Repishti was a psycho, and I rest easier knowing that someone has taken him off the streets. It's too bad that the person who did society a favour has to suffer.

If you need further assistance and information, you have my address.

Sincerly.

Oravia Stefan

-324263-8A                    SAN FRANCISCO POLICE DEPARTMENT              ASSIGNED TO:
                                                                          SEXUAL ASSAULT

                                INITIAL INCIDENT REPORT

FCIBLE RAPE, BODILY FORCE                                    CODE: 02004

ME OF OCCURRENCE: WED 11/28/79 0800HRS          621-985 L
CATION OF OCCURRENCE: 20 6TH ST, APT: 304
CATION SENT TO: 50 7TH ST                    UNIT REPORTING: 3B13Z
STRICT OF OCCURRENCE: SOUTHERN               REPORTING AREA: 604
PE PREMISE: HOTEL ROOM

PORTED TO POLICE: WED 11/28/79 1030
PORTED TO BUREAU: WED 11/28/79 1030       REPORTED TO: DAMON/LT/1144    Spaa 1
TERED INTO COMP : THU 11/29/79 0202 (502) ENTERED    BY: SANFOR
  the Frank-Richy    White City - Au. - 826-4471     2622 - Saleo
CTIM-1(ALSO REPORTEE): RICHEY/DELORES/JENE   W/F   10/11/60
  RES. ADDRESS: PHOENIX OREGON                   RES. PHONE: 503-535-6201   CO
        R/PO BOX 541 - OTHER ADDRESSES 1917 OREGON ST, BERKELEY
48-1093(FRIEND'S HOUSE)
        VC FORM GIVEN BY #1004

SPECT-1(BOOKED): REPISHTI/FAHRI/SHERIF   W/M   04/12/55
   5'06"    150 LBS   HAIR: BLACK
RES. ADDRESS: 20 6TH ST #304
SOCSEC: 99606963
BOOKED AT: COUNTY JAIL NUMBER 1    BOOKING APPROVAL:WALWYN/SGT/1939
       SECTION VIOLATED: N/W 261
       MAROON PANTS, BROWN SHIRT, TATTOES ON TOP OF HANDS
       SOC SEC # SHOULD BE 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

TICLE-1(HELD FOR EVIDENCE): UNDERPANTS

TICLE-2(HELD FOR EVIDENCE): PAPER
        SHE UNDRESSED ON

                            NARRATIVE
   I MET THE R/V AT 50 7TH ST AND SHE RELATED THE FOLLOWING TO ME.  LAST
GHT (11/27/79) SHE WAS SITTING IN THE GREYHOUND DEPOT WAITING FOR A FRIEND.
E SUSPECT APPROACHED HER AND BEGAN TALKING WITH HER.  HE BOUGHT HER COFFEE
D STAYED WITH HERFOR SEVERAL HOURS, SEVERAL TIMES TELLING HER THAT HIS ROOM
S CLOSE BY AND SHE WAS WELCOME TO COME AND STAY.  SHE ALWAYS REFUSED AND
OUT 0500 HRS 11/28/79 HE LEFT AND WENT TO HIS ROOM.  HE DID LEAVE HER HIS
OM NUMBER AND ADDRESS AND TOLD HER TOCOME UP IF SHE WANTED.  ABOUT, 0700,
E VICTIM DECIDED THAT HER FRIEND WASN'T GOING TO SHOW UP AND THAT THE ONLY
Y SHE BE ABLE TO GET HOME WAS IF SHE STOLE SOME MONEY FROM THE SUSPECT.
TH THAT INTENT SHE WENT TO HIS ROOM AND WAS LET IN BY THE SUSPECT.    SHE
S FRIENDLY WITH HIM AND AT SOME POINT TOOK HIS WALLET AND PUT IT IN HER
CKET.  THE SUSPECT SAW HER THOUGH AND BECAME VERY ANGRY.  HE PUSHED HER ON
E BED AND STARTED YELLING AT HER.  SHE APOLOGIZED AND TOLD HIM SHE NEEDED
NEY TO GET HOME.  SHE TRIED TO LEAVE BUT THE SUSPECT PREVENTED HER BY
LDING HER ON THE BED.  HE BEGAN FONDLING HER, RUBBING HIS HANDS ON HER BODY.
  TOLD HIM SHE WAS PREGNANT AND HE CONTINUED AND PREVENTED HER FROM GETTING
F HE FINALLY MADE HER TAKE HERCLOTHES OFF AND HAD INTERCOURSE WITH HER.
E DIDN'T KNOW IF HE EJACULATED.  I ALONG WITH SGT MOORE WENT TO THE SUSPECTS
OM AND CONFRONTED HIM.  HE RELATED ESSENTIALLY THE SAME STORY AS ABOVE
CEPT HE DENIED ANY SEXUAL INTERCOURSE BECAUSE SHE TOLD HIM SHE WAS PREGNANT.

                                                          Exhibit I

HE ALSO TOLD US THAT S..X..O OF HIS WAS MISSING, ..L OUGH HE HAD IT WHEN
E WAS AT THE GREYHOUND DEPOT.        AT THIS POINT IN TIME DUE TO THE
ISCREPENCE IS IN THE STORIES AND THE REASON THE VICTIM WENT TO THE ROOM WE DID
OT ARREST BUT I.D.ED THE SUSPECT FOR FURTHER INVESTIGATION.  WE TRANSPORTED
Y VICTIM TO C.E.H. WHERE SHE WAS EXAMINED BY DR. BURKE.  HE LATED REPORTED
) .E THAT THE VICTIM HAD HAD INTERCOURSE IN THE LAST COUPLE OF HOURS AND SHE
.SO HAD ABRASIONS IN HER VAGINAL AREA WHICH HE BELIEVED WERE CAUSED BY FORCED
NTRY.  I CONTACTED LT. DAMON OF SEX CRIMES AND RELATED ALL OF THE ABOVE TO
IM.        WITH THE INFORMATION OF AN ACT OF INTERCOURSE ACTUALLY HAVING TAKEN
.ACE, AND THE STATMENTS BY THE SUSPECT THAT NONE OCCURRED, IT WAS DECIDED TO
RREST THE SUSPECT AT THIS TIME.           OFFICER MANELKE, SELBY AND I WENT BACK
) THE SUSPECTS ROOM AND TOOK HIM INTO CUSTODY.  THE VICTIM WAS TRANSPORTED TO
)1 6TH ST WHERE SHE WILL BE IN TEMPORARY RESIDENCE.  SHE WAS INSTRUCTED TO
)NTACT SEX CRIMES DETAIL IF SHE MOVES.  RAPE EXAMINATION FORMS ENCLOSED
'REPORT.  VICTIMS UNDERPANTS AND PAPER GOWN SHE CHANGED ON BOOKED EVIDENCE
)R I.D.  CC: VWAP/CRIME LAB.

EPORTING OFFICER(S): ALLEN/DALE/L/PTL/1004
)PROVED BY: WALHYN/SGT/1939 ASSIGNED BY: JACKSON/PTL/1134 11/29/79/0221

(PE CLEARANCE: ARREST, BOOKED

    END OF INCIDENT REPORT 79-324263-8A



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


PEOPLE OF THE STATE OF CALIFORNIA

       Respondent,

vs.

ALI PERTSONI,

       Petitioner

AFFIDAVIT IN SUPPORT OF

FEDERAL HABEAS CORPUS RELIEF


I, _Ahmad Rismanchi_, declare that I reside in
Fremont with my wife & my children, I
work at Citi Brokers as a realtor.

From 1976 Till 1981 I had a restaurant
T 1640 Broodway in Oakland, about late 1980
r Begining of 1981 one day I went to my
restaurant where my wife Samin Rismanchi
was running it By Herself, where I meet a
short Guy He looks Italian To my He introduced
Himself as Tony Repishti or Fahri Repishti
The way He was Talking I felt I cant Trust or
I cant like this guy and something was Botherr
my wife which it was Fear from This guy. But...
cont

I declare under penalty of perjury that the above statement is
true and correct.

DATE: 7-11-1988

PLACE/ADDRESS:  39650 Liberty St.
                 #100
                 Fremont, Cal 94538
                 Phone: 657-3000 (office)
                 Home phone: 797-9817

SIGNATURE

Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA
        Respondent,

VS.

ALI PERTSONI,
        Petitioner

**AFFIDAVIT IN SUPPORT OF**
**FEDERAL HABEAS CORPUS RELIEF**

I, *Ahmad RISMANCHI*, declare To asked Him about this Table she scared I went I asked Him To leave he start play he nice guy and Bought me Bear and apperantly he was going To my Restaurant every day from 7AM to 8-9 PM which Business close. and Flirting with my wife and this was going on for 30-40 day till next time I meet Him he offere me in Oak land you need a Gun he pulled out a small silver Gun for $100 I told Him no need, week after he called me he was Drunk he start says Bad wards and he mentioned he is coming To my office To kill me because he couldn't get to cost

I declare under penalty of perjury that the above statement is true and correct.

DATE:

_____
SIGNATURE

PLACE/ADDRESS:

2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


PEOPLE OF THE STATE OF CALIFORNIA

      Respondent,

vs.

ALI PERTSONI,

      Petitioner

AFFIDAVIT IN SUPPORT OF

FEDERAL HABEAS CORPUS RELIEF

I, _Ahmad Rismandi_ cent, declare The Restaurant after 7½ and my wife she was scared To death after 10 minutes she called me says Ahmad learn from your office. He is coming To Hurt you. But some how he got in the Restaurant by gun point he asked my wife To Take her clath off and rape Her and push her Down and gone, this problem never gone from my mind because of some problem we divorced. There is complet report of my wife at oakland police Dept you could used that.

I declare under penalty of perjury that the above statement is true and correct.

DATE: 7·11·1988

PLACE/ADDRESS:
39650 LiberTy sT
suite 100 FremonT
cal, 94538

_Ahmad Rismandi_
SIGNATURE

3

EXHIBIT B. pg 3

Case 3:08-cv-01181-MHP Document 22 Filed 12/08/2008 Page 1 of 16

FAHR  Kepishti

**CRIME REPORT**
Oakland Police Department

I

Exhibit K

PAGE I

Add'l Ch....
Ass...
Robbery
Assault w/ Intent to Commit Rape (220pc)
Oral Copulation    (288 pc)



ADDITIONAL INFORMATION REPORT — OAKLAND POLICE DEPARTMENT
80-31976

Rape (261.3 pc)
Rismachi, Sirin 60   27   2745  Winchester  Dr.  Hayward

COMPLETE ONLY THIS SECTION FOR VIOLATIONS OF THE CALIFORNIA VEHICLE CODE



Robbery _____ (211pc)
Assault w/Intent to Commit Rape (220pc)
Oral Copulation _____ (288apc)

D. Burke   7122 _____ Foskett  3/1

Rape (261.3pc) _____ 80-31970

Kisaguchi, Sumi FR. 27   2745 Winchester Dr. Hayward

Loss:
#1 Cash $1,500.⁰⁰ und demand _____ $1,500

On 18 April 80 at 1850 C/o [illegible] with LA [illegible]
who advised I/o of the follow[ing]

the Comp and her husband, Wit #1 are owners of
the Little Car Restaurant. Approx 4 months ago Sus
began coming in to the restaurant, [illegible]
approx [illegible] the [illegible]
that he [illegible]
her to deliver [illegible]
He began [illegible]
money [illegible]
children [illegible]
a matter [illegible] received all present
and that she would be involved [?].

Approx 1 Feb 1980 the Comp was leaving [illegible] she was
in the parking lot behind the Little Car Rest. when
Sus #1 approached her. The Sus pulled [illegible]
to be a .357 magnum from his waist band and forced
the Comp to drive to a hotel approx 2 blocks [illegible]
the Sus #1 forced the Comp to go [illegible] the Hotel
room. He then told the Comp to take off her
clothes or he would remove them for her. The [illegible]
slapped the Comp in the face, and pushed her down
onto the bed. He then removed the Comp's clothes
and underwear. The Sus #1 then forced the Comp
to have intercourse with him. The Comp believes th

D. Burke   7122 _____ Foskett

Rape (261...) _____ 80-31970

80-31976

Rape. (261.3 P.)                                19 Mar 80
Piragochi, Sione Fd. 27   2745 Winchester Oak Hw.

COMPLETE ONLY WHEN ARRESTING FOR VIOLATIONS OF THE CALIFORNIA VEHICLE CODE

Susp ejaculated inside her vagina. The victim
told the comp to put her clothing back on and
leave the hotel.

Upon 15 February 80, about 2000 the comp
was again leaving work, the Capri Car lot
where she was approached inside the parking lot by
Susp #1. The Susp #1 stated to the comp, "are
you going to do it by yourself or I am going to
tell your husband." The susp #1 then forced the
into the veh, and forced her to drive to a
parking lot on Webster St. There the Susp #1
pulled her gun, pointed it at [illegible] and
stated "this has six bullets, it will one be for
you." He then forced the comp to [illegible] [illegible]
hotel close by (Hotel per veh.) The Susp #1 then
removed all of his clothing and forced the comp
to oral copulate him. The Susp #1 ejaculated into
the comp's mouth. The Susp #1 then rubbed some
all over the comp's face. The Susp #1 then urinated
into a glass and poured it all over the comp's head
and face. The Susp #1 told the comp to get dressed
and leave. The comp dressed and left the hotel.
[illegible] the entire [illegible] the Susp #1 had [illegible] gun [illegible]
the [illegible]
comp [illegible]
stated [illegible]
The comp [illegible]
comp [illegible]
hotel. The Susp #1 continued to follow her out of
D. Buck  7122                     [illegible]

80-31976

Rape (261.3 P.)                                19 Dec 80
Piragochi, Sione Fd 27   2745 Winchester Oak Hw.

COMPLETE ONLY WHEN ARRESTING FOR VIOLATIONS OF THE CALIFORNIA VEHICLE CODE

[illegible] told her to [illegible]

III

PAGE 3



IV

ADDITIONAL INFORMATION REPORT          OAKLAND POLICE DEPARTMENT          80-31976

19 Apr 80

Bsgt. (2&3 pic)

Ciganovchi, Sima FD 27   2745 Winchester Dr. Hay

the time, told her to come out of the bathroom,
that he could easily shoot her through the door.
The lamp at this time exited the bathroom.
The Susp there began hitting the lamp in the
chest, breast + face area with his fists and told
her that he wanted all her money. The Susp
continued pointing the gun at the lamp
lamp gave the Susp #1 all the money she had
with her. Loss #1, $1500.00 ___

Appx. 5 months at 1430 the lamp ___
at her place of work, the Cali Casket ___
Susp #1 came into the enclosure and tell the Comp
that he wanted ___ money ___ pointed the gun at
the bed ___ ___ ___ ___ ___
then removed the gun from his waistband, pointed
it at the lamp and said, "I am going to kill you
unless I make" then he said, "go upstairs or I'll
kill you". The Susp #1 there pushed the Comp
up the stairs. The Susp there pushed the Comp
the lamp ___ ___ ___ ___ ___ ___
said ___ ___ ___ ___ ___ ___
all of her clothing. The Susp #1 began touching the
Comp's breasts with his hands. The Susp #1 ___
urinated into a glass, held the gun on the lamp
and told her if she didn't drink the urine, he would
shoot her. He forced the lamp to drink the urine.

D. Bush  7177₀          Foshatt

ADDITIONAL INFORMATION REPORT          OAKLAND POLICE DEPARTMENT          80-31976

19 Apr 80

Bsgt. (2&3 pic)

Ciganovchi, Sima FD 27   2745 Winchester Dr. Hay

PAGE 4

80-31976

Ⅴ

ADDITIONAL INFORMATION REPORT    OAKLAND P.D.    DEPARTMENT

_Kosf (267 PC)_                                    19 Rec RD

_Kisamachi, Somia FD 27    2745 Manchester Pl, Hay_

COMPLETE ONLY WHEN ARRESTEE FOR VIOLATIONS OF THE CALIFORNIA VEHICLE CODE

From 3 mar 80 to 5 April 80 the _Comp_ stayed
away from work because of the fright she felt
because of the experience she had with the Susp #1.
Susp #1 telephoned the _Comp_ everyday. The Susp #1
continued to threaten to shoot + kill the _Comp_, her
husband and their two children.

19 Apr 80 approx 1130 the Susp went into the _Comp_
Lin restaurant. The _Comp's_ husband told him to
leave. They had a verbal confrontation and after
approx 15 minutes the Susp #1 left the premises.
The Susp #1 telephoned the restaurant 3 times
this date and continued verbally _____ the threats
to both the _Comp_ + her husband. _____
Wit #1, _Comp's_ husband, that _____ she was
pregnant with his child, he didn't want the _Comp_
but that he does want the baby. At this time
the _Comp_ telephoned O.P.

Due to the threats from the Susp #1, the _Comp_
was too afraid to call the police. She is in
fear of her life and her family.

The Susp left a phone number with the _Comp_ +
her husband to call in case they need to telephone
him. The number is 776-6946 or 776-6946.

_D. Gosha    7170    Fosbokoll_

---

Page 5

ADDITIONAL INFORMATION REPORT    OAKLAND POLICE DEPARTMENT    80-31976

_Kosf (267 PC)_                                    19 Rec RD

_R. Smauchi, Somia FD 27    2745 Manchester Pl, Hay_

COMPLETE ONLY WHEN ARRESTEE FOR VIOLATIONS OF THE CALIFORNIA VEHICLE CODE

The _Comp_ was afraid _____
which left the _Comp_ _____



R. Bunk  7177p  Foshel

VII

**FOLLOW-UP INVESTIGATION REPORT**
**OAKLAND POLICE DEPARTMENT**    7 May 80    80-31976

HISANCHI, Siain

Tape 261FC
notel    sexual gratification    19 Apr 80

#1 RAPISHITI Fahri    MO    /12Apr 55    AXX 198

#2

| Date | |
|---|---|
| 21 Apr | Contacted complainant by telephone. She appears very nervious and confirms the information in the police report. She states she does not wish to testify or to have him arrested, only to leave her alone. She states the only sexual contact she had with the susp. were those listed in the report. |
| | Called telephone numbers listed in the r  rt as possibly belonging to the susp. Unknown at the first, and  e second is a restaurant where he is known and comes in fairly r  larly. They will try to contact him and have him contact investigators. Used computer and susp. appears to be the above susp. Complainant looked on name charge slips and came up with the date of the 26 Mar. that she saw the susp. and he was arrested. This is the same as listed on the CORPUS. |
| 22 Apr. | Complainant called. She states her husband received a call from the susp. and he is asking about their calling the police. Susp. stated he was going to call the police to report what is happening. Complainant could not recall the name or location of the hotel. |
| 22 Sept | 1415 suspect telephoned twice and consented to be in investigators office 1400. He states she had come to his hotel room in Oakland numerious ti es, every day, and they had intercourse almost every day. He offered to show the investigators the hotels and prove she was there. Susp. came into the investigators office and gave a written statement. He showed an old imigration card for I.D. |
| | He states the complainant is pregnant by him, wanted him to marry her, but he refused and now she is willing her accusing him being raped and forced to give him money, when she was willing partner and willingly gave him money. |
| | Susp. took Sgt.Klwett to the Travlers Hotel where the desk clerk, Mr. Clay, recognized him and indedated he had a girl, but could not describe her or recognize her. Also talked to hotel manager Mr. Laryck, he also recognized suspect, but did not remember who any woman would be with him. The hotel also showed several telephone |

**DISPOSITIONS**

☐ 01 Arrest and Prosecution
☐ 03 Comp. Release to Prosecution
☑ 05 Complaint Refused by D.A.
☐ 06 Pros. for Another Offense
☐ 12 D.A. Cannon
☐ 03 Unfounded
☐ 08 Pros. By Outside Department

☐ 02 Occurred in Other Jurisd.
☐ 09 Turned Over to Military Auth.
☐ 07 Death of Offender
☐ 14 Located or Returned Home

**JUVENILE DISPOSITION ONLY**

☐ 11 Remand over to Juvenile Authority
☐ 15 Juvenile Court Citation
☐ 09 Reprimanded and Released
☐ 16 Notice to Appear

Page 9



Mr. Larack, he also recogni... ...but did not remember who
any woman would be with him. ...hotel also showed several telephone

also talked to hotel manager

JUVENILE DISPOSITION ONLY

☐ 01 Arrest and Prosecuted
☐ 03 Comp. Refuses to Prosecute
☐ 06 Complaint Refused by D.A.
☐ 04 Pros. for Another Offense
☐ 12 D.A. Citation
☐ CR Unfounded
☐ 06 Pros. By Outside Department

☐ 80 Observed in Other Jurisd.
☐ 09 Turned Over to Military Auth.
☐ 14 Located or Returned Home

☐ 11 Turned over to Juvenile Authority
☐ 13 Juvenile Court Citation
☐ 16 Reprimanded and Released
☐ 14 Notice to Appear

---

Oakland Police Department — CONTINUATION SHEET

| MISANCHI, Simin | RAPISHTI, Fahri | PAGE 2 | 80-31976 |

calls from the room. He was at the hotel April 9th to 11, and was in the
hotel on other occasions. Tel. Cals were short(15-20s) to 874-55017,
782-0795.

Went to Torain Hotel,832-2100 at 16th and Clay. Talked to clerk Simon Pay.
He also stated the suspl had been in the hotel numerous times, but they
have sent all of their registration cards to their accountant. He also could
not remember what the sus. girl friend ...if any...looked like ... ...
seeing a woman and talks to her, but can't remember her ...

Inter Office letter sent to OfficerBurks, Denise with a picture of the susp.
and incouraging her to re- contact the compl. if she has an opportuity.

25 Apr 0800 Susp. telephoned. States he is going to N.Y. promises not to
contact the complainant, not to go to her business, not to call her. He now
states he made long telephone calls to the compl... ...from the Semins
hotel in S.F.  861-8170, from room 623. At that he ... ...e used the name of
O.Baker. He also states he stayed in room 406 in ... ...Travelers Hotel in Oak.

The complainant telephoned investigator 22 April 1...5. She was questioned about
the possible information she had been going to the susp. hotel room
numerous times. She related she and her husband, and her sisters had also
gone with the susp. to the hotel to have the clerks look at her, and they could
not recognize her. She ...
only wanted the sus...
(after leaving t... ...
...would be availabl...

26 April. Complainant telephoned. She had been expecting the investigator Fri.
at the Cabel Car resturant. She again gave assurance she was not expecting, they
had not been I.D by the desk clerks. She does acknowledge the she had
received long teleph ne calls at her home from the susp. She states her
sister was usually there and she would talk to his because he would call
back if she didn't. She again stated she ...wanted him to leave her alone,
and did not want to go to court. She was ...ly instructed to call the
investigator, or the police, if he comes to the resturant and refuses to
leave, or viol tes any law. She was also instructed not to engage in any
further tele hone conversations with him. She indecates she understands,
and will contact the investigator if there are any further problems.
She states the s.sp. has previously stated he was moving for N.Y., Boston,
and other cities.

6 May 1980. Received telephone call from susp. Stated he was calling from ...
No confirmation. Warned about not contacting compl.



jail after I kill you."
April 1980 about 1130 a.m. the man came into the restaurant. My husband told him to get out. He refused to leave until after about 15 minutes he went out of the...

---

80-31976

Oakland Police Department
STATEMENT

Kimanchi, Simia Akhlaa

Kimanchi, Simia E.D. 156153   2745 Winchester Dr. 111-037

Cable Car Rest. 1648 Broadway 763-M78

My husband and I are owners of the Cable Car Restaurant...

...38 to 28 years old, 5 feet about 160 pounds, heavy with blk hair and brown eyes, medium complexion, he would come... dark... just looked... like an older customer. They he started to come into the Restaurant everyday. He used to talk about just everyday things, three about after... he started telling me he loved me and wanted to marry me. He told me I should divorce my husband and go away with him. He would repeat this over and over. He said if I didn't go with him, he would kill my husband and my 2 children. He said he would shoot them. He would just kill everybody. He would pull out his... and put his hand on the gun and say "This is... this is about I'm going to kill them with." He repeated this over and over every day. He also told me that he was a member of the mafia. He said he has... killed eleven people, two in New York and...

---

80-31976

Oakland Police Department

Kimanchi, Simia

Kimanchi, Simia E.D. 156153   2745 Winchester Dr.

Cable Car Rest. 1648 Broadway...

---

Page 9



XI



Oakland Police Department

Name of Complainant or Defendant: Kimochi, Simon          80-31076

Kimochi, Simon  P.O. 156257   2745 Kimberly Dr   Hayward  CA 581-0217

Cable Car Rest. 1640 Broadway  763-1423  Owner

D. Bush   717p   Agent Dir   1400   2600

at 1640 Broadway

... to the place. He had a woman call and he
He again kept threatening me and my family stating that
he would shoot them. He tell me  he didn't
been here for 2 weeks that he was the subject
dollars if I used to my husbands business or took
City. I went there and there was no one
think he followed me from the business to McDonalds
Hamburgers in Union City. He tell me he wanted to
talk to me and give me the money back. He forced me
to go to Round Table Pizza. He started wising tables
and chairs and glass around the restaurant and no one
did anything. He said, he was going to kill all
American Boys. I asked an employee to call the
police. The police then took him to jail. He said
"I was in jail 2 days for you I will be no years
jail after I kill you." This morning, today
April 1980 about 1130 am, the man came into the
restaurant, my husband tell him to get out. He refused
to leave until after about 15 minutes he left...

Kimochi, Simon Akhlan          80-31076

Oakland Police Department

Kimochi, Simon  P.O. 156257   2745 Kimberly Dr   Hayward  CA 581-0217

Cable Car Rest. 1640 Broadway  763-1423  Owner

D. Bush   717p   1400   2600



I never told my husband. Now the second time he was me was approximately February 15, 1980 about Six P.m. I was leaving with, I went to the parking lot behind the table car. The man, Tony, came up to me and said "You are going to do it by yourself or Tony or myself ..."

XII.

STATEMENT — Oakland Police Department

NAME OF COMPLAINANT OR DEFENDANT: RAPISHTI, PAHRI
80-37976
ADDRESS: 3845½ Oroual st #10
ISLAM, U.    age 12-68

STATEMENT TAKEN BY: Sgt. W. Kanes.

I first met Sing at de Uchil City Restaurant ...

seen ...

was a ...

me at ...

many time sim would call in, was
call sh back in Hayward. I would call to back
at his home so the would be no long distance
telephone calls to ...

The manager of the hotel knew how much
I called Hayward because many time I calls
from my room and it was on my bill. I
also would get 30-40 watt a glister
from him to make telephone calls. We would
talk 4 or 5 hours. Some time 1:00 to 6:00 P.m.

On the 10 Mar. 1980 "he tell" me he was
married, had two children and wanted to leave his
I did not want to marry her.

During the time between 13 February and the —

80-37976
Oakland Police Department

PAge 12

XIII

page 13

(I) called Hayward [illegible] many times collect from my room and it was on my bill. I also would get 30-40 worth of quarters from him to make telephone calls. We would talk 4 or 5 hours. Sometime 1:00 to 6:00 PM.

On the 10 Mar 1980 Fola told me she was married, had two children and wanted to [illegible] (husband) I didn't want to marry her.

During the time between [illegible]

---

1. Name of complainant or defendant | 80-51416 | Statement — Oakland Police Department

Name of person giving statement: RAPISATI, FAHRI
AKA ISLAMI-A

Statement taken by: [illegible] 6006 [illegible]

At: 455-7th St. In presence of: [illegible]

For vehicle collisions only

Vehicle year | Make | Model | Type | Color | License No. | State | Operator's I.D.

Registered owner | Address | City | Tel. or bus. phone

Admonition: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer one will be appointed to represent you before any questioning, if you wish one.

Signed: [illegible] 1 [illegible]

Do you understand each of these rights I have explained to you?

Having these rights in mind, do you wish to talk to us now?

Statement: don't have [illegible] with [illegible]

She told me [illegible] pregnant and it was my baby. That's when she was saying she wanted to leave her husband and marry me.

She separated from her husband about 2½ years ago. She had even paid a lawyer for a divorce.

X Fahri Rapisati

Read to him and each word pronounced to him. He gave assurance he understood all of it and no questions correction, [illegible] all three.

**IDENT REPORT FORM**                                        SAN FRANCISCO POLICE DEPARTMEN

| REPT NO. 801548615 | ☑ INITIAL ☐ SUPPLEMENTARY | ☑ BOOKED ☐ CITED | SURVEY  A B C D | STATEMENT TAKEN? YES ___ NO | ASSIGNED (RECORD ROOM USE ONLY) |
|---|---|---|---|---|---|

| E OF INCIDENT | M.O. CODE | UNIT PTS | DATE(S) & TIME(S) OF OCCURRENCE |
|---|---|---|---|
| 24 = IN PUBLIC / RESISTING ARREST | 3A4 | 05-29-80 | 0045 HRS |

| DATE & TIME REPORTED TO POLICE 5-29-80  0059 HRS | DATE & TIME REPORTED TO BUREAU / OP CTR | NAME & STAR RPTD TO |
|---|---|---|

| LOTION OF OCCURRENCE BROADWAY / KEARNY | LOCATION SENT TO SAME | TYPE OF PREMISE PUBLIC STREETS |
|---|---|---|

| RPTING OFFICER QUAN, TIM 1684 | STAR | REPORT APPROVED BY | STAR 1513 | HOW CLEARED (RECORD ROOM USE ONL |
|---|---|---|---|---|

VIM CODES: V - VICTIM, R - REPORTEE; W - WITNESS; P - PARENT; N - NOTIFY; F - FOUND; M - MISSING

| RE NAME (LAST, FIRST, MIDDLE) MADRID, LEONARD J. #1900 | RACE W N I C J OTHER UNK | SEX M | DOB OR AGE | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|---|
| RESIDENCE ADDRESS | BUSINESS ADDRESS | | | VICTIM OF CRIME NOTIFICA YES NO STAR: |

HER INFORMATION / MISSING PERSON INFORMATION
S.F.P.O. - POLICE OFFICER

| DE NAME (LAST, FIRST, MIDDLE) | RACE W N I C J OTHER UNK | SEX | DOB OR AGE | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|---|
| RESIDENCE ADDRESS | BUSINESS ADDRESS | | | VICTIM OF CRIME NOTIFICA YES NO STAR: |

HER INFORMATION / MISSING PERSON INFORMATION

PECT CODES: A - ADMONISHED; B - BOOKED; C - CITED; D - DETAINED; E - EXONERATED; S - SUSPECT; X - DIVERTED

| DE NAME (LAST, FIRST, MIDDLE) REPISHTI, TONY F. | RACE W N I C J OTHER UNK | SEX M | DOB OR AGE | ALIAS |
|---|---|---|---|---|

| GHT 5'8" | WEIGHT 155 | HAIR COLOR BLK DLN BRO GRY SANDY RED BALD YMI UNK | EYE COLOR BLK BLU 6RO GRY GRN HAZ. MIXED UNK | ADDRESS |
|---|---|---|---|---|

| #7 CITATION # | BOOK/CITE SECTION 647 PC.-DRUNK  148 PC.-RESISTING |
|---|---|

| ERE BOOKED CO.A | BOOK/CITE APPROVED BY | STAR 1513 | I.S. F (SOC. SEC.; OP. LIC.; ARMY SER. #; ETC.) |
|---|---|---|---|

EN A WHERE CITED TO APPEAR/ OTHER INFORMATION / ADDITIONAL DESCRIPTION OF SUSPECT
WHITE SHIRT, BROWN SPORTS JACKET, BROWN PANTS, TAN SHOES

ICLE CODES. F - USED FELONY; U - USED OTHER; S - STOLEN; R - RECOVERED; B - BOOSTED; D - STRIPPED; T - TOWED; P - STOLEN PLATES. L - LC

| E LICENSE PLATE NO. | STATE | YEAR | TYPE | VIN | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|---|---|---|---|

| DITION WHEN RECOVERED: 1 APPARENTLY DRIVEABLE 2 ENGINE & TRANSMISSION MISSING ENGINE MISSING 4 TRANSMISSION MISSING 5 BURIED 6 WRECKED 7 OTHER STRIPPED | PLATES MISSING 1  2  NONE | TOW CHECK (NAME) | WAIV SIGN YES |
|---|---|---|---|

ER INFORMATION

PERTY CONDITION CODES: S - STOLEN; R - RECOVERED; L - LOST; E - EVIDENCE; F - FOUND; P - PROPERTY FOR SAFEKEEPING; D - DAMAGE

| C PROPERTY DESCRIPTION | VALUE |
|---|---|
| E PROPERTY DESCRIPTION  13590  3A00  RR05  ch. 2010 | VALUE |
| E PROPERTY DESCRIPTION  27170  RR04 | VALUE |
| Y PROPERTY DESCRIPTION | VALUE |

W INCLUDE ADDITIONAL VICTIMS, SUSPECTS, VEHICLES AND/OR PROPERTY BEFORE BEGINNING NARRATIVE.

OFF. WM #1431 AND I RESPONDED TO A CALL
MEET AN OFFICER AT BROADWAY AND KEARNY. UPON
R ARRIVAL, WE OBSERVED B-REPISHTI HANDCUFFED, OFF DUT
ICE OFFICER MADRID WAS HOLDING REPISHTI's ARM, AN

Exhibit L

CIDENT REPORT FORM CONTINUATION                    SAN FRANCISCO POLICE DEPARTMENT

| NO. 8001548615 | REPORTING OFFICER QUINN, TIM | 1684 | DATE & TIME OF OCCURRENCE 04-29-80 0045 HRS. |

EPISHTI IN A HEAD LOCK. REPISHTI WAS YELLING AND
POSSIBLY TURNING HIS BODY IN AN ATTEMPT TO BREAK-
FREE. I APPROACHED P. EPISHTI AND HELD HIM IN AN
ATTEMPT TO SEARCH HIM AND PUT HIM INTO THE PATROL
VEH. AT THIS TIME, REPISHTI RAMMED ME WITH
HIS BODY AND CAUSED BOTH OF US TO FALL TO THE
GROUND. REPISHTI WAS FINALLY PLACED INTO THE
PATROL VEH. AFTER A BRIEF STRUGGLE AND TRANSPORTED
TO CO. A. AT THE BOOKING COUNTER, REPISHTI CONTINUED
YELLING, STRUGGLING, AND WAS UNCOOPERATIVE. OFF. WM. AND I
HAD TO PHYSICALLY RESTRAIN REPISHTI. IN ORDER TO BOOK HIM AND PLACE
HIM INTO THE HOLDING CELL. AT THIS TIME, I
NOTICED THAT, REPISHTI WAS UNSTEADY ON HIS FEET,
HIS SPEECH WAS RAMBLING, HIS EYES WERE BLOODSHOT-
EN. HE HAD A STRONG ALCOHOLIC BREATH. OFF. MADRID
1900 TOLD ME THAT REPISHTI WAS DRUNK IN PUBLIC
E YELLED, AND CHALLENGED PEOPLE ON THE STREET TO A
FIST FIGHT. I RECEIVED MINOR ABRASIONS FROM THE,
FALL TO THE GROUND AND I RECEIVED MEDICAL
ATTENTION FROM 1H83, STEWARD DUTTON, AT CO. A.
Cc. legal, AIA

PAGE 2 OF 2        ICSS ENTRY BY:

INCIDENT REPORT FORM                    MAY 32   13 01 '01          SAN FRANCISCO POLICE DEPARTMENT

INITIAL ☐ SUPPLEMENTARY    ☒ BOOKED  SURVEY          STATEMENT TAKEN  ASSIGNED (RECORD ROOM USE ONLY)
TYPE OF INCIDENT  WARRANT              ☐ CITED   A B C D    YES ☐ NO ☒
(IRRITATING AGENT IN PUBLIC PLACE)    M.O. CODE  UNIT RPTG  DATE(S) & TIME(S) OF OCCURRENCE
REPORTED TO POLICE                              3E12   06-01-81   0100 - 0130
06-01-81   0137                DATE & TIME REPORTED TO BUREAU OR CTR
LOCATION OF OCCURRENCE  700 GEARY          06-01-81   2215
RPTG OFFICER  XX WILKIE       STAR  LOCATION SENT TO  700 GEARY    NAME & STAR RPTD TO  JASON  1826
COPIES  V - VICTIM, R - REPORTEE;  7/123   REPORT APPROVED BY  Sgt. X. Price   STAR  TYPE OF PREMISE  BAR
W - WITNESS, P - PARENT; N - NOTIFY; F - FOUND, M - MISSING          HOW CLEARED (RECORD ROOM USE ONLY)
NAME (LAST, FIRST, MIDDLE)
V  TEKAKIS, GUS
RES. ADDRESS  874 PINE  #3      RACE ☒W ☐N ☐I ☐C ☐J OTHER UNK  SEX M  DOB OR AGE 10-30-53  RES. PHONE 673-1498  BUS. PHONE 771-9866
INFORMATION / MISSING PERSON INFORMATION  BUSINESS ADDRESS  700 GEARY       VICTIM OF CRIME NOTIFICATION ☒YES ☐NO  STAR: 2123
NAME (LAST, FIRST, MIDDLE)  PASSENGER AT HOB NOB BAR
W  MONTOYA, DANNY
RES. ADDRESS  56 O'FARRELL #402  RACE ☒W ☐N ☐I ☐C ☐J OTHER UNK  SEX M  DOB OR AGE 09-28-46  RES. PHONE 771-8292  BUS. PHONE 861-7829
INFORMATION / MISSING PERSON INFORMATION  BUSINESS ADDRESS  32 - 9TH ST.    VICTIM OF CRIME NOTIFICATION ☒YES ☐NO  STAR: 2123

CODES: A - ADMONISHED; B - BOOKED; C - CITED; D - DETAINED; E - EXONERATED; S - SUSPECT; X - DIVERTED
NAME (LAST, FIRST, MIDDLE)
EPIEMTI, FAHRI SHERIF        RACE ☒W ☐N ☐I ☐C ☐J OTHER UNK  SEX M  DOB OR AGE 04-12-55  ALIAS TONY SHABANI
HEIGHT 150  HAIR COLOR BLK BLN ☒BRO GRAY SANDY RED BALD WHT PNK  EYE COLOR BLK BLU ☒BRO GRY GRN HAZ MIXED  ADDRESS
HABITATION 5/2
ACTION F (G38459 & G36459A-YW 37754 PC, 12420 PC  WARRANT (INXE6.)  AS PC. 647f PC
ARRESTED (I) / APPEARED  STAR  I.D. # (SOC. SEC; UP. LIC; ARMY SER #; ETC)  51-F 355 036
OTHER INFORMATION / ADDITIONAL DESCRIPTION OF SUSPECT
TAN BLAZER - PANTS SUIT, WHITE SHIRT, LONG BLK TRENCH COAT
CODES: F - USED FELONY; U - USED OTHER; S - STOLEN; R - RECOVERED; B - BOOSTED; D - STRIPPED; T - TOWED, P - STOLEN PLATES; L - LOST
PLATE NO.  STATE  YEAR  TYPE  VIN
CONDITION RECOVERED: 1 APPARENTLY DRIVEABLE 2 ENGINE & TRANSMISSION MISSING  YEAR  MAKE  MODEL  STYLE  COLOR
3 ENGINE MISSING 4 TRANSMISSION MISSING 5 BURNED 6 WRECKED 7 OTHER STRIPPED  PLATES MISSING 1 2 NONE  TOW CHECK (NAME)  WAIVER SIGNED YES NO
CONDITION CODES: S - STOLEN; R - RECOVERED; L - LOST; E - EVIDENCE; F - FOUND; P - PROPERTY FOR SAFEKEEPING; D - DAMAGE
DESCRIPTION  BLACK CAN LABELLED "PARALYZER - CS TEAR GAS -
DESCRIPTION  CHEMICAL DEFENSE WEAPON"  MODEL # W207      VALUE
DESCRIPTION  SG200   M/041        $4433.11  VALUE
ADDITIONAL VICTIMS, SUSPECTS, VEHICLES AND/OR PROPERTY BEFORE BEGINNING NARRATIVE.  1213¢  VALUE
PLATES (CONT.) CODE W3 SCOTT ED  WM 12-30-34
#9, 771-9866, 666 POST #202, 700 GEARY, VICTIM OF
NOTIFICATION YES 2123, OWNER OF HOB NOB BAR

Exhibit M

INCIDENT REPORT FORM CONTINUATION                    SAN FRANCISCO POLICE DEPARTMENT

| INCIDENT NO. | REPORTING OFFICER | STAR | DATE & TIME(S) OF OCCURRENCE |
|---|---|---|---|
| 011141143 | SMITH | 2125 | 06-01-51  0100 - 0130 |

NARRATIVE: (R1) GEKAKIS STATED TO ME THAT (V1) MONTOYA, (V2) SCOTT AND (S1) REPISHTI WERE SITTING AT THE BAR AND HIM BEING GEKAKIS ASKED REPISHTI TO LEAVE THE BAR BECAUSE HE HAD TOO MUCH TO DRINK. REPISHTI BECAME UPSET AND REFUSED TO LEAVE. GEKAKIS ASKED HIM TO LEAVE SEVERAL MORE TIMES. REPISHTI STOOD UP AND GRABBED AN ASHTRAY LIKE HE WAS GOING TO THROW IT AND THEN HE SET THE ASHTRAY DOWN. REPISHTI THEN STEPPED BACK AWAY FROM THE BAR, REACHED INTO HIS RIGHT COAT POCKET AND TOOK OUT A BLACK CAN, ITEM #1. HE THEN SPRAYED IT IN THE DIRECTION OF GEKAKIS MONTOYA AND SCOTT. MONTOYA WAS HIT IN THE FACE WITH THE CHEMICAL AGENT. GEKAKIS CALLED THE POLICE AND GAVE A DESCRIPTION OF A W/M WEARING LONG BLACK TRENCH COAT. OFFICER NESTOR AND I ARRIVED AT THE SCENE AND OBSERVED W/M MATCHING THE INITIAL DESCRIPTION STANDING IN FRONT OF THE BAR. THE SUSPECT SAW US AND STARTED WALKING WEST ON GEARY. SUSPECT WAS OUT OF SIGHT APPROX. SECONDS. SUSPECT WALKED AROUND THE GARBAGE CANS AND STEPPED OFF THE CURB AND FELL TO THE GROUND. NESTOR AND I DETAINED HIM. GEKAKIS POSITIVELY IDENTIFIED SUSPECT. OF. NESTOR FOUND A BLACK SPRAY CAN ON THE GROUND NEXT TO THE GARBAGE CANS. NESTOR AND I DID NOT OBSERVE ANYONE ELSE WALK IN THAT AREA EXCEPT REPISHTI. GEKAKIS MONTOYA AND SCOTT SAID THE CAN LOOKED LIKE THE ONE REPISHTI USED. REPISHTI DID NOT HAVE ANY CHEMICAL AGENT PERMIT. REQUEST FOR LABORATORY EXAMINATION FIVE FINGERPRINTS TO COMPARE WITH SUSPECT WAS SUBMITTED WITH FINGERPRINTS. ARRESTEE ALSO BOOKED ON MURDER WARRANT.

PAGE  2  OF  2

| | ICSS ENTRY BY: |
|---|---|

## TESTIMONY OF JIM SAITI

A-Jim Saiti     Q-Defense Attorney

---------------------------------------------------------------

Q-do you also --or did you know a person by the name of Fahri Repishti:

A-yes sir. I saw him twice.

Q-Okay, and are you familiar with Mr. Repishti's reputation in the Albanian community for the character trait of violence?

A:yes sir.

Pages 308-72 and 308-73
Q-okay, now, was there an incident where you were in a fight with Mr. Repishti?

A- second time. Yes sir.

Q-How long -- the fight that involved you how long ago was that? Do you remember?

A-I don't remember. Three weeks after the first fight, first fight he had at Gold Mirror. Three weeks later, it was a same day Sunday. He started fighting with another  customer. He came on our side. So he know me before. I was Albanian too. He said to me, he came, "what is your bar? Give me address" and I said "I don't have address" Then he started fighting with another customer, something right cross, because he was cursing. So we jump up,and we push each other around, and he said --

Q-Let me stop you. This  was a pushing type of thing?

A-Yes. Pushing thing.

Q-Okay then what happened?

A-later on he sat on other side. I sat in corner of bar. Somebody called the police or somthing. The police came to talk to Mike, the owner.

Page 308-74
Q-let me ask you this. Do you remember any incidents involving a knife.

A-No that is later on after the police came and he sat in the corner. I want to leave after 20 minutes or 30 minutes later. I went to leave front door. I guess he run to kitchen, so the cook told another guy, this Albanian Jack, told me he's got a big knife. He said "Jim watch out. He has a knife." So I turned and a customer  from the restaurant he got up, he grabbed like this - he shook him and the knife fell down.

Q-at that time when you turned around was Mr. Repishti coming in your direction holding a knife?

A-Yes sir. Before happening in street, but he didn't hit me that night?

Exhibit N

**STATE COURT TRIAL MAY 10, 1982**
**PAGE 308-49**

### TESTIMONY OF JACK SEDIE

A-Jack Sedie      Q-Defense attorney

------------------------------------------------------------------------------------------------------

Q---with Mr. Repishti or any knowledge that you may have obtained about Mr. Repishti, did you ever during the period of time that you knew him ever know him to have a job?

A-no sir.

Q-Now are you familiar with Mr. Repishti's reputation in the Albanian community with regard to violence.

A-Yes, sir.

Q-and what was his reputation in the Albanian community with regard to the character trait of violence?

A-the worse human kind can have!

Q-are you saying that his reputation was that he was a very violent personality?

A-violent, you name it.

**Page 308-50 and 308-51**
Q-and have you even seen of your knowledge any specific instances where Mr. Repishti fought?

A-yes sir, I seen him three different occasions. At the Gold Mirror Restaurant and he came in. He started to fight with another Albanian guy.

Q-was it a fist fight or something"

A-fist fight and anything they can get their hands. And then one of the guys, of of the chefs, he called me. He said in the kitchen he said he got a knife.

Q-now did you actually see Mr. Repishti with a knife?

A-yes sir. I saw him.

Q-Okay.

A-then I jumped. We have a little window, kind of square window, doesn't have any glass, just kind of just a square where we get the groceries in. So I jumped through that square and I screamed at Jim. I "watch out" I said "he got a knife," and then while I'm saying that one American guy grabbed Mr. Repishti, put both of his arms around his hand like this and told him "drop it." He wouldn't drop it. Well I told him to drop the knife now and he wouldn't drop the knife. He was "screaming, "I'm going to do this" and you know. And then this guy kind of pull him aside and bumping his hand against the wall. At that time he dropped the knife.

Q- when he was running with the knife, was he running toward anyone?

1

**TESTIMONY OF JACK SEDIE – STATE COURT TRIAL MAY 10, 1982**

A-Yes, he was running toward Jim Saiti.

**308-52 and 308-53**
Q-And at the time he was running toward Jim Saiti, did Jim Saiti have any kind of a weapon?

A-No sir. He didn't.

Q-during this incident did you ever see Mr. Repishti with a gun?

A-yes sir. I see him.

Q---did you observe Mr. Repishti and Mr. Saiti did you ever see Mr. Repishti with a firearm?

A-Yes sir, I seen him.

Q-Okay was there another incident where you did see a gun?

A-Yes sir, True.

Q-When did that incident occurred?

A-that happened about, I say, about probably 2 months after that.

Q-about 2 months after the first incident you just described?

A-that's correct.

Q-can you tell us what occurred that instance?

A-the same thing. He came  Saturday afternoon at Gold Mirror. He was fighting again. I don't know why. What the reason, I didn't ask question. Repishti was fighting with the American guy – the gentleman which I later found out was an off duty policeman.

Q-now did you see, did you actually see the fight?

A-yes, sir, I saw.

**Page 308-54 and 308-55**
Q-Okay, with regard to this second incident.

A-all right.

Q-what did you see?

A-then he went out this way and I was looking at the side of door and this Repishti, he went up the street on 18th avenue. Then I saw a car came from the street and the man came out of the car. So they start to fight,and I told to bartender, Denny, I said "they're fighting over there. They're going to kill each other, I said.

Q-Repishti was on top of this guy, the off duty officer?

2

**TESTIMONY OF JACK SEDIE – STATE COURT TRIAL MAY 10, 1982**

A-Yes, kicking him right on his face, his feet and I grabbed him and I picked him up. And he told me like this, he said "you owe me a blood" In Albanian when you say "you owe me a blood" it means that you're going to kill me or I'm going to kill you.

Q-so he threatened to kill you basically at that point?

A-yes. Yes. And I grabbed him. I grabbed him. I put him down on the ground. I was waiting for Denny.

### Page 308-55
Q-okay.

A-so he came and grabbed both of us. I was trying to make, to cool him off and he said "let me go", He said "I'm fine now." And then he ran, was looking for something, you know. I didn't realize what he was looking for and then in the grass over there, Dino said "Jack, I said "watch out, There's a gun." He said to me, you know, "I grabbed this guy again. I told him you know, you take the gun". In the meantime, that time the police came, about four of them. There's a lady police woman and 3 gentlemen. They knew him, you know, they just let him go. They do nothing.

Q-was there any other incidents?

A-yes. There was another time.

Q-and when did that occur?

A-that occurred just before the kitchen was closed.

### Page 308-56
Q-was that –How long ago? I mean – I'm sorry.

A-just about a couple of months between.

Q-couple of months after this second incident?

A-that's right. He came with the – it was about 11:30, I say, because I just – the people were working the restaurant. And he came, he said "I want a drink," And the owner told him "don't serve. We don't want him inside there," you know and he said "I demand a drink." He said "my money is good." And Denny said "I'm sorry, I can't give you any drink here. " And Denny said, "I'm sorry I can't give you any drink here." Then he started, you know, cursing all that. Then he just pull the gun, just like that, cold, pulled the gun. Dino said,"what's doing?" "Nothing," he said. He just took that gun, threw it on the counter, hit the floor somewhere down. But it was not any fist fight or anything like that.

Q-Did Mr. Repishti ever tell you that he lived in New York during this period?

A-yes sir. He told me he was —he lived—he living all over. There was no particular one spot he would be.

Q-he told you that he would travel to various parts of the country?

A- Yes. All over. Yes.

State Court Trial May 10,1982
Page 334

### TESTIMONY OF MIKE BUSHATI

A-Mike Bushati    Q-Defense Attorney
--------------------------------------------------------------
Q-Let me ask you the question? Did you come to know a person named Fahri Repishti?

A-Yes sir.

Q-and was he a person that came to your restaurant from time to time?

A-few times. Two times he was very drunk and big problem.

Q-and you indicated that there were two incidents--

A-that's right.

Q---that there were problems in your restaurant involving Repishti?

A- that's right.

Q-the person we're talking about here that had the fights in the restaurant?

A-Yes.    Q-You know his name wasn't Fahri Repishti?

A-right

Q-that was not his real name.



Exhibit O

116

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3        **DEPUTY COMMISSIONER MORRIS:**  Okay, we're

4    back on record.

5        **PRESIDING COMMISSIONER PEREZ:**  Sir, the

6    panel has reviewed all information received from

7    the public and relied on the following

8    circumstances in concluding that you are

9    suitable for parole and that you would not pose

10   an unreasonable risk of danger to society or a

11   threat to public safety if released from prison

12   at this time.  Sir, one of the factors that we

13   did take into consideration in our decision

14   today -- Well before I read the decision let me

15   just read into the record that we took into

16   consideration the gravity of the commitment

17   offense.  We took into the consideration your

18   criminal history.  We took into consideration

19   all of the factors and information in your

20   Central File to include the record before us, to

21   include all the documents provided to us at the

22   last minute by the institution and there were

23   some documents that were received late.  So I do

24   want to note for the record that we seriously

25   considered all factors, mainly the gravity of

26   the commitment offense as well your criminal

27   **ALI PERTSONI  C-48947   DECISION PAGE 1   02/08/06**

Exhibit P

From:              Mr. Aqif Shehu, Mayor, City of Gjakovë, Kosova

To:                Board of Parole Hearings

Date and venue:    08 August 2005, Gjakovë

Subject:           Mr. Ali Pertsoni (Perteshoni) (C48947)


Dear Sirs,

I am writing this letter to you in the capacity of the Mayor of Municipality of Gjakovë, one of the municipalities of Kosova, Europe, currently being managed jointly by local authorities and UNMIK administration, which represents a UN Protectorate. As the mayor of this Municipality elected by the free vote of freedom-loving and democratic people, I kindly ask the members of Board of Parole Hearings, on my behalf and on behalf of the people of this ancient society, but young in democracy, to have the understanding for Mr. Ali Pertsoni (Perteshoni) (C48947), regarding his release, enabling him to return to his country. With all the experience obtained in self-help, therapy programs, Katargeo and victim/offender program in the prison, he would be a useful person to his community helping the traumatized individuals among his compatriots during the recent war in Kosova, of whom many were kidnapped, as civilians, by Serb paramilitary and military forces and kept for several years in prisons in Serbia. The people in our community: women, children, the elderly and men suffered a great deal of pain losing members of their families. We are convinced Mr. Ali Pertsoni would be the right person to help them overcome the horrifying and traumatizing experience in the prisons of Serbia they have gone through. We fully accept the fact that Mr. Ali Pertsoni is a person having the skills that he has learned back in the States to serve his community in the proper manner, and that is the reason that Mr. Pertsoni already has many job offers in our community, so when he returns, he will be greatly welcomed.
We take full responsibility for Mr. Ali Pertsoni (C48947) and we also guarantee that Mr. Pertsoni is not a threat to our community, as he actually has never been such in the past, while he was living here in his hometown. On the contrary, taking into consideration the fact that Mr. Ali Pertsoni has obtained the above-mentioned experience, he would be very useful to his community, and that is why we fully support and welcome his release by the Board. I would like to remind the members of the Board that we wrote letters also in previous years in support of Mr. Ali Pertsoni, but surprisingly the Board did not take them into consideration.
However, hoping this time, the attitude of the Board to be quite positive, as far as a decision of release for Mr. Ali Pertsoni is concerned, I would like to thank all the members for their efforts and understanding in the matter, and to extend to all of them my warmest regards.

Yours faithfully,

Mr. Aqif Shehu
Mayor

Exhibit Q

From:            Judge Agim Muhaxhiri, President of Municipal Court,
                 City of Gjakovë, Kosova

To:              Board of Parole Hearings

Date and venue:  08 August 2005, Gjakovë

Subject:         Mr. Ali Pertsoni (Perteshoni) (C48947)

Dear Sirs,

I am writing this letter to you in the capacity of the President of Municipal Court
of Municipality of Gjakovë, one of the municipalities of Kosova, Europe, currently
being managed jointly by local authorities and UNMIK administration, which
represents a UN Protectorate, in support of release of Mr. Ali Pertsoni (C48947),
who is a member of Pertsoni (Perteshoni) family of the City of Gjakovë, Kosova,
Europe, who are respected and low-binding members of our community.
I am fully convinced that Mr. Ali Pertsoni, with the experience he has obtained in
self-help, therapy programs, the Katargeo and the victim/offender program in
the prison, he would be a useful person to his community helping the
traumatized victims among his compatriots during the recent war in Kosova, and
even before the war living under oppression. In our country the civilians were
kidnapped, murdered, tortured by Serb paramilitary and military forces and kept
for several years in prisons in Serbia. We are convinced that Mr. Ali Pertsoni
would be the right person to help them overcome the horrifying and traumatizing
experience in the prisons of Serbia during and after the war. Therefore, having
this in mind, I kindly ask the members of Board of Parole Hearings, to have the
understanding for Mr. Ali Pertsoni (Perteshoni) (C48947), regarding his release,
enabling him to return to his country, as a free and very useful citizen to our
community. The fact that Mr. Ali Pertsoni is a person that has the above-
mentioned skills that he has learned back in the United States, makes him an
appropriate person to serve his community of origin in the proper manner. This
is even the reason why Mr. Pertsoni has already many job offers in his
community, so once he returns, he will be welcomed with open arms.
As people serving in the judicial system of our country with the support also of
international experts, among whom many being Americans, we take full
responsibility for Mr. Ali Pertsoni (C48947) and we also guarantee that Mr.
Pertsoni is not a threat to our community, as he actually has never been such in
the past, while he was living here in his hometown. On the contrary, taking into
consideration the fact that Mr. Ali Pertsoni has obtained the above-mentioned
experience, he would be very useful to his community, and that is why we fully
support and welcome his release by the Board. I would like to remind the
members of the Board that we wrote letters also in previous years in support of
Mr. Ali Pertsoni, but surprisingly the Board did not take them into consideration.
However, hoping this time, the Board to reach a decision in support of Mr. Ali
Pertsoni's release, I would like to extend to the Board members my kindest
regards.

Yours sincerely,

Judge Agim Muhaxhiri, President of Municipal Court, City of Gjakovë

From:            Genc Juniku, Municipal Public Prosecutor,
                 City of Gjakovë, Kosova

To:              Board of Parole Hearings

Date and venue:  08 August 2005, Gjakovë

Subject:         Mr. Ali Pertsoni (Perteshoni) (C48947)

Dear Sirs,

I am writing this letter to you in the capacity of the Municipal Public Prosecutor of Municipality of Gjakovë, one of the municipalities of Kosova, Europe, currently being managed jointly by local authorities and UNMIK administration, which represents a UN Protectorate, based on SC Resolution 1244, in support of release of Mr. Ali Pertsoni (C48947), member of Pertsoni (Perteshoni) family of the City of Gjakovë, Kosova, Europe, who are respected and low-binding members of our community.

I am fully convinced that Mr. Ali Pertsoni, with the experience he has obtained in self-help, therapy programs, Katargeo and the victim/offender program in the prison, would be a useful person to our community helping the traumatized victims before the war living under oppression and during the recent war in Kosova. Among many of them were kidnapped, as civilians, by Serb paramilitary and military forces and kept for several years in prisons in Serbia. We are convinced that Mr. Ali Pertsoni would be the right person to help them overcome the horrifying and traumatizing experience in the prisons of Serbia they have gone through. Therefore, having this in mind, I kindly ask the members of Board of Parole Hearings, to have the understanding for Mr. Ali Pertsoni (Perteshoni), regarding his release, enabling him to return to his country, as a free and very useful citizen to our community. The fact that Mr. Ali Pertsoni is a person that has the above-mentioned skills that he has learned back in the United States, makes him an appropriate person to serve his community in the proper manner as far as traumatized individuals from the recent war in our country are concerned, which are many. This is even the reason why Mr. Pertsoni has already many job offers in his community of origin, so when he returns, he will be welcomed in our community.

As people serving in the judicial system of our country with the support also of international experts, among whom many being Americans, we take full responsibility for Mr. Ali Pertsoni (C48947) and we also guarantee that Mr. Pertsoni is not a threat to our community, as he actually has never been such in the past, while he was living here in his hometown. On the contrary, taking into consideration the fact that Mr. Ali Pertsoni has obtained the above-mentioned experience, he would be very useful to his community, and that is why we fully support and welcome his release by the Board. I would like to remind the members of the Board that we wrote letters also in previous years in support of Mr. Ali Pertsoni, but surprisingly the Board did not take them into consideration.

However, hoping this time, the Board will reach a decision in support of Mr. Ali Pertsoni's release, I extend to the Board members my kindest regards.

Yours sincerely,

Genc Juniku, Municipal Public Prosecutor, City of Gjakovë

From:              Agim Haraçia, Attorney-at-Law
                      City of Gjakovë, Kosova

To:                  Board of Parole Hearings

Date and venue:    08 August 2005, Gjakovë

Subject:        Mr. Ali Pertsoni (Perteshoni) (C48947)


Dear Sirs,

I am Agim Haraçia. I was the former Municipal Public Prosecutor in Gjakova City. Now I have my own private law practice. I have written letters of support for Mr. Ali Pertsoni's (C48947) release to you Board members in previous years, but I see that my letters were not taken into consideration.

Mr. Pertsoni has support from our community in Gjakova City, has many job offers and has a place to stay with his family, when he returns. Mr. Ali Pertsoni's family are well respected and law-biding citizens of our community.

Because of his experience in prison involving himself in various programs, such as: self-help, therapy programs, Katargeo and the victim/offender program, Mr. Pertsoni would be a benefit to us when he serves our community. We look forward to Mr. Pertsoni's release to return to our community as a very useful person for the treatment of many traumatized victims of recent war in Kosova, among his compatriots, who were kidnapped during it, by the Serb military and paramilitary forces, as civilians, and were kept for several years in Serbs prisons in Serbia, where they were subject to the worst forms of mistreatment and torture.
Our community takes full responsibility for him when he returns home. He is certainly not a threat because our community supports his release, and we all welcome his come back.
We are looking forward and are waiting for Mr. Pertsoni to return back to our country as a useful member of the community of his origin.

Thank you for your time and consideration

Yours sincerely,

Agim Haraçia
Attorney-at-Law, City of Gjakovë

**Iniciativa e Femres Kosovare-**

**Kosova Woman Initiative- New**

Rr/st. Tirana nn.
www.ifkvizioni.org
Phone & Fax: 381 390 26 989;
Gjakove

To:        Board of Parole Hearings

From:      Kosovo Woman Initiative`- New Vision
           Gjakova, Kosova

           Mrs. Ardita Rizvanolli, Executive Director

Date:      28 July 2005

Subject:   EMPLOYMENT OFFER for Mr. ALI PERTSONI
           (PERTESHONI) C48947, from Gjakovë, Kosova

Apart from our common women issues activities, our organization also deals with the treatment of traumatized women from the recent war in our country, their reintegration regardless of their ethnicity and even age, offering them a new chance to get involved in the society as completely recovered and normal individuals contributing in the same extent as the other people that did not go through their life experience.

Therefore, after learning of Mr. Ali Pertsoni (Perteshoni)'s qualifications acquired, while serving his life term at Saint Quentin Prison in California, USA, and learning, also, on the other hand, of the possibility of his chances to eventually be released, we hereby declare that considering the fact that Mr. Ali Pertsoni (Perteshoni) is an experienced person involving himself in self help group, therapy and victim/offender programs in prison, and also considering these to be extremely valuable tools that Ali might use to help our women of the above mentioned kind to reach a normality in their lives, that can enable them become normal and valuable individuals to our society, and also considering the fact that our organization lacks people of such qualifications and experience in the above-mentioned field, we hereby declare our readiness to offer to Mr. Ali Pertsoni (Perteshoni) a job with our organization, as a person who would be a benefit not only to our community but would also help our organization in its successful and useful performance with our women in need and vulnerable ones.

Mr. Ali Pertsoni (Perteshoni), apart from his experience gained back in the USA in the above-mentioned field, has a priority in the fact that he comes from this community and that he knows the culture and mentality of the people of our country, being a native thereof, which enables him to be a very promising, successful and indispensable resource to our organization in the mentioned field, also due to the fact that the women in our country do not discuss openly about their problems, but we are deeply convinced that having Ali working for them they can trust him because he comes from a very respectable family.

Therefore, wishing him a soon return home, we look forward to having Mr. Ali Pertsoni (Perteshoni) as our staff member.



Kosovar Youth Council
Qamil Hoxha 7/3
10000 Prishtine, Kosove
Tel: +377 44 189 236, 187 737, 248 590
Fax: 381 – 38 - 223 182
E-mail: kyckosova@yahoo.com
www.kyckosova.org
UNMIK registration number: 5100075-7

To:      Board of Parole Hearings                    Date: 28 July 2005

From:    Kosovar Youth Council
         OSCE NGO Resource Center
         Gjakova, Kosova

Subject:     **EMPLOYMENT OFFER for Mr. ALI PERTSONI**
**(PERTESHONI) C48947, from Gjakovë, Kosova**

Apart from our common youth issues activities, our organization also deals with the treatment of traumatized children and youth from the recent war in our country, reintegration of youth offenders, regardless of sex, ethnicity and even age, offering them a new chance to get involved in the society as completely recovered and normal individuals contributing in the same extent as the other people that did not go through their life experience.

Therefore, after learning of Mr. Ali Pertsoni (Perteshoni)'s qualifications acquired, while serving his life term at Saint Quentin Prison in California, USA, and learning, also, on the other hand, of the possibility of his chances to eventually be released, we hereby declare that considering the fact that Mr. Ali Pertsoni (Perteshoni) is an experienced person involving himself in self help group, therapy and victim/offender programs in prison, and also considering these to be extremely valuable tools that Ali might use to help our people of the above mentioned kind to reach a normality in their lives, that can enable them become normal and valuable individuals to our society, and also considering the fact our organization lacks people of such qualifications and experience in the above-mentioned field, we hereby declare our readiness to offer to Mr. Ali Pertsoni (Perteshoni) a job with our organization, as a person who would be a benefit not only to our community but would also help our organization in its successful and useful performance with our people in need and vulnerable ones.

Mr. Ali Pertsoni (Perteshoni), apart from his experience gained back in the USA in the above-mentioned field, has a priority in the fact that he comes from this community and that he knows the culture and mentality of the people of our country, being a native thereof, which enables him to be a very promising, successful and indispensable resource to our organization in the above-mentioned field.

Therefore, wishing him a soon return home, we look forward to having Mr. Ali Pertsoni (Perteshoni) as our staff member.

Sincerely:
Rrezart Hoxha
-Executive Director-

Making a better place for e better life!                    1

**LUSH KRASNIQI, DIRECTOR**
**NGO "27 PRILLI 1999-MEJE"**
**NGO RESOURCE CENTER**
**STR "UCK" GJAKOVA CITY**
**KOSOVA**

Dear Board of Parole Hearings,

May this letter find you in good health and in great spirit. I am writing this letter of support for Ali Pertsoni (C48947) who is going before you board members.

I am Lush Krasniqi the Director of an organization that represents the victims of the war crimes in Kosova. Our function in our community is to provide support, care and help to the children who were traumatized during the war. These children lost members of their family and in many cases lost their entire family.

It is my most sincere hope and desire that Mr. Pertsoni be granted parole and be allowed to return to his native land of Kosova, where he has a great deal of support from family, friends and the community.

I represent a victims group that has made much progress where victims/offenders reconciliation is concerned and due to his long period of incarceration where he has acquired a great deal of knowledge and experience from the various self-help groups, along with the therapy that he has received would be a great asset to our organization.

 Mr. Pertsoni knows the culture and customs; with this understanding and experience, it will allow him to be a very positive and motivating force with the various men and women within our society. It will allow Mr. Pertsoni to make good use of the rest of his life by being a positive motivating force in the lives of a great deal of other victims who I believe from his life experience will benefit.

In closing I'd like to extend my deepest and sincere gratitude by saying, I truly appreciate your time and consideration in this matter before you, praying as I look for a positive resolve.

Sincerely,

Lush Krasniqi, Director

22. 08. 2005.
                                Date

SUPPORT FOR MY HUSBAND

Board of Parole Hearings:

This is a support letter for my husband Ali Pertsoni (C48947) who will be going before you board members. My name is Yuriko. My husband and I have been together for over 30 years. I am presently working at Kaiser Permanente in San Francisco. I have a full-time, steady job and steady income. I have been there for over 8 years. Before that I was working for a doctor for 15 years until he retired. And before that I have worked in Illinois and in Texas. I have worked over 35 years.

I have a place of residence in San Francisco and have been living here in the same building for 25 years. Always my husband has a place to stay with me when he is released because he is my other half and I love him very much. My true desire is to go to Kosova with my husband when he is released at which time I will retire since I have been working all these years and have a retirement plan.

I have been visiting my husband for over 24 years every week on weekends. On my vacation time from work I come on Fridays to visit him also. He has expressed to me all the time he is very sorry what happened to the victim My husband has very deep remorse for what he did. Every year my husband fasts. When he fasts, he does it for the victim and the victim's family.

In the year 2003 I went to Gjakova City, Kosova and spent time there with my husband's family. While I was there I saw the overwhelming support that my husband has in his city from the Mayor, the judge, district attorneys, his family members, the relatives, and friends all asking about him when will he return to Kosova. They all showed great support for offers of jobs and especially support for his return. My husband has so much love and devotion to his family the same devotion and love he has given to me all these years. I also saw the love, strong bond and devotion that his family and relatives show for my husband and for me. Both our desire and goal is to return to Kosova to help and serve the community of Gjakova.

While there in Kosova I made plans and gave the design for the room to be built for us which is to be added to his brother's house. This room is now finished and ready for us. My husband's deepest and sincere desire is to go back to Kosova permanently. He has always expressed to me all these years to return to his country. My husband has participated in many programs in the prison which has benefited him in a positive way. With all this experience he has gained in these programs, he can use all of these skills to help the people in his country. We are both old now. All I ask is that you please give to my husband a second chance and let him return to his country. My husband's goal and my goal are the same is that we return to Kosova together. I pray that you give to my husband a second chance.

Sincerely,

*Yuriko Pertsoni*
Yuriko Pertsoni
508 Larkin Street #501
San Francisco, CA 94102
Work phone (415) 833-2031
Home phone (415) 771-7526

Exhibit S

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
AUGUST 2002 CALENDAR
LIFER PROGRAM UNIT
CALIFORNIA STATE PRISON – SAN QUENTIN

## I. PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Ali Pertsoni, CDC# C-48947, is a 48-year-old (DOB: 4/27/54), married, Albanian-American first-termer, committed from San Francisco County. He is serving a 27-year-to-life sentence for First Degree Murder with use of a Firearm. The index offense occurred on 5/27/81, and he entered into the California Department of Corrections (CDC) for this crime on 6/18/82. He arrived most recently at CSP-SQ on 5/14/93. The inmate was 27 years of age at the time of his involvement in the controlling offense. The victim in the offense was 26 year old Farhi Repishti, an Albanian reportedly of the communist party. The inmate's MEPD was calculated to be 8/31/97. Current classification score is 0, and has been since 8/94. The inmate has no record of use of aliases. He has two tattoos, one on each shoulder (one of his wife, the other reflecting his loyalty and allegiance to Albania). The inmate has been raised in, and has continued to practice, the Muslim religion, although he indicated that in each of the past ten years he completely read both the Bible and the Koran. There is a current USINS hold on the inmate (#A20-404-550) as of 8/27/99, for deportation to his native country.

The inmate's central file and health record were reviewed. This review included a report on the inmate for the BPT authored by Dr. Zimmerman, and dated 9/15/99. For the purpose of the current evaluation, the inmate was interviewed on 7/11/02. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Prison Terms to assist in determining his eligibility for parole. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist.

After some initial conversation, which included a plan to access the language line for Albanian-Kosovo translation (800/774-4344), it was clear that the inmate was well versed in speaking the English language, and could readily make his needs known. Although subsequent efforts to access the language line for certain portions of the interview were unsuccessful, the inmate, when periodically asked, verbalized his belief that he was able to adequately represent himself linguistically during the evaluation. Thus, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.

Exhibit T

**DEVELOPMENTAL HISTORY:**  The reader is referred to the report of Dr. Zimmerman for the relevant aspects of Mr. Pertsoni's developmental history.

In the present interview, Mr. Pertsoni described growing up as the third of ten children born to the union of his biological parents, who remained married until their untimely deaths in 1981. The inmate previously suspected that the oppressive communist regime in Yugoslavia was somehow involved in their deaths. The inmate's father had two children from a previous marriage, and thus the sibship of 12 grew up under communist supervised martial law, in relative poverty, and all lived in a three-bedroom home in Kosovo. The inmate described how those not of the communist party were harassed, threatened, or assaulted while growing up, and that the children received preferential treatment regarding access to educational opportunities.  The inmate dropped out of school on at least two occasions, and went to work to help his family. The family was raised as Muslims, and practiced their religion in the home, as the mosques were all closed.

The inmate acknowledged several noteworthy behaviors or events in his life prior to the age of 13 years, including lying, fighting, dropping out of school, curfew violations, and witnessing violence (police on friends, neighbors, and other citizens). He denied being the victim of any type of abuse or neglect during his childhood.

He noted on more than one occasion that he was raised "right" by his parents, and that the worst thing that he could do was to bring shame on his family. As he became more politically active against the communist rule, he began to be noticed by the authorities and felt great concern that he was bringing trouble to his family. At the age of 20, the inmate escaped Kosova, hiding on trains and then walking through the mountains (to avoid the checkpoints) to a refugee camp in Austria, where he stayed for a few weeks and was granted asylum. After several months, he was sent to the United States in 1975.

**EDUCATION:** The reader is referred to Dr. Zimmerman's report regarding the relevant aspects of Mr. Pertsoni's educational history.

In the present interview, Mr. Pertsoni reported that he completed about three years of formal education in Kosovo, prior to dropping out of school after the fourth grade. He noted, "Life in school was more difficult if you were not communist." He dropped out of school after the third grade, and helped his father work cleaning the streets (picking up after the horses). He went back to school, but was unable to complete more than three years of education. He denied any known learning problem or any school-related deportment difficulty. By his early teens, the inmate secured a job in a butcher shop, and was able to bring home scraps of meat to help feed his family. At any time he was working for money, the inmate gave his pay to his father to help the family.

While incarcerated, the inmate has been involved in educational pursuits, learning English as a second language (ESL). He was awarded the student of the month in July 1999. Institutional achievement testing (TABE) assessed the inmate to be academically

functioning (total battery) at the mid-fourth grade level (5/12/00), with noted improvement in his scores over the years. He was determined by psychology staff to have normal cognitive functioning (NCF) in a 4/15/02 assessment.

**FAMILY HISTORY:** The reader is referred to Dr. Zimmerman's report. Of note are the corrections made and reflected in the section above on developmental history.

Mr. Pertsoni's parents are both deceased, and they died about three months apart from each other in 1981. Four months after learning of the deaths of his parents, the inmate was involved in the commitment offense. The inmate remains in contact with several of his brothers, one of whom has visited the inmate three times from his current home in Holland. The inmate noted other contacts to include a brother (who owns a taxi service in Kosovo), and another brother currently residing in Norway. Mr. Pertsoni reported that several of his siblings continue to reside in Kosovo, and have offered him various jobs and a place to live. He noted that a brother currently lives "in the home of my father," and that the home has been rebuilt with a place for the inmate and his wife.

**PSYCHOSEXUAL DEVELOPMENT:** Per Dr. Zimmerman's report.

In the present interview, Mr. Pertsoni confirmed that his first sexual experience was at the age of 22, with his soon-to-be wife who is ten years his senior. He noted some internal struggle prior to having sex, as he was not yet married. He explained that, per his religious teaching, "If you have sex before you are married, you bring shame to your family." He has had sexual relations only with his wife. He denied any history of infidelity, or of contracting a sexually transmitted disease. Mr. Pertsoni described himself as strictly heterosexual.

**MARITAL/RELATIONSHIP HISTORY:** Per Dr. Zimmerman's report.

In the present interview, Mr. Pertsoni confirmed that he remains married, with no children. He married his wife, the former Yuriko Takemoto, in 6/82, shortly after he was convicted of the instant offense. She is currently about age 58, and continues to reside in San Francisco. The inmate reported that she visits him every week. Prior to their marriage, the inmate had known her for several years, having met in Chicago working in the same restaurant business, and had been living with her for about 2½ years prior to his involvement in the crime for which he is incarcerated.

**MILITARY HISTORY:** Mr. Pertsoni has no record of military service.

**EMPLOYMENT/INCOME HISTORY:** Per Dr. Zimmerman's report.

At the time of the index offense, Mr. Pertsoni had been working for the prior six to eight months in a restaurant owned by a fellow Albanian. He reported that he worked as "a dishwasher, a cook's helper, making salads, bus boy, anything to help" in the business. He reported that he had been working hard in the restaurant business since his arrival in the United States in 1975, first in Chicago for several years, and then in 1978 to San

Francisco, where he was first confronted by the victim. After this confrontation. the inmate stated he reported the potential problem to the FBI. He then left with his girlfriend to live Houston, Texas in 1979 for about a year, again working in a restaurant, before moving back to San Francisco in approximately 1980. The inmate reported that he left Texas after yet another altercation with the victim, who was last known by the inmate to be living there (Texas) prior to the confrontation on the night of the crime in San Francisco.

The inmate denied ever receiving public assistance, SSI disability, or any unemployment benefits. He denied augmenting his income via any illegal means. He emphasized that he always worked and supported himself, and that for years he would sent money back to his family in Kosovo, usually in the amount of $200 a month.

He is currently working in Vocational Dry Cleaning, where he has been assigned since 2/00, with generally satisfactory or above average work supervisor reports. Mr. Pertsoni hopes to complete this vocation, as well as to obtain his GED, prior to his release from prison. In the past, he has worked in landscaping, dental lab, furniture factory and as a butcher while in prison. He has received numerous work-related laudatory chronos over the years, including five since mid-1999.

**SUBSTANCE ABUSE HISTORY:** Per Dr. Zimmerman's report.

In the present interview, Mr. Pertsoni again denied any prior use of alcohol or any illegal drug at any time in his life. He has no record of arrests for substance-related behavior or activity. He does not see himself as having a substance abuse problem nor a related need for treatment, and there is no suggestion to the contrary found in his records.

**PSYCHIATRIC AND MEDICAL HISTORY:**    The reader is referred to Dr. Zimmerman's report for the relevant details of Mr. Pertsoni's mental health history, or lack thereof.

According to his record, it appears that Mr. Pertsoni has never utilized mental health services, either prior to or following his incarceration. It was accurately reported that he was psychiatrically hospitalized for a two week period in 1977, when he was unable to speak English and was arrested (charges later dismissed) on a serious matter. Once a translator was utilized in the hospital, the inmate was immediately discharged. He was not treated at that time for any known symptoms, as the issue seemed to revolve around language and cultural issues.

Since his arrival into CDC, the inmate has been classified as a GP (General Population) inmate. His involvement with mental health services in prison is relegated to specific evaluations for the Board of Prison Terms hearings. At these times, he has been primarily diagnosed with no mental disorder, but with some noted adult antisocial behaviors that are responsible for the inmate's current imprisonment. The one exception to this was a BPT evaluation of 2/8/88, in which the psychiatrist offered a diagnosis of "Emotionally Unstable Personality, explosive, improved." There is no known correlate

in the standard nosological texts to this "diagnosis," and there is likewise no behavioral assessment offered in the report to substantiate or support this determination.

Briefly stated, the consensus opinion among previous evaluators has been that Mr. Pertsoni represents a decreasing risk for future violence in the community, as compared to other inmates. It had been consistently noted that the inmate has expressed sincere remorse for his behaviors in the controlling offense. Earlier evaluations (2/11/85 and 5/14/84) noted the inmate's propensity to become agitated and emotional during discussion of political issues, particularly those associated with the communist government in Yugoslavia. By the 2/8/88 evaluation, "The excitability noted in the past has become tempered some. ... He is showing improving ability to be reflective in his method of presenting himself." In the report of 5/96, it was opined, of the inmate's future violence, "His prognosis is difficult to assess given that the instant offense did not arise out of nor in the course of a mental disorder. ∴. Furthermore, the threat that this inmate poses on society if paroled will need to be made on other grounds that strictly psychiatric factors."

The BPT evaluation of 7/97 (L. Carr, PhD) summarized, "Mr. Pertsoni can be (viewed) as the product of a politically sensitive European culture and his disruptive early childhood and adolescent experiences. ... It is culturally appropriate for him to be physically and verbally expressive." The evaluation noted that the inmate is functioning in the "high average" range of intelligence, that there are no indications of a criminal orientation, and that he is an "industrious individual." Dr. Carr concluded, "Mr. Pertsoni appears psychiatrically stable, and there is nothing to suggest or indicate he would deteriorate in a less controlled setting. No special parole considerations appear indicated."

The report of Dr. Zimmerman (9/15/99) noted, of Mr. Pertsoni, "His exemplary behavior in the CDC strongly suggests that he poses a minimal risk of dangerousness to others both within the correctional setting and if released to the community."

Medically, the inmate has been diagnosed with a history of left medial epicondylitis, bilateral shoulder tendonitis, and a history of hypercholesterolemia. He denied any significant health problems. He denied any history of head injury, seizures, hospitalizations, or surgeries (not already reported) that were either traumatic or out of the ordinary.

**PLANS IF GRANTED RELEASE:** Mr. Pertsoni stated that, were he to be granted parole, his plans are to return to Kosovo and "help the children that have been damaged by war, who have the hurt and anger that I did." There is a letter in the inmate's file from Mr. Lush Krasnigi, Director of an organization that represents the victims of war crimes in Kosovo that provides support and help to children traumatized by war. Mr. Krasnigi has offered the support of his organization to the inmate upon his parole, and look forward to the inmate being a part of their organization. Mr. Pertsoni will plan to move with his wife into the family home, where his brother currently resides. The inmate indicated that he would be able to find employment quickly and readily, and pointed to

several of his sibling currently living in the Kosovo area that own businesses and who would gladly help him. He pointed to his skills as a butcher, his history of restaurant experiences, and as having job skills as a result of his incarceration (landscaping, furniture factory for several years, vocational dry cleaning). He reported that his wife is very supportive of such a move (to Kosovo) after the inmate's parole.

## II. CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:**  Mr. Pertsoni's mental status was essentially within normal limits. He appeared his chronological age, and had short graying brown hair and a thick mustache that matched his hair color. He was neatly groomed and dressed and displayed appropriate personal hygiene. His demeanor was polite, respectful, personable, responsive and cooperative. Speech pattern reflected a direct quality, with a noticeable accent of Slavic decent. Affect was full range, and congruent to cognitive content. Cognitive functions and sensorium were grossly intact, and essentially unremarkable. There were no signs of disturbance in thought, mood, affect, ideation, or perception. The inmate presented himself as open, thoughtful, non-defensive, and very straightforward. There were only a few occasions where he had to pause and mentally search for the correct word to appropriately express himself.

The inmate noted that he does consider himself to be a criminal, and pointed to that fact that he broke the law, and thus deserves to be punished. He described himself currently as "a very nice guy. I can control myself. I can use my age (wisdom). Before, I was different. I was without thinking. Now, I see how I was wrong. I cannot bring him (victim) back, but I wish I could. Sometimes I feel very ashamed. I did something bad, and I don't ever try to forget. I will never, ever, under any circumstances, repeat it (what I did). I am a better person now. I have more feeling for people and for myself."

When asked about what in his life has given him the greatest sense of pride, the inmate responded, "I would work, and send money to my family in Kosovo. I would send $200 a month, and it would feel so good for me. Like I was flying. My brothers would have more food, shoes, clothes, and my father was proud of me. Now, I messed that up. I have brought shame to my family."

There is no evidence of mental illness in the inmate. He likewise does not present with the behavioral correlates of a personality disorder. He did seem genuinely stressed about his criminal behavior resulting in the loss of life of an "Albanian brother." The cultural issues in the inmate's history are most reflective of his style of interpersonal interactions and religious-based values.

## DIAGNOSTIC IMPRESSION:

| Axis I: | V71.01 | Adult Antisocial Behavior, by history. |
|---|---|---|
| Axis II: | V71.09 | No diagnosis or condition on Axis II. |
| Axis III: | | History of left medial epicondylitis, bilateral shoulder tendonitis, and a history of hypercholesterolemia. |
| Axis IV: | | Incarceration for life term. Culturally displaced for half his life. |
| Axis V: | | GAF: 97. |

**CRIMINAL HISTORY/REVIEW OF LIFE CRIME:** Mr. Pertsoni has no known record of juvenile offenses, and he denied any youthful illegal activity.

According to the POR (dated 6/15/82), his prior criminal record reflects an arrest in 2/77, while in Chicago, for aggravated assault and unlawful use of a weapon. These charges, which were later dismissed, related to the inmate's then-fervor surrounding the political strife in his homeland. He was next arrest for assault with a deadly weapon in 2/81, in San Francisco, for which he was sentence to serve a 10-day jail term and was placed on 18-month court probation. According to the inmate, this latter arrest was associated with a near-collision at a stop, where an angered Hispanic exited his vehicle to come and confront the inmate. During the increasingly heated discussion, the inmate pushed open his car door in a fairly hard manner, striking the victim in the leg (with the car door). The inmate noted, "I pled guilty."

The instant offense, according to the POR, occurred shortly after midnight on 7/27/81 in the Greek American Club, which the inmate frequented to drink coffee and interact with other Albanians. According to witnesses, the inmate entered the club and approached the victim, Fahri Repishti, who was a patron in the club that night. After a brief conversation in a foreign language, the inmate produced a gun and shot the victim three times. Although the last two bullets entered the victim's head, the actual cause of death was determined to be massive internal hemorrhage in the abdomen, site of the first bullet entry. The inmate then left the club, threw the gun out of the car, drove to the home of a friend and asked the friend to call police. Mr. Pertsoni was taken into custody without incident at about 7:30 in the morning of the offense. Noted in the records are interviews with witnesses, who indicated that the victim was aggressive, and a bully who sometimes carried weapons.

According to the inmate, "There is no excuse for what I did. I killed an Albanian brother. I hadn't seen him (victim) for quite awhile. I used to go to the club to see people from my country. I went to Las Vegas for about two weeks, on a vacation with my wife. We came back, I dropped her off at home, and I went to the club to drink Turkish coffee and eat baklava. The owner would laugh, and say, 'you mean Greek coffee.' Same thing really. I had the gun in the car. That was the last time I see my home. I drove to the club, parked and was thinking of the coffee and baklava. (Q) I don't think about taking in the gun. I just did it. (Q – *victim?*) The last time I had seen him was in Houston. I didn't think he would be there (at the club). (Q) I went in, asked for a Turkish coffee, and put a quarter down on the (video game) machine to play next. I went up to the

counter to get cigarettes and my coffee (gets up, demonstrating). I guess the guy (victim), peace be on him, the guy I killed, he heard my voice. He popped up and started coming at me. I was very surprised, and I was scared of the guy. (Q) Once, in Houston, he beat me up, and push me down a bunch (flight) of steps. He threaten my wife on the phone. "(Pause) He came in close, put his hands to his waistband. I thought he was getting his gun, so I pulled mine and said, 'slow down.' He said, 'Punk,' in Albanian, and 'you're not going to do nothing.' I say to back off, stop. (Sigh, pause) He say, 'I'm going take your gun and shove it up your ass.' He grabbed the gun with one hand, and slapped me with the other. We were wrestling for the gun, and it went off and hit him in the stomach. He fell down, and was still holding on to the gun. Then I shot him two more times. They say I shot him in the head. (Q – *remember shooting the gun?*) I don't know. I have no excuse. I took a life. I don't remember shooting the gun. But I take responsibility. I done bad. I killed my Albanian brother (eyes glazing). A wrong is a wrong. I'm not trying to find excuses for my bad action. I done bad, and I'm paying the price. I shot the guy three times. I remember the gun going off the first time. We were fighting and it was self-defense." The inmate reported that he purchased the gun, already loaded, in Houston for $140, and did so with a concern for protection against the victim's threatening and assaultive behavior toward the inmate. Although he had carried it on occasion in the past, he was unsure if he had ever carried into the club before.

The inmate reported that he had made several efforts in the past to stay away from the victim, who was seen as aggressive and demeaning to the inmate and to the inmate's family. After the murder, the inmate indicated that he was most worried about his family, and the possible repercussions they might have to endure as a result of the inmate's actions. In this respect, he expressed some concern about possible retaliation, as he stated, "I can get away, but my family cannot. I killed an Albanian brother. I wondered how I could explain to my family (tearful). I killed him, poor guy. And I think of his family, too. He won't ever see his mother and father again, and I'm still alive. I deserve to be here (prison). I took a life. Every day, I wake up and feel sorry for the awful things I've done."

**PRISON OFFENSES:** Since his incarceration for the controlling offense, Mr. Pertsoni has received only one CDC-115 Rule Violation Report (RVR), which occurred on 6/23/86 for being in a fist fight.

**RISK FOR VIOLENCE:** A structured empirical approach was utilized in assessing future risk for violence. Current research supports this approach as being the most reliable and valid method for predicting future risk of violence. Three separate measures were employed.

On the Psychopathy CheckList – Revised, (PCL-R), a measure of static risk factors, Mr. Pertsoni scored within the *low* range of severity. As illustrated above, he had no juvenile record, a steady work history, a family, and at the time of the index offense he was employed in a restaurant. He reported regularly making money, and sending a portion of it to his family in Kosovo on a monthly basis. He has been seen as straightforward, honest, and responsible across several dimensions.

On the Violence Risk Appraisal Guide (VRAG), an actuarial measure, the inmate scored in the *moderately low* range of violence risk. This is a static measure, and the inmate's score or category on this particular instrument is unlikely to significantly change over the course of his incarceration.

On the History-Clinical-Risk – 20 (HCR-20), which includes historical and dynamic risk factors associated with violence, the inmate obtained a score within the *low* range of severity. Historical items weighed most heavily for Mr. Pertsoni, and essentially constitute what brought him to prison. He has no significant attitudinal difficulties, has no major mental illness, is emotionally and behaviorally stable, and has verbalized feasible release plans. He appears to have solid personal and familial support that is extensive and steady.

**CONCLUSION:** The index offense presents as a crime of instrumental violence, and was committed by the inmate on an individual who was known to have attacked the inmate in the past, and who also had reportedly threatened the inmate's wife. According to the inmate, however, there was no premeditation involved in the offense as he had just returned from a vacation and had no knowledge that the victim was in town. He did admit to carrying a loaded gun into the club on the night in question, and cannot provide an alternative explanation as to why this occurred. The inmate had a history of violent behavior, including the access to weapons, as noted in his arrest history. However, for the most part his criminal behaviors have been related either to the political turmoil and his personal biases regarding the governance of his homeland, or in association with language and cultural barriers he experienced as an immigrant. Those factors have greatly modulated downward over time.

While incarcerated, the inmate has made noticeably effective use of his time. He has been involved in several self-help group programs, has been in both Cat. X and Cat. T programs, has raised his level of educational achievement, has evidenced outstanding work habits and attitudes, has been disciplinary free for the last 16 years, and is currently in a vocational job program.

There are no signs of a mental disorder, either historically or currently. The inmate has no history of a problem with substance abuse. Attitudinal improvement has been seen and demonstrated steadily over the years. Strong social and personal supports serve as a protective factor to anticipated stress upon release. Risk assessment measures suggest that the inmate poses a *low* likelihood to become involved in a violent offense if released into the free community.

The inmate has been disciplinary free for now over 16 years, and has only one RVR in his 20 years of incarceration. He has numerous laudatory chronos for his work performance and attitude. He is apparently an able and reliable worker in his current placement of Vocational Dry Cleaning. He does not currently present as a candidate for any noteworthy change as a result of psychotherapeutic intervention. Ongoing education and involvement in self-help or introspective treatment groups is suggested and

encouraged, but such educational group treatment involvement should not be considered as mandatory.

_Steven Walker (signature)_

_____                    7/16/02
Steven Walker, Ph.D., CA License # PSY-11894                    Date
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

PERTSONI, Ali  C-48947                                        1-19-06

# PSYCHOSOCIAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# FEBRUARY 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

# PSYCHOSOCIAL ASSESSMENT

I.    Identifying Information: Mr. Pertsoni is a 51-year old  Albanian male who is serving
      a 27 year to life sentence for 1st degree murder (P187) committed May 27, 1981.
      This report is based on a review of the inmate's central files, medical record and a
      face to face interview conducted in the mental health offices of San Quentin State
      Prison.  Mr. Pertsoni was informed of the limits of confidentiality in that information
      provided would be included in a report to the Board of Prison Terms.  Mr. Pertsoni
      stated that he understood this and was able to demonstrate an understanding of the
      purpose of the interview.  He denied any need for assistance or for any adaptive aides
      and stated that he was fully able to participate in the interview.  Only Mr. Pertsoni
      and the examiner were present at the interview.

Mr. Pertsoni's developmental history, education, family history, psychosexual development,
sexual orientation, marital history, military history, employment history, and substance abuse
history have been extensively reviewed and reported in prior reports to the Board and will
not be reiterated here.  The interview with Mr. Pertsoni revealed no substantial differences in
factual information from what has already been reported to the Board in these categories.

II. Psychiatric and Medical History
Mr. Pertsoni has no history of treatment for a mental disorder.  He was hospitalized for
psychiatric observation in Chicago in 1979.  He stated that after his arrest in Chicago for
firing a gun at a man during a political demonstration, he was sent to an inpatient unit for
psychiatric observation.  After being interviewed in his own language, he was released
without treatment, or recommendation for psychiatric follow up.  He has not required any
psychiatric treatment subsequent to that event.  His contacts with the mental health system in
CDC were not related to any mental illness.  His evaluations by mental health staff for Board
of Prison Terms consideration have indicated no mental disorders.  One report indicated
Adult Antisocial Behavior.  In 1988, he was evaluated and noted to have an "Emotionally
Unstable Personality, explosive, improved."

III. Plans if Granted Release:
Mr. Pertsoni plans to be reunited with his family in Gjakova, Kosova.  His brother and his
family have built a room on their home for Mr. Pertsoni and his wife.  His wife has visited
the residence and was involved in the preparation of the room.  He has numerous letters of

Pertsoni, Ali   C-48947          1      San Quentin              1-19-06

support from family members and public officials in his community of origin. He has a job offer from a real estate company in Burlingame to do handyman work, but expects to be deported if released from prison. His plan for employment in Kosova includes work with an American agency to assist victims of trauma in his country. Mr. Pertsoni would work with his wife to develop a program in conjunction with the Center for Attitudinal Healing. He has letters of support on file documenting plans for this program and plan. Mr. Pertsoni also acknowledged that he would be willing to take any employment that he could find until he was able to set up the type of work he wants to do. He emphasized that he has worked his entire life and has always been able to find employment. He has never required government assistance and, in fact, sent money home to his family when he was newly arrived in the U.S. He has a history of being effective at using contacts and enlisting support to achieve his goals. He remains confident that he would be able to continue to do this in the future.

## CLINICAL ASSESSMENT

IV. Current Mental Status/Treatment Needs:

Mr. Pertsoni appeared to be his stated age. Inspite of having had a heart attack, he appeared robust and energetic. He is an outgoing man who has good social skills and gives the impression of being at ease with people. He was well groomed and neatly dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. Eye contact was good. His attitude was enthusiastic and cooperative. His manner was direct, confident and personable. Thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the above average range. He has been able to master English and gain academic skills. He has plans for future projects in his country that he has developed with a nonprofit agency and demonstrated insight into how this program could be helpful to people. Speech was animated and fluent. Affect was full range and stable. There was no evidence of disturbance of thought, mood, perception, cognition or affect. His judgement appeared to be sound. He retains religious and cultural values from his ethnic identity, and has also been able to adaptively incorporate other cultural values. He seems willing to take full responsibility for his actions and his future plans.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | V71.01  Adult Antisocial Behavior (by history, ) |
| AXIS II: | V71.09  No Diagnosis |
| AXIS III: | Cardiovascular Disease |
| AXIS IV: | Stressors: Life Sentence, Cultural Displacement |
| AXIS V: | Current Global Assessment of Functioning |
| | GAF = 90 |

Mr. Pertsoni does not have symptoms of a mental disorder. He requires no treatment for mental problems at this time, and has no known history of needing mental health treatment.

B. Current Level of Care: N/A as Mr. Pertsoni does not currently have a mental disorder

C. Treatment Activities:  N/A  as Mr. Pertsoni does not currently have a mental disorder.

D. Medications: N/A as Mr. Pertsoni does not currently have a mental disorder..

E. Prognosis: As he has no documented history of mental illness and no history of substance abuse, Mr. Pertsoni's mental functioning is expected to remain stable.

V.      Review of Life Crime

Mr. Pertsoni met the victim while both were living in Chicago.  They were introduced socially but he did not like the man because he knew his victim's reputation in the Albanian community as a supporter of the Yugoslav government.  He stated that the victim was an acknowledged Communist.  Mr. Pertsoni described him as being disliked in the Albanian community for his politics.  Conflict arose between the two men after they met in Chicago. Mr. Pertsoni stated that the man made threats against him and "tried to attack me."

The conflict between the men escalated in San Francisco after it became known in Mr. Pertsoni's ethnic community that the victim was being prosecuted on a rape charge.  Mr. Pertsoni objected to his fellow Albanians raising money for the man's defense, as he felt that the man "had taken her virginity and should be in jail." Police reports of the crime indicate that the victim of the rape had intended to rob Mr. Pertsoni's victim, so his perception of the woman's virtue was an indication of his cultural displacement.  He also heard the victim bragging about raping the woman and this upset him.

He stated that during this time, he didn't see the victim for a few months.  He continued going to the club frequented by men who spoke his language to drink coffee, eat baklava and socialize.  One night at the club, he saw the victim and the men argued.  The argument broke into a fight in which Mr. Pertsoni was hit and pushed down the stairs.  Mr. Pertsoni reported this incident to the FBI, thinking they were the only law enforcement agency.  The next day a couple of friends told Mr. Pertsoni that the victim said "he kicked my ass and the next time, he was going to kill me."

Mr. Pertsoni believed that the man had power in his country of origin and would be able to hurt his family.  He stated that he made a decision to move to Texas to get away from the victim.  While driving past a restaurant frequented by speakers of his native language, Mr. Pertsoni spotted the victim sitting is the window of the restaurant.  He called his friend who worked at the restaurant who said he knew the victim and that he was an angry person.  Mr. Pertsoni went to a store and bought a gun for protection and told his wife that they were moving back to San Francisco.  (A review of Mr. Pertsoni's records indicates that he has given slightly different accounts of his alleged encounter with the victim in Texas.)  He states that he is sure that the man was the victim and not a case of mistaken identity.

After he returned to San Francisco, he began to frequent the restaurant for coffee and conversation.  After returning from a holiday in Las Vegas with his wife, he went to the restaurant and suddenly encountered the victim.  He stated that the victim verbally threatened him.  He saw the man put his hand in his pocket as if he had a weapon.  Mr. Pertsoni stated that he then aimed his gun at the victim and that the victim grabbed the gun and threatened to "stick it in my ass."  According to Mr. Pertsoni, the gun went off and the victim fell.  "I shot

him 2 more times.  I don't make any excuse…I shot him the first time.  I was free of him.  I don't remember shooting the other 2 times."  Mr. Pertsoni left the club and went to a friend's house and told him what he had done.  His friend offered to give him money to leave the country, but he refused knowing that he would "have to face it."  He called his wife and explained to her what had happened and turned himself into authorities.

## VI .Assessment of Dangerousness:
The following is a risk assessment and not intended to predict future dangerousness with complete accuracy.  A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior.  Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

### A.  In a Controlled Setting:
Mr. Pertsoni has one RVR (6-23-86) for a fistfight, during his entire period of incarceration.  Based on his institutional adjustment and record, Mr. Pertsoni would be expected to continue to function in a non-violent manner in a controlled environment.

### B.  If Released to the Outside Community:
In 2002, Mr. Pertsoni was evaluated using 3 measures for predicting future risk for violence.  On the Psychopathy Checklist – Revised, (PCL-R), he received a score within the low range of severity.  He also received a rating that indicated low risk on the History-Clinical Risk – 20 (HCR-20).  On the Violence Risk Appraisal Guide (VRAG), Mr. Pertsoni scored in the moderately low range of violence risk.  It is important to note that this instrument measures static factors that do not measure contemporary functioning or gains.

The evaluation also cited several factors that were associated with reduced risk for future violence.  He has no juvenile record, was employed steadily, and family support.  He was also noted at that time to have no major mental illness, no significant attitudinal difficulties and a feasible release plan.

It was noted in Mr. Pertsoni's evaluation that his "criminal behaviors have been related either to the political turmoil and his personal biases regarding the governance of his homeland, or in association with language and cultural barriers he experienced as an immigrant.  Those factors have greatly modulated downward over time."

Mr. Pertsoni's only risk factor for future violence is his past history of violence.  His tendency to react with violence as a young man was the result of socialization in a politically volatile environment where he perceived much injustice and threat to his safety and the safety of his loved ones.  This preparedness to act violently to correct injustices or establish safety carried over in his life as a newly arrived immigrant in the United States.  He no longer feels that he has to act in the role of protector or enforcer.  Part of this is due to change in political climate, part to age and maturity, and part to learning new skills and acculturation.

He's case several positive factors associated with a low incidence of recidivism for violent behavior:

Pertsoni, Ali  C-48947                                      1-24-05

Addendum:

This is a correction to the Board of Prison Terms psychological evaluation of 1-19-06, p. 5, paragraph 3. The sentence should read as follows: "Given Mr. Pertsoni's institutional adjustment and continued progress, he *would be* expected to maintain his gains when released to the community."

_____  1 - 24 - 06  ____
Michel Lynn Inaba, Ph.D.                    Date

He has no history of mental illness or hospitalization for a mental disorder.
He does not have a personality disorder, and has not required psychiatric treatment while incarcerated.
He does not have a history of juvenile crime or early maladjustment.
He does not use alcohol.
He has more than one vocational trade that would make him employable after release.
He has a social support network from his wife locally, his ethnic community, and his extended family in Kosova.
He has no recent history of recent loss of control or impulsive behavior.
He does not see himself as a victim and does not have paranoid or violent thoughts.
He demonstrates remorse as well as compassion and caring for others.

It would seem that Mr. Pertsoni would be more than likely to maintain gains documented in his institutional records. He is strongly religious and does not espouse *any* anti-social values. He not only has no substance abuse history, but also has never engaged in the use of intoxicants. Other than one fistfight in prison, his violent behavior seems to have occurred solely in a political context that no longer exists.

The problems with aggression, impulse control, and grandiosity that resulted in the crime for which Mr. Pertsoni is incarcerated, seem to be well within Mr. Pertsoni's control at all times. This opinion is based on previous evaluations, his institutional record, and the present clinical evaluation. There is some degree of grandiosity in Mr. Pertsoni's personality, but without tendencies toward aggression and impulsivity, it is a character trait that is, at this point, benign. It may, in fact, serve him well in that he is more likely to take on projects and associate with individuals who can support him in gaining new skills, and achieving his stated goals of helping victims in his country. Given Mr. Pertsoni's institutional adjustment and continued progress, he would not be expected to maintain his gains when released to the community.

VII. Comments and Recommendations:
If Mr. Pertsoni follows his proposed parole plan that to return to his country in the company of his wife, he would seem to be at low risk of future violent behavior. He suffered a heart attack fairly recently, and feels he has developed a deeper appreciation for the value of life as a result of that experience. He is grateful to those who assisted him during his critical illness and becomes emotional when discussing the care and concern he received from doctors and staff. Mr. Pertsoni, in fact, expresses gratitude for many things that individuals who have lived in affluent cultures may take for granted. While he has become acculturated during his many years in the U.S., his personal and cultural identities remain tied to his country of origin. His orientation is to be law abiding, and he no longer feels a need to take the law into his own hands. He is not a career criminal, nor habitually aggressive. While he has proven that he was capable of violent behavior toward others, he has shown that he is able to control tendencies toward aggression for extended periods of time, even in a highly aggressive environment, such as prison.

Mr. Pertsoni has a set of religious and cultural values that place high value on community and family support and cohesion, and prohibit criminal behavior. He feels that he has

PERTSONI, Ali   C-48947                                              1-19-06

harmed his family and his culture through his actions and seeks to redress that harm. This includes making appropriate amends to the victim's family. He has thought about appropriate ways of doing this. Mr. Pertsoni stated that he has learned to trust authority and has learned to use the appropriate authorities for help when needed. He would be able to return to a country where this would now be possible.

If released from prison, he could be expected to be positively engaged in employment and to participate in community life, and life with his extended family. He understands the negative consequences of trying to solve a problem with violence and has gained skills to handle conflict effectively, without resorting to violence. Based on his institutional record, he can be expected to conform to any conditions of parole. Overall, his risk for future violence would appear to be lower than average. He would be expected to maintain his gains either in the U.S., or his homeland following release from prison.

1 - 20 - 06

Michel Lynn Inaba, Ph.D.
CDC Contract Psychologist



# OFFICE OF THE GOVERNOR

July 7, 2006

### *Via Facsimile and U.S. Mail*

Mr. Ali Pertsoni, C-48947
*California State Prison at San Quentin*
Post Office Box C-48947
San Quentin, California 94974

Dear Mr. Pertsoni:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

Attachment

cc:  Board of Parole Hearings (w/attachment)

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**ALI PERTSONI, C-48947**
**FIRST-DEGREE MURDER**

AFFIRM:                    _____

MODIFY:                    _____

REVERSE:                   _____ X _____


On July 27, 1981, Ali Pertsoni shot to death Fahri Repishti during an argument at a club.

Just after midnight, Mr. Pertsoni, armed with a gun, went to a local social club for some coffee. Upon entering the club, he saw Mr. Repishti. The two men apparently knew each other. Mr. Pertsoni saw Mr. Repishti sitting across the room and walked towards him. Likewise, Mr. Repishti walked toward Mr. Pertsoni, and the two men met near the middle of the room. The men exchanged words in a foreign language, and Mr. Pertsoni pulled out the gun and shot Mr. Repishti once in the stomach. After Mr. Repishti fell to the floor, Mr. Pertsoni, according to the probation report, "lost control of his temper" and shot Mr. Repishti two more times in the back of the head. Mr. Pertsoni turned and pointed the gun at other club patrons, telling them not to move. He then fled the club, leaving Mr. Repishti to die on the floor.

Mr. Pertsoni was arrested a short time later. Following a jury trial, he was convicted of first-degree murder enhanced for the use of a firearm. He was sentenced to 25 years to life for murder, plus a consecutive two-year term for the firearm enhancement.

When he perpetrated this crime, Mr. Pertsoni, an Albanian national from the former Yugoslavia, was 27 years old and had immigrated to the United States approximately six years earlier. Not long after he arrived in United States, Mr. Pertsoni was involved in a protest outside the Yugoslavian embassy in Chicago, at which he was arrested for shooting out a man's car windows. While no charges resulted from this incident, Mr. Pertsoni does not deny it occurred. He told the 2006 Board that he aimed at the man inside the car, but was only trying to scare him. In 1981, just months before Mr. Repishti's murder, Mr. Pertsoni was convicted of a separate assault with a deadly weapon. That incident involved the use of a car. Mr. Pertsoni's known criminal history is currently a negative factor weighing against his parole suitability because not only does it include assaultive conduct, but it occurred over a short period of time, just after he entered the United States, and up until he was finally incarcerated for the life offense.

Mr. Pertsoni's assaultive conduct did not stop upon entering state prison. He was disciplined in 1986 for fighting with another inmate. He also has been counseled eight times for minor misconduct, most recently in 1989. To his credit, however, Mr. Pertsoni has been discipline-free for approximately 20 years now and has made efforts during his incarceration to enhance his ability to function within the law upon release. He has completed numerous adult basic education and literacy courses. He has completed vocational furniture and dry cleaning, has

Ali Pertsoni, C-48947
First-Degree Murder
Page 2

earned additional certificates in dry cleaning and furniture, and has held institutional jobs as spray-booth lead man, chop-saw plainer, machine operator, janitor, chair sander, landscaping, porter, and dental prosthetic-appliance constructer. He has also availed himself of an array of self-help and therapy, including Developing a Positive Attitude Group, Victim Offender Education Group, TRUST, Hooked on Phonics, Emergency Management Institute, Katargeo, MANALIVE, and Alternatives to Violence. He additionally has maintained seemingly solid relationships and close ties with supportive family and friends and has received favorable evaluations from various correctional and mental-health professionals. All of these factors are supportive of Mr. Pertsoni's parole suitability at this time.

Mr. Pertsoni also has made plans upon release from prison. Subject to deportation to Kosovo, Serbia upon release, he reportedly has family with whom he can live and an employment offer there. He also has alternate plans, in the event he is not deported, to live with wife in San Francisco, his county of last residence, while working for a nearby real estate manager repairing houses.

Yet, despite any factors tending to support Mr. Pertsoni's suitability for parole at this time, the first-degree murder he perpetrated was especially heinous because of the cold and calculated manner in which it was carried out. According to the probation report, Mr. Pertsoni entered the social club armed with a gun. He approached Mr. Repishti, and the two men exchanged words before Mr. Pertsoni pulled out his gun and shot Mr. Repishti once in the stomach at close range. As Mr. Repishti "slumped" to the floor, Mr. Pertsoni looked at him, and then shot him in the back of the head. A witness said that Mr. Pertsoni waited another five seconds before firing one final shot into the back of Mr. Repishti's head. Not only was this a callous crime, but Mr. Pertsoni put multiple people at risk of death or serious injury by firing a gun three times inside of the occupied club, and by pointing the gun at the other patrons, telling them not to move, before fleeing the scene. The probation report states that the shootings occurred in the presence of 12 to 14 other people. The gravity of the first-degree murder perpetrated by Mr. Pertsoni is sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

The 2006 Board concluded that Mr. Pertsoni committed this murder "as a result of significant stress" in his life, noting that he was fearful of Mr. Repishti because of their divergent views on the treatment of Albanian people in Kosovo, Mr. Repishti's reputation for violence, and because of past confrontations between Mr. Pertsoni and Mr. Repishti. Regardless of whether and to what amount he suffered, given the nature and circumstances of the murder he committed, the existence of this factor does not now tip the scales in favor or Mr. Pertsoni's parole suitability.

While Mr. Pertsoni says that he accepts responsibility and is remorseful for what he did to Mr. Repishti, his version of events surrounding his crime has varied significantly over the years. According to his 1984 mental-health evaluation, Mr. Pertsoni viewed the shooting as self-defense. Based on the 1996 mental-health evaluation, however, he stated that the gun accidentally went off while he struggled with Mr. Repishti. Similarly, based on Mr. Pertsoni's description of the crime as summarized in the 1999 Life-Prisoner Evaluation, Mr. Pertsoni stated that the gun went off as the two men struggled. As Mr. Repishti fell to the floor, he continued struggling for the gun, and it "discharged" two more times into the back of Mr. Repishti's head.

Ali Pertsoni, C-48947
First-Degree Murder
Page 3

According to his 2002 mental-health evaluation, he said "I remember the gun going off the first time. We were fighting and it was self-defense." But unlike his statement in 1999, Mr. Pertsoni indicated that he did not remember shooting Mr. Repishti two more times in the back of the head. Likewise, at his 2006 mental-health evaluation, he said, "I shot [Mr. Repishti] the first time. I was free of him. I don't remember shooting the other two times." At his 2006 parole hearing, Mr. Pertsoni told the Board that after shooting Mr. Repishti in the stomach, he shot him two more times in the head because he was scared of Mr. Repishti, was angry at him, and still considered him a threat. The recurring and significant changes to Mr. Pertsoni's story—including changes made as recently as at his 2006 hearing—are evidence in the record that Mr. Pertsoni is either unable or unwilling to fully grasp or fully accept responsibility for the nature and magnitude of his actions.

Now age 52, after being incarcerated for nearly 25 years, Mr. Pertsoni has made some creditable gains. But given the record before me and after carefully considering the very same factors the Board must consider, I find the negative factors weighing against Mr. Pertsoni's parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Pertsoni.

Decision Date: 6-30-2006

ARNOLD SCHWARZENEGGER
Governor, State of California

HISTORY
1. Amendment of section title filed 10-27-77 as an emergency; effective upon filing. Certificate of Compliance included (Register 77, No. 44).

### § 2373.   Nonlife 1168 and ISL Prisoners: Parole Consideration Hearing Rights.

(a) Multijurisdiction Prisoners Located in California. At all hearings at which a prisoner is being considered for parole, all multijurisdiction prisoners located in California shall have the rights specified in Sections 2245–2255.

(b) Multijurisdiction Prisoners Located Outside California. At all hearings at which a prisoner is being considered for parole all multijurisdiction prisoners located outside California shall have the rights specified in Section 2367. The hearing shall be a telephone hearing.

(c) Record. The record of any parole consideration hearing shall be a tape recording. Until July 1, 1978, for all multijurisdiction ISL prisoners, the record shall be a written summary of the hearing prepared at the hearing by department staff. After July 1, 1978, the record shall be a tape recording.

HISTORY
1. Repealer of former Section 2373 and renumbering of Section 2374 to Section 2373 filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24). For history of former section, see Register 77, No. 44.

# Article 11.   Parole Consideration Criteria and Guidelines for Murders Committed on or After November 8, 1978, and Specified Attempted First Degree Murders Committed on or After January 1, 1987

### § 2400.   Scope of Article.

The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted first degree murders where the perpetrator is sentenced for life under the provisions of Penal Code Section 664, effective January 1, 1987. The guidelines in this article are based on the public's expressed intent in amending Penal Code Sections 190 and 664 that a person convicted of first or second degree murder or attempted first degree murder, as specified should be incarcerated for an extended period of time.

The prisoner's minimum eligible parole date is established by statute. The amount of good conduct credit that a prisoner sentenced for first or second degree murder may earn to reduce the minimum eligible parole date is established by statute. (Penal Code Sections 2930–2933.) Life prisoners convicted of attempted first degree murder do not earn these credits; their minimum eligible parole date will be established pursuant to Penal Code Section 3046. The Department of Corrections will determine the minimum eligible parole date. The length of time a prisoner must serve prior to actual release on parole is determined by the board. The amount of postconviction credit a prisoner may earn to reduce the length of time prior to release on parole is determined by the board. This article implements Penal Code Section 3041 and concerns only the board's exercise of discretion in determining whether a prisoner is suitable for parole and, if so, when the prisoner should be released on parole.

The standards for the Department's action in reducing the minimum eligible parole date and the standards for the board's decision whether to reduce the period of confinement are different. The Department's decisions under Penal Code Sections 2930–2933 do not affect the board's decision concerning postconviction credit under these rules.

A prisoner committed for first or second degree murder or attempted first degree murder shall have his or her initial parole consideration hearing as provided in Section 2268. The prisoner will have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit will be granted until the board has established a period of confinement.

Although many of the sections in this article are the same as the sections in Article 5, they are repeated in this article to avoid confusion between the rules applicable to prisoners who committed murders on or before November 7, 1978 and these rules which apply to prisoners who committed murders on or after November 8, 1978, and those who committed attempted murder on or after January 1, 1987. The suitability criteria are the same for both groups. The guidelines for establishing the periods of confinement are different because of the change in the minimum term for first degree murder and the change from a determinate to an indeterminate term for second degree murder and attempted first degree murder. The provisions for adjusting the terms for other offenses are also different because of the change in Penal Code Section 669 which permits courts to impose sentences consecutive to life terms (Stats. 1978, Ch. 579, eff. 1/1/79).

As used in this article, "life prisoner(s)" refers only to persons committed to prison for first or second degree murders committed on or after November 8, 1978, or to persons committed to prison for life for attempted murders committed on or after January 1, 1987.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 190, 664, 2930–2933, 3040, 3041, 3046 and 5076.1, Penal Code.

HISTORY
1. New Article 11 (Sections 2400–2411) filed 9–8–81; effective thirtieth day thereafter (Register 81, No. 37).
2. Amendment filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).
3. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).
4. Amendment filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2401.   General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

HISTORY
1. Amendment filed 8–12–82; effective thirtieth day thereafter (Register 82, No. 33).
2. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2402.   Determination of Suitability.

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, dur-


Page 73
Exhibit V

and after the crime; past and present attitude toward the crime; any ditions of treatment or control, including the use of special conditions er which the prisoner may safely be released to the community; and other information which bears on the prisoner's suitability for re- .e. Circumstances which taken alone may not firmly establish unsuit- ity for parole may contribute to a pattern which results in a finding insuitability.

c) Circumstances Tending to Show Unsuitability. The following cir- nstances each tend to indicate unsuitability for release. These circum- ices are set forth as general guidelines; the importance attached to any :umstance or combination of circumstances in a particular case is left he judgment of the panel. Circumstances tending to indicate unsuit- lity include:

:1) Commitment Offense. The prisoner committed the offense in an lecially heinous, atrocious or cruel manner. The factors to be consid- d include:

(A) Multiple victims were attacked, injured or killed in the same or larate incidents.

(B) The offense was carried out in a dispassionate and calculated man- r, such as an execution–style murder.

(C) The victim was abused, defiled or mutilated during or after the of- ise.

(D) The offense was carried out in a manner which demonstrates an ceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation the offense.

(2) Previous Record of Violence. The prisoner on previous occasions flicted or attempted to inflict serious injury on a victim, particularly if e prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or multuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually as- ulted another in a manner calculated to inflict unusual pain or fear upon e victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe ental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious mis- nduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following cir- mstances each tend to show that the prisoner is suitable for release. The cumstances are set forth as general guidelines; the importance at- hed to any circumstance or combination of circumstances in a particu- case is left to the judgment of the panel. Circumstances tending to in- :ate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assault- ; others as a juvenile or committing crimes with a potential of personal rm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indi- cate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the re- sult of significant stress in his life, especially if the stress has built over a long period of time.

(5) Lack of Criminal History. The prisoner lacks any significant histo- ry of violent crime.

(6) Age. The prisoner's present age reduces the probability of recidi- vism.

(7) Understanding and Plans for Future. The prisoner has made realis- tic plans for release or has developed marketable skills that can be put to use upon release.

(8) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 3041, Pe- nal Code.

## § 2403.  Base Term.

(a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. If the prisoner has been received in prison for more than one murder committed on or after November 8, 1978 the base crime is the most serious of the murders considering the facts and circumstances of the crime. If the prisoner has been sentenced to prison for murders com- mitted before November 8, 1978 and for murders committed on or after November 8, 1978 the base offense shall be the most serious of the mur- ders committed on or after November 8, 1978.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the cate- gory most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

Provided, however in cases of attempted murder, after determining the category as specified, the panel shall impose one–half the middle base term, unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as pro- vided in Sections 2404 or 2405, the panel may impose the upper or lower base term provided in the matrix by stating the specific reason for impos- ing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case and if the facts supporting the term imposed are stated.

(b) Matrix of Base Terms for First Degree on or after November 8, 1978.

## CIRCUMSTANCES

| FIRST DEGREE MURDER Penal Code § 189 (in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of irrelevantly force prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred; e.g., crime partner, drug dealer, etc. | 25—26—27 | 26—27—28 | 27—28—29 | 28—29—30 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26—27—28 | 27—28—29 | 28—29—30 | 29—30—31 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 27—28—29 | 28—29—30 | 29—30—31 | 30—31—32 |
| IV. Threat to Public Order or Murder for Hire The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 28—29—30 | 29—30—31 | 30—31—32 | 31—32—33 |

### SUGGESTED BASE TERM

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

## CIRCUMSTANCES

| SECOND DEGREE MURDER Penal Code § 189 (in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or action calculated to induce terror in the victim. |
|---|---|---|---|
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 15—16—17 | 16—17—18 | 17—18—19 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16—17—18 | 17—18—19 | 18—19—20 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 17—18—19 | 18—19—20 | 19—20—21 |

### SUGGESTED BASE TERM

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

#### HISTORY
1. Editorial correction filed 10-8-81; effective thirtieth day thereafter (Register 81, No. 41).
2. Amendment of subsection (a) filed 1-20-88; operative 2-19-88 (Register 88, No. 5).

## § 2404.   Circumstances in Aggravation of the Base Term.

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(7) The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime;

(8) The murder was wanton and apparently senseless in that it was committed after another crime occurred and served no purpose in completing that crime;

(9) The corpse was abused, mutilated or defiled;

(10) The prisoner went to great lengths to hide the body or to avoid detection;

(11) The murder was committed to prevent discovery of another crime;

(12) The murder was committed by a destructive device or explosives;

(13) There were multiple victims for which the term is not being enhanced under Section 2407;

(14) The prisoner intentionally killed the victim by the administration of poison;

(15) The prisoner intentionally killed the victim by lying in wait;

(16) The prisoner occupied a position of leadership or dominance over other participants in the commission of the crime, or the prisoner induced others to participate in the commission of the crime;

(17) The prisoner has a history of criminal behavior for which the term is not being enhanced under Section 2407;

(18) The prisoner has engaged in other reliably documented criminal conduct which was an integral part of the crime for which the prisoner is currently committed to prison;

(19) The prisoner was on probation or parole or was in custody or had escaped from custody at the time the crime was committed;

(20) Any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041 Penal Code.

## § 2405.  Circumstances in Mitigation of the Base Term.

(a) General. The panel shall impose the lower base term or another term shorter than the middle base term upon a finding of mitigating circumstances. Circumstances in mitigation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category lower on either axis than the categories chosen as most closely related to the crime;

(2) The prisoner participated in the crime under partially excusable circumstances which do not amount to a legal defense;

(3) The prisoner had no apparent predisposition to commit the crime but was induced by others to participate in its commission;

(4) The prisoner tried to help the victim or sought aid after the commission of the crime or tried to dissuade a crime partner from committing other offenses;

(5) The prisoner was a passive participant or played a minor role in the commission of the crime;

(6) The crime was committed during or due to an unusual situation unlikely to reoccur;

(7) The crime was committed during a brief period of extreme mental or emotional trauma;

(8) The prisoner has a minimal or no history of criminal behavior;

(9) Any specific factors in mitigation, including those listed in the Sentencing Rules for Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

## 2406.  Adjustment for Weapons, Great Loss and Prior Prison Terms.

(a) General. Effective January 1, 1979, Penal Code Section 669 was amended to permit the court to impose enhancements under Penal Code Sections 12022, 12022.5, 12022.6 and 667.5 consecutive to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion whether to impose or strike the punishment upon a finding that the prisoner used a deadly or dangerous weapon, was armed with a firearm, used a firearm, caused great loss or served prior prison terms, the board shall consider

the court's action in determining the adjustment under this section.

(b) Punishment Imposed by the Court. If the court imposed the consecutive punishment for the enhancement, the board shall not add an additional adjustment for using a deadly or dangerous weapon, being armed with a firearm, using a firearm, causing great loss in committing the murder, or having served a prior prison term.

(c) Punishment Stricken by Court. If the court struck the punishment upon a finding of circumstances in mitigation, the board shall consider any circumstances in mitigation. The board may add an adjustment for using a deadly or dangerous weapon, being armed with a firearm, using a firearm, causing great loss or having served a prior prison term. The suggested adjustment is one-half the punishment that was stricken by the court.

(d) No Allegation or Finding. If the board finds that the prisoner used a deadly or dangerous weapon, was armed with a firearm, used a firearm, caused great loss or served a prior prison term although that fact was not found to be true at the time of the prisoner's conviction, the board may add an adjustment based on that finding. The adjustment should be less than the adjustment suggested in subdivision (c) of this section.

In adding adjustments for prior prison terms under this subsection, the panel should consider the length of time between the prisoner's release from custody and commission of a new offense.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 3040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

## § 2407.  Adjustments for Other Offenses.

(a) General. Effective January 1, 1979 Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime and base term as provided in Section 2403(a). The board shall add adjustments for the remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for a second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the Board shall not add additional adjustment for the nonlife crime.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for the nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 2271(c) for crimes which carry a sentence of one year and one day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code.

HISTORY

1. Amendment of subsection (b)(3)(B) filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

## § 2408. Circumstances in Aggravation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2407 include:

(a) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(b) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions, but not resulting in adjustments under Section 2407.

(c) Crimes of Increasing Seriousness. The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(d) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place, indicating a significant pattern of criminal behavior rather than a single period of aberrant behavior.

(e) Status. The prisoner was on probation or parole or was in custody or had escaped from custody when the crime was committed.

(f) Vulnerability. The victim was particularly vulnerable.

(g) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code: Sentencing Rules for the Superior Courts.

## § 2409. Circumstances in Mitigation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2407, or which may justify no adjustment, include:

(a) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(b) Insignificant Prior Record. The other crime indicates an insignificant pattern of prior criminal behavior. For example, the other crime is unrelated to the principal offense in time, in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct.

(c) Probation. The prisoner was granted probation after conviction of the other crime.

(d) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code: Sentencing Rules for the Superior Courts

## § 2410. Postconviction Credit.

(a) General. Life prisoners may earn postconviction credit for each year spent in state prison from the date the life-term starts. Prior to the initial parole consideration hearing life prisoners shall have documentation hearings as provided in Section 2269.1. At the documentation hearings, the board shall document the prisoner's performance, participation, behavior and other conduct as specified in subsection (c) of this section. Credit shall not be granted or denied at these hearings. The documentation shall be used by the panel which establishes a parole date to determine how much, if any, credit should be granted for the years served prior to the establishment of the parole date. Once a parole date is established, postconviction credit for time served since the last hearing shall be considered at the progress hearings scheduled as provided in Section 2269.

The board shall consider each case individually in determining the amount of credit. This section provides guidelines for granting credit but a panel may grant more or less credit as appropriate.

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances. The suggested amount of postconviction credit is zero to 4 months for each year served since the date the life term started excluding any time during which service of the life term is tolled.

The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of credit. Less than 4 months credit may be granted if the prisoner fails to meet the general expectations set forth in Section 2410(c). More than 4 months credit may be granted if the prisoner demonstrates exceptional performance in a work assignment, exceptional participation in self–help or rehabilitative programs, or other exemplary conduct. If the panel grants more than 4 months of postconviction credit for any year, the case shall be reviewed as provided in Sections 2041–2043.

Provided, however, postconviction credits which would advance the parole release date to less than 180 days from the date of the hearing shall not be granted unless or *until the parole review authority of the Governor is exercised pursuant to Penal Code section 3041.1.*

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC Rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institution, the prisoner's custody status, and any other impediments to the prisoner's receiving work assignment.

(2) Participation in Self–Help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self development (refer to CDC Rules 3040 and 3041). Lack of program participation shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of programs at the institution, the prisoner's custody status, and any other impediments to the prisoner's participation in programs.

(3) Behavior in the Institutional Setting. All life prisoners are presumed to behave in a disciplinary–free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000–3021). However, a minor disciplinary offense shall not necessarily prevent the granting of postconviction credit.

(d) Credit Not Granted. No annual postconviction credit shall be granted in the case of any prisoner who commits serious (as defined in 15 CCR Section 3315) or numerous (more than three) infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see Section 2451) unless the panel finds evidence in mitigation and supports such finding with a statement of its reasoning.

Consistent unsatisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the withholding of annual postconviction credit which otherwise could have been granted.

(e) Change in Parole Date. Once postconviction credit is granted for particular year of imprisonment, the credit shall be applied to any new term established after rescission or reconviction after a reversal.

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: See tions 3040 and 3041, Penal Code *In re Stanley*, 54 Cal.App.3d 1030 (1976).

HISTORY

1. Amendment of subsection (d) and NOTE filed 8–15–91; operative 9–16–91 (Register 91, No. 51)

2. Amendment of subsections (b) and (c)(2) filed 12–20–93; operative 1–19–94 (Register 93, No. 52).

## § 2411. Fixing a Parole Date.

(a) Total Period of Confinement. The terms established for the base crime and any adjustments shall be added together resulting in a total pe-

] of confinement. The total period of confinement shall be reduced by postconviction credit granted under Section 2410. This results in the ]sted period of confinement.

b) Period of Prison Confinement. Any preprison credit shall be deted from the total period of confinement as provided in Sections 1–2345. This results in the total period of prison confinement. The toperiod of prison confinement shall be reduced by any postconviction Jit granted under Section 2410. This results in the adjusted period of on confinement.

c) Release Date. The adjusted period of prison confinement and any : at large shall be added to the date the life term starts. This results in parole date. For purposes of determining the parole date, the life terms ts on:

1) Consecutive Life Sentences. The date the prisoner was received er Penal Code Section 2900 or 1203.2a for the earliest life sentence ic prisoner is sentenced to prison with consecutive life sentences.

2) Concurrent Life Sentences. The date the prisoner was received unPenal Code Section 2900 or 1203.2a for the earliest life sentence used alculating the parole date if the prisoner is sentenced to prison with current life sentences.

3) Consecutive Nonlife Sentences for Crimes or Enhancements. The the prisoner completed serving the nonlife sentence or the sentence the consecutive enhancement under Penal Code Section 669 if the oner is sentenced to prison with nonlife sentences which are consecuto life sentence or with court imposed consecutive enhancements.

4) Concurrent Nonlife Sentences. The date the prisoner was received he life crime under Penal Code Section 2900 or 1203.2a, if the prisonsentenced to prison with nonlife sentences which are concurrent to life sentences. If the panel added any adjustments for the nonlife ies and the prisoner was received for those crimes prior to the date /as received for the life crime, the time served for those nonlife crimes r to the date the life term starts shall be deducted from the adjustment he nonlife crime.

E. Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, i.2a and 2900, Penal Code.

HISTORY
ndment of subsection (b) filed 11-13-85; effective thirtieth day thereafter egister 85, No. 46).

## Article 12.  Parole Consideration Criteria and Guidelines for Habitual Offenders Sentenced to Life Terms Under Penal Code Section 667.7

### 20.  Scope of Article.
he criteria and guidelines in this article shall apply to prisoners sened to a term of 20 years to life as habitual offenders under Penal Code ion 667.7 for crimes committed on or after January 1, 1982. The clines in this article shall be construed to be based on the public's exssed intent in adding Section 667.7 to the Penal Code that a person icted of a felony in which the person inflicts great bodily injury or personally uses force likely to produce great bodily injury, and who crved two or more prior prison terms for specified crimes should be cerated for an extended period of time.

he general statement in Section 2400 regarding the differences ben the minimum eligible parole date and the parole release date shall omplied with as if incorporated herein.

prisoner committed as a habitual offender shall have his initial paconsideration hearing in the thirteenth month prior to the minimum bic parole date. The prisoner shall have documentation hearings as ided in Section 2269.1, but no specific amount of postconviction it shall be granted until the board has established a period of confinet.

L. Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, -2933, 3040 and 3041, Penal Code.

HISTORY
1. New Article 12 (Sections 2420–2429.1) filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).

### § 2421.  General.
A habitual offender shall be considered for parole for the first time at the initial parole consideration hearing. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2422(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2422(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining suitability for parole and the setting of parole dates, the circumstances of the crimes for which the prisoner was sentenced, and any circumstances in aggravation or mitigation.

In setting the base period of confinement, the panel shall consider the circumstances of the current and prior offenses resulting in the conviction as a habitual offender, including the number of prior prison terms for specified crimes and the extent of injury to the victim of the current offense. The panel may then make adjustments to the base period of confinement for other factors.

The circumstances tending to show suitability and unsuitability, and the circumstances in aggravation and mitigation contained in this article shall be construed as guidelines only. The panel may make findings outside the guidelines when warranted in the individual case and reasons are stated on the record.

NOTE: Authority cited: Section 5076.2. Penal Code. Reference: Sections 667.7, 3040 and 3041, Penal Code.

### § 2422.  Determination of Suitability.
(a) General. The panel shall first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. At all parole consideration hearings for habitual offenders the panel shall consider the information described in Section 2281(b).

(c) Circumstances Tending to Show Unsuitability. The panel shall consider those circumstances listed in Section 2281(c) which the panel finds are appropriate to the case of a habitual offender. The panel may make other findings when warranted by the circumstances of an individual case and reasons are stated in the record.

(d) Circumstances Tending to Show Suitability. The panel shall consider those circumstances listed in Section 2281(d) which the panel finds are appropriate to the case of a habitual offender. The panel may make other findings when warranted by the circumstances of an individual case and reasons are stated in the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7 and 3041. Penal Code.

### § 2423.  Base Term.
(a) General. The panel shall set a base term for each habitual offender who is found suitable for parole. The base term shall be established based on the circumstances of the series of prior and current offenses which resulted in conviction as a habitual offender, considered as a whole.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the most serious of the series of prior and current offenses which resulted in commitment as an habitual offender. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in Sections 2424 or 2425, the panel may impose the upper or lower base term provided in the matrix by stating the specific reason for imposing such a term. A base term other than the upper, middle, or lower base

term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case and if the facts supporting the term imposed are stated.

(b) Matrix of base terms for prisoners sentenced to terms of 20 years to life as habitual offenders under Penal Code Section 667.7 for crimes committed on or after January 1, 1982.

## CIRCUMSTANCES

| HABITUAL OFFENDERS<br>Penal Code § 667.7<br>(in years and does not include postconviction credit as provided for in § 2410) | A. Crime included a single victim who did not require extensive medical treatment or prisoner was a passive participant or played a minor role in the crime. | B. Crime involved multiple victims or there were multiple injuries inflicted on the same or different victims. | C. Victim was tortured or suffered loss of bodily member or organ, or duration of offense was lengthy and prisoner had an opportunity to cease but instead continued. | D. Crime involved intricate planning or there exists facts which indicate the crime was committed in a manner which demonstrates an exceptionally callous disregard for human suffering. |
|---|---|---|---|---|
| I.<br>Contributing Victim<br>While not an accomplice, victim was involved in criminal activity which contributed to the motivation for the crime, i.e., drug dealer, sex offender, etc. | 20–22–24 | 21–23–25 | 22–24–26 | 23–25–27 |
| II.<br>Prior relationship<br>Victim was involved in a prior relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the crime. | 21–23–25 | 22–24–26 | 23–25–27 | 24–26–28 |
| III.<br>Vulnerable victim<br>Victim was particularly vulnerable due to age or physical or mental condition. | 22–24–26 | 23–25–27 | 24–26–28 | 25–27–29 |
| IV.<br>Injury to victim<br>Victim suffered fatal injury, required extensive medical treatment, or was permanently disabled as result of the crime. | 23–25–27 | 24–26–28 | 25–27–29 | 26–28–30 |

## SUGGESTED BASE TERMS

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Sections 667.7 and 3041, Penal Code.

HISTORY

1. Amendment of section and NOTE filed 3–15–93; operative 4–14–93 (Register 93, No. 12).

2. Editorial correction adding subsection (b) and matrix (Register 93, No. 17).

§ 2424. **Circumstances in Aggravation of the Base Term.**

Circumstances in aggravation of the base term include but are not limited to:

(a) Criminal History

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time after release on parole.

(3) The prisoner has been convicted of other offenses during the periods between the commission of the current offense and the offenses underlying the prior prison terms.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.7.

(b) Circumstances of Offenses.

(1) The current offense or offenses resulted in greater injury to one or more victims than is required for a finding under Penal Code Section 12022.7.

(2) The current offense or offenses or the offenses underlying the prior prison terms resulted in death to one or more victims.

(3) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the prisoner preys on victims who are particularly vulnerable, or who occupy a position of trust in relation to the prisoner.

(4) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate a pattern of the commission of similar violent crimes; i.e., conviction for three or more sexual offenses, or three or more offenses involving use of a firearm.

(c) The Circumstances in Aggravation enumerated in Sections 2283, cept subdivision (a)(1), and 2404, as appropriate to the case of a habitual offender.

(d) Any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 3040 and 3041, Penal Code.

## 2425. Circumstances in Mitigation of Base Term.

Circumstances in mitigation include but are not limited to:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the or prison terms are non–violent offenses not listed in Penal Code Section 667.5(c).

(2) There is a relatively long period of crime-free conduct, including successful completion of parole, between commission of the offenses relating in commitment as a habitual offender.

(3) The prisoner has no other convictions for violent crimes as defined Penal Code Section 667.5(c) other than those resulting in commitment a habitual offender.

(b) Circumstances of Offenses.

(1) The great bodily injury to the victim in the current offense was no ater than that required for a finding under Penal Code Section 022.7, and the prisoner did not personally inflict injury on any other im of any offense of which he has previously been convicted.

(2) The current offense or offenses did not involve use of a firearm, and offenses underlying the prior prison terms did not involve use of a earm, or arming or use of a deadly or dangerous weapon.

(c) The Circumstances in Mitigation enumerated in Sections 2284, except subdivision (a)(1), and 2405, as appropriate to the case of a habitual ender.

(d) Any other circumstances in mitigation including those listed in the ntencing Rules for the Superior Courts.

TE Authority cited: 5076.2, Penal Code. Reference. Sections 667.7, 3040 and 11, Penal Code.

## 2426. Adjustment for Weapons, Great Loss, Great Bodily Injury and Prior Prison Terms.

(a) The panel shall consider the addition of adjustments for weapons. at loss, and prior prison terms as provided in Section 2406.

(b) The panel shall consider the addition of an adjustment for great ily injury using the guidelines as provided in Section 2406 for the addition of adjustments for weapons, great loss, and prior prison terms.

(c) The panel shall not add adjustments for prior prison terms or findings of great bodily injury which resulted in the commitment as a habitual ender.

re: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.5, 7, 3040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

## 2427. Adjustments for Other Offenses.

(a) General. Effective January 1, 1979, Penal Code Section 669 was ended to permit the court to impose sentences for other crimes to be ved consecutively to a life sentence (Stats. 1978, Ch. 579). Since the in has discretion to order that the sentences for more than one crime erved consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

1) General. The board shall not add adjustments for convictions for ich the prisoner has been pardoned or which have been reversed by an ellate court.

2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime base term. The board shall add adjustments for the remaining life nes. The adjustment for each remaining life crime shall be a period

of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

i. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for a second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the board shall not add additional adjustments for the nonlife crimes.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for the nonlife crime prior to reception on the life offense; or

(B) One–half the determinate term imposed by the court; or

(C) One–half the term that would be established under Section 2271 for crimes which carry a sentence of a year and a day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1170, 3040 and 3041, Penal Code.

## § 2428. Circumstances in Aggravation and Mitigation of the Adjustment for Other Crimes.

(a) Circumstances in Aggravation. Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2427 include:

(1) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(2) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions but not resulting in adjustments under Section 2427.

(3) The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(4) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place.

(5) Status. The prisoner was on probation or parole or had escaped from custody when the other crime was committed.

(6) Vulnerability. The victim was particularly vulnerable.

(7) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

(b) Circumstances in Mitigation. Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2427, or which may justify no adjustment, include:

(1) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(2) Probation. The prisoner was granted probation after conviction of the other crime.

(3) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1170, 3040 and 3041, Penal Code; and Sentencing Rules for the Superior Courts.

### § 2429.   Postconviction Credit.

The application of postconviction credit shall be considered as provided in Section 2410.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 3040 and 3041, Penal Code; *In re Stanley*, 54 Cal.App.3d 1030 (1976).

### § 2429.1.   Fixing a Parole Date.

The parole date shall be determined as provided in Section 2411.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1203.2a and 2900, Penal Code.

## Article 13.   Parole Consideration Criteria and Guidelines for Sex Offenders Sentenced to Life Terms Under Penal Code Section 667.51

### § 2430.   Scope of Article.

The criteria and guidelines in this article shall apply to prisoners sentenced to a term of 15 years to life under Penal Code Section 667.51. The guidelines in this article shall be construed as based on the public's expressed intent in adding Section 667.51 to the Penal Code that a person convicted of lewd or lascivious acts committed against a child under the age of 14, and who has served two or more prior prison terms for specified sex crimes should be incarcerated for an extended period of time.

The general statement in Section 2400 regarding the differences between the minimum eligible parole date and the parole release date shall be construed as if incorporated herein.

A person committed under Penal Code Section 667.51 shall have his initial parole consideration hearing in the thirteenth month prior to the minimum eligible parole date. The prisoner shall have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit shall be granted until the board has established a period of confinement.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 667.7, 2930–2933, 3040 and 3041, Penal Code.

HISTORY

1. New Article 13 (Sections 2430–2439.1) filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).

### § 2431.   General.

A sex offender shall be considered for parole for the first time at the initial parole consideration hearing. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2432(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2432(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting a parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining suitability for parole and the setting of parole dates, the circumstances of the crimes for which the prisoner was sentenced and any circumstances in aggravation or mitigation.

In setting a base period of confinement, the panel shall consider the circumstances of the current and prior offenses resulting in conviction under Penal Code Section 667.51.

The circumstances tending to show suitability and unsuitability, and the circumstances in aggravation and mitigation contained in this article shall be construed as guidelines only. The panel may make findings outside the guidelines when warranted in the individual case and reasons are stated on the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 3040 and 3041, Penal Code.

### § 2432.   Determination of Suitability.

(a) General. The panel shall first determine whether the prisoner suitable for release on parole. Regardless of the length of time served, prisoner shall be found unsuitable for and denied parole if in the judg ment of the panel the prisoner will pose an unreasonable risk of dang to society if released from prison.

(b) Information Considered. At all parole consideration hearings f sex offenders the panel shall consider the information described in Sec tion 2281(b).

(c) Circumstances Tending to Show Unsuitability. The panel sha consider those circumstances listed in Section 2281(c) which the pane finds are appropriate to the case of a sex offender. The panel may mak other findings when warranted by the circumstances of an individual cas and reasons are stated in the record.

(d) Circumstances Tending to Show Suitability. The panel shall con sider those circumstances listed in Section 2281(d) which the panel finds are appropriate to the case of a sex offender. The panel may make other findings when warranted by the circumstances of an individual case and reasons are stated in the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51 and 3041, Penal Code.

### § 2433.   Base Term.

(a) General. The panel shall set a base term for each sex offender who is found suitable for parole. The base term shall be established based on the circumstances of the series of prior and current offenses which resulted in conviction as a sex offender, considered as a whole. The panel shall set a base term which it finds to be appropriate in an individual case after consideration of the Circumstances in Aggravation listed in Section 2434 and the Circumstances in Mitigation listed in Section 2435, and any other circumstances which appear to be important in the judgment of the panel.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51 and 3041, Penal Code.

### § 2434.   Circumstances in Aggravation of the Base Term.

Circumstances in aggravation of the base term include:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time of each other.

(3) The prisoner has been convicted of offenses, misdemeanors or felonies, involving sexually aberrant behavior other than those resulting in the life sentence under Penal Code Section 667.51.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.51.

(5) The current or prior commitments to state prison resulted from multiple convictions for sex and sex–related offenses.

(b) Circumstances of Offenses.

(1) The current offense or offenses or the offenses underlying the prior prison terms resulted in physical or psychological injury to the victim beyond that occasioned by the sex act.

(2) The current offense or offenses or the offenses underlying the prior prison terms involved arming or use of a firearm or deadly or dangerous weapon.

(3) The current offense or offenses and the offenses underlying the prior prison terms establish a pattern of sexual crimes against children.

(4) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the prisoner preys on victims who are particularly vulnerable resulting from factors other than the age or sex of the victim, and/or who occupy a position of trust in relation to the prisoner.



(c) The Circumstances in Aggravation listed in Sections 2283, except subdivision (a)(1), and 2404, as appropriate to the case of a habitual sex offender.

(d) Any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 3040 and 3041, Penal Code.

## § 2435.  Circumstances in Mitigation of the Base Term.

Circumstances in mitigation of the base term include:

(a) Criminal History.

(1) The offenses underlying the prior prison terms were for non-violent offenses not listed in Penal Code Section 667.5(c).

(2) The prisoner has no other convictions for sex or sex-related offenses other than those resulting in commitment under Penal Code Section 667.51.

(3) The current and previous commitments resulted from a single sex offense committed against a single victim.

(b) Circumstances of Offense.

(1) The current offense or offenses and the offenses underlying the prior prison terms resulted in no physical or psychological injury to any victim beyond that directly resulting from the sex act.

(2) The current offense or offenses and the offenses underlying the prior prison terms did not involve arming or use of a firearm or deadly or dangerous weapon.

(3) The commission of the offenses resulting in commitment under Penal Code Section 667.51 appear to have resulted from a psychological condition for which the prisoner has voluntarily and continuously sought treatment.

(c) The Circumstances in Mitigation listed in Sections 2284, except (a)(1), and 2405, as appropriate to the case of a habitual sex offender.

(d) Any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 3040 and 3041, Penal Code.

## § 2436.  Adjustment for Weapons, Great Loss, Great Bodily Injury and Prior Prison Terms.

(a) The panel shall consider the addition of adjustments for weapons, great loss, and prior prison terms as provided in Section 2406.

(b) The panel shall consider the addition of an adjustment for great bodily injury using the guidelines as provided in Section 2406 for the addition of adjustments for weapons, great loss and prior prison terms.

(c) The panel shall not consider adjustments for prior prison terms which resulted in the commitment as a sex offender.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.5, 667.51, 3040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

## § 2437.  Adjustments for Other Offenses.

(a) General. Effective January 1, 1979, Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime and base term. The board shall add adjustments for the remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for a second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the board shall not add additional adjustments for the nonlife crimes.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for the nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 2271 for crimes which carry a sentence of a year and a day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 669, 1170, 3040 and 3041, Penal Code.

## § 2438.  Circumstances in Aggravation and Mitigation of the Adjustment for Other Crimes.

(a) Circumstances in Aggravation. Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2437 include:

(1) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(2) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions but not resulting in adjustments under Section 2437.

(3) The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(4) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place.

(5) Status. The prisoner was on probation or parole or had escaped from custody when the other crime was committed.

(6) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

(b) Circumstances in Mitigation. Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2437, or which may justify no adjustment, include:

(1) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(2) Probation. The prisoner was granted probation after conviction of the other crime.

(3) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 669, 1170, 3040 and 3041, Penal Code; and Sentencing Rules for the Superior Courts.

## § 2439.  Postconviction Credit.

The application of postconviction credit shall be considered as provided in Section 2410.

130

1    your counsel will explain this to you if you
2    don't understand. We used Section 2403(b),
3    first-degree murder, offense committed on or
4    after November 8, 1978. The panel finds that
5    category 2-B is appropriate in that you did have
6    a prior relationship to some extent, you knew
7    the victim, and that the victim died as a result
8    of your actions. We assess the middle term of
9    28 years. Twenty-eight years times 12 months is
10   336 months. You were received by the Department
11   in 1984 and for 20 years you have remained
12   disciplinary-free. In other words, no 115s. We
13   took the one year in which you received the 115,
14   we gave you no credit for that, but we gave you
15   credit for the rest of the years. So every year
16   that you have remained disciplinary-free we have
17   given you 4 months credit. So we gave you 4
18   months credit for 20 years, that's a total of 80
19   months. We subtracted that from 336, which
20   brings your base term -- your term, your total
21   term down to 256 months, which equals 21 years
22   and 4 months. Okay? So you are -- I think
23   you're there. I think you're there. Somebody
24   else in records is going to do the actual
25   calculations. If you're not there you're very,
26   very close, okay, 21 years 4 months.
27   **ALI PERTSONI   C-48947   DECISION PAGE 15   02/08/06**

Exhibit W

(C) One-half the term that would be established under Section 2271(e) for crimes which carry a sentence of one year and one day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code.

HISTORY

1. Amendment of subsection (b)(3)(B) filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2408. Circumstances in Aggravation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2407 include:

(a) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(b) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions, but not resulting in adjustments under Section 2407.

(c) Crimes of Increasing Seriousness. The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(d) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crimes was committed at a different time and place, indicating a significant pattern of criminal behavior rather than a single period of aberrant behavior.

(e) Status. The prisoner was on probation or parole or was in custody or had escaped from custody when the crime was committed.

(f) Vulnerability. The victim was particularly vulnerable.

(g) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code. Sentencing Rules for the Superior Courts.

### § 2409. Circumstances in Mitigation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2407, or which may justify no adjustment, include:

(a) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(b) Insignificant Prior Record. The other crime indicates an insignificant pattern of prior criminal behavior. For example, the other crime is unrelated to the principal offense in time, in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct.

(c) Probation. The prisoner was granted probation after conviction of the other crime.

(d) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code. Sentencing Rules for the Superior Courts.

### § 2410. Postconviction Credit.

(a) General. Life prisoners may earn postconviction credit for each year spent in state prison from the date the life term starts. Prior to the initial parole consideration hearing life prisoners shall have documentation hearings as provided in Section 2269.1. At the documentation hearings, the board shall document the prisoner's performance, participation, behavior and other conduct as specified in subsection (c) of this section. Credit shall not be granted or denied at these hearings. The documentation shall be used by the panel which establishes a parole date to determine how much, if any, credit should be granted for the years served prior to the establishment of the parole date. Once a parole date is established, postconviction credit for time served since the last hearing shall be considered at the progress hearings scheduled as provided in Section 2269.

The board shall consider each case individually in determining the amount of credit. This section provides guidelines for granting credit but a panel may grant more or less credit as appropriate.

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances. The suggested amount of postconviction credit is zero to 4 months for each year served since the date the life term started excluding any time during which service of the life term is tolled.

The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of credit. Less than 4 months credit may be granted if the prisoner fails to meet the general expectations set forth in Section 2410(c). More than 4 months credit may be granted if the prisoner demonstrates exceptional performance in a work assignment, exceptional participation in self-help or rehabilitative programs, or other exemplary conduct. If the panel grants more than 4 months of postconviction credit for any year, the case shall be reviewed as provided in Sections 2041–2043.

Provided, however, postconviction credits which would advance the parole release date to less than 180 days from the date of the hearing shall not be granted unless or *until the parole review authority of the Governor is exercised pursuant to Penal Code section 3041.1.*

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC Rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institution, the prisoner's custody status, and any other impediments to the prisoner's receiving work assignment.

(2) Participation in Self–Help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self development (refer to CDC Rules 3040 and 3041). Lack of program participation shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of programs at the institution, the prisoner's custody status, and any other impediments to the prisoner's participation in programs.

(3) Behavior in the Institutional Setting. All life prisoners are presumed to behave in a disciplinary-free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000–3021). However, a minor disciplinary offense shall not necessarily prevent the granting of postconviction credit.

(d) Credit Not Granted. No annual postconviction credit shall be granted in the case of any prisoner who commits serious (as defined in 15 CCR Section 3315) or numerous (more than three) infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see Section 2451) unless the panel finds evidence in mitigation and supports such finding with a statement of its reasoning.

Consistent unsatisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the withholding of annual postconviction credit which otherwise could have been granted.

(e) Change in Parole Date. Once postconviction credit is granted for particular year of imprisonment, the credit shall be applied to any new term established after rescission or reconviction after a reversal.

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code. *In re Stanley,* 54 Cal.App.3d 1030 (1976).

HISTORY

1. Amendment of subsection (d) and NOTE filed 8–15–91; operative 9–16–91 (Register 91, No. 51).

2. Amendment of subsections (b) and (c)(2) filed 12–20–93; operative 1–19–94 (Register 93, No. 52).

### § 2411. Fixing a Parole Date.

(a) Total Period of Confinement. The terms established for the base crime and any adjustments shall be added together resulting in a total pe-

## DEPORTATION WAIVER

ALI PERTSONI, WARRANT NUMBER A-20404550

I, Ali Pertsoni, declare as follows:

1.   I am a legal alien from the country of Kosovo (Formerly Yugoslavia) granted permanent resident status by the Immigration and Naturalization Service of the United States of America.

2.   I entered the United States July 29, 1975.  My Green Card number is A-20404550.

3.   On May 18, 1982 I was convicted of First Degree Murder in People of the State of California v. Ali Pertsoni, San Francisco Case No. SF106467.

4.   I have been incarcerated within the California Department of Corrections for approximately 22 years.  My in-stitutional number is C-48947.

5.   At my last parole hearing held August 28, 2003, by the Board of Prison Terms I was informed that I could be released at my next parole hearing.  My next parole hearing is tentatively scheduled for August, 2004.

6.   Upon being found suitable for release by the Board of Prison Terms I intend to return to and remain in Kosovo. Specifically, I do not wish or plan to ever return to the United States of America.

7.   I am aware that immigration laws require I be afforded a deportation hearing prior to being deported, where I can pre-sent testimony and witnesses as to why I should not be deported, and that upon a finding of good cause it is possible that I will not be removed from the United States.

Exhibit X

PAGE 2.   DEPORTATION WAIVER/ALI PERTSONI, WARRANT NO. A-20404550

8.   I voluntarily wish to waive my right to a deportation hearing, and further request that I be deported to Kosovo immediately upon my release from the California Department of Corrections.

9.   This waiver of my right to a deportation hearing is made with full knowledge that the effect thereof is to cause my immediate removal from the United States of America upon my release from the California Department of Corrections without a deportation hearing.

I swear under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the _5_ day of January, 2004, at San Quentin State Prison, Marin County, California.

_____
Ali Pertsoni, Declarant

## N O T A R I Z A T I O N

State of California    )
                       ) ss
County Of Marin        )

On this _5_ day of January, in the year 2004, before me, _N.J. FRANCIS_, a notary public, personally appeared Ali Pertsoni, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that he executed it.

[Notarial Seal]

_____
Notary Public for the State Of California

My Commission expires:

_____8/5_____, 2006

W. J. FRANCIS
Commission # 1368155
Notary Public - California
Marin County
My Comm. Expires Aug 5, 2006



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number C-48947
                           )
ALI PERTSONI               )
                           )
_____)

INMATE COPY

CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

FEBRUARY 8, 2006

8:40 A.M.


PANEL PRESENT:

MARGARITA PEREZ, Presiding Commissioner
RUFUS MORRIS, Deputy Commissioner

OTHERS PRESENT:

ALI PERTSONI, Inmate
PAT FOX, Attorney for Inmate
TWO CORRECTIONAL OFFICERS, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


Ramona Cota              Peters Shorthand Reporting

Exhibit Y

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 45 |
| Post-Commitment Factors | 73 |
| Parole Plans | 61 |
| Closing Statements | 106 |
| Recess | 115 |
| Decision | 116 |
| Adjournment | 134 |
| Transcriber Certification | 135 |

--oOo--

1

1      **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER MORRIS:**  We are on

3  record.

4          **PRESIDING COMMISSIONER PEREZ:**  Thank you.

5          **ATTORNEY FOX:**  Thank you.

6          **PRESIDING COMMISSIONER PEREZ:**  Good

7  morning, sir.

8          **INMATE PERTSONI:**  Good morning.

9          **PRESIDING COMMISSIONER PEREZ:**  This is a

10  Subsequent Parole Consideration Hearing for Ali

11  Pertsoni, CDC C-48947.  Today's date is February

12  8, 2006.  We are located at San Quentin State

13  Prison, the time is 8:40 a.m.  Sir, according to

14  the record you were received by the Department

15  on June 18, 1982.  Your life term began on May

16  8, 1984 out of the county of San Francisco for

17  the offense of murder first with the use of a

18  firearm, Penal Code Section 187 and PC 12022.5.

19  Case number 106467, count one, for which you

20  were assessed a term of 25 to life plus two

21  years with a minimum eligible parole date of

22  August 31, 1997.  Sir, this hearing is being

23  tape-recorded and for the purposes of voice

24  identification we are going to go around the

25  room and have everyone identify themselves by

26  stating their first name, last name and spelling

27  their last name.  When we get to you, sir, I'd

2

1  like to ask you to provide us with your CDC

2  number as well.  I will start with myself and go

3  to my right.  My name is Margarita Perez, P-E-R-

4  E-Z, Commissioner with the Board of Parole

5  Hearings.

6       **DEPUTY COMMISSIONER MORRIS:**  Rufus

7  Morris.  That's M-O double R-I-S, Deputy

8  Commissioner.

9       **PRESIDING COMMISSIONER PEREZ:**  Go ahead,

10  sir.

11       **INMATE PERTSONI:**  Pertsoni, P-E-R-T-S-O-

12  N-I, CDC number is C-48947.

13       **PRESIDING COMMISSIONER PEREZ:**  First

14  name, sir?

15       **INMATE PERTSONI:**  Ali, A-L-I.

16       **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney

17  for Mr. Pertsoni.

18       **PRESIDING COMMISSIONER PEREZ:**  Thank you.

19       **ATTORNEY FOX:**  You're welcome.

20       **PRESIDING COMMISSIONER PEREZ:**  And I note

21  for the record that we have two correctional

22  officers in the room, they will not be

23  participating in today's hearing; they are here

24  for the purposes of security.  Counsel, I

25  understand that you have gone over and fully

26  discussed with your client the Americans With

27  Disabilities Act statement and questions and to

3

1   your knowledge he has no ADA issues that require

2   accommodation for today's hearing and your

3   client wishes to waive further inquiry.  Is that

4   correct?

5        ATTORNEY FOX:  That's correct.  The only

6   things to be aware of is he does have glasses

7   for reading in the event he needs to read

8   anything.  And he did bring in a little jar of

9   nitroglycerin because he has heart problems.  So

10  just be aware of that.

11       PRESIDING COMMISSIONER PEREZ:  Okay, I

12  appreciate that.  And I do note for the record

13  that you recently had a heart attack; is that

14  correct, sir?

15       INMATE PERTSONI:  Yes.

16       PRESIDING COMMISSIONER PEREZ:  How long

17  ago was that, sir?

18       INMATE PERTSONI:  About six months, six

19  or seven months.

20       PRESIDING COMMISSIONER PEREZ:  Okay.

21  Still recovering.

22       INMATE PERTSONI:  Yeah.

23       PRESIDING COMMISSIONER PEREZ:  How are

24  you doing, sir?

25       INMATE PERTSONI:  Good.

26       PRESIDING COMMISSIONER PEREZ:  Okay, very

27  good, very good.  And you do have your glasses

4

1    with you in the event that you require them.

2         INMATE PERTSONI:  Yeah.

3         PRESIDING COMMISSIONER PEREZ:  But other

4    than that he will not require any other

5    accommodations; is that correct, counsel?

6         ATTORNEY FOX:  That's correct.

7         PRESIDING COMMISSIONER PEREZ:  Very good.

8         ATTORNEY FOX:  Thank you.

9         PRESIDING COMMISSIONER PEREZ:  Also I

10   understand that you have gone over and fully

11   discussed the procedures today to include the

12   grievance process and your client wishes to

13   waive rereading of the admonitions; is that

14   accurate?

15        ATTORNEY FOX:  Yes.

16        PRESIDING COMMISSIONER PEREZ:  Okay, very

17   good.  And lastly, to the best of your knowledge

18   your client has had the opportunity to review

19   his Central File and all of his rights have been

20   met.  Is that accurate?

21        ATTORNEY FOX:  Yes, as to this hearing.

22        PRESIDING COMMISSIONER PEREZ:  Okay, very

23   good then we'll proceed.  Sir, during today's

24   hearing you have certain rights.  One of those

25   rights would be the right to be heard by an

26   impartial panel.  Do you have any objections to

27   today's panel?

5

1        **INMATE PERTSONI:**  No.

2        **PRESIDING COMMISSIONER PEREZ:**  Counsel,

3   objections to the panel?

4        **ATTORNEY FOX:**  No, we have no objection,

5   thank you.

6        **PRESIDING COMMISSIONER PEREZ:**  Okay,

7   thank you.  And sir, I would ask you to speak up

8   just a little bit when  you respond.  We want to

9   make sure we get everything on tape, okay.

10  Commissioner Morris, is there confidential

11  information and will we be using it for today's

12  purposes?

13       **DEPUTY COMMISSIONER MORRIS:**  There is

14  confidential information, however, we will not

15  be using it.

16       **PRESIDING COMMISSIONER PEREZ:**  Thank you.

17  Sir, I have passed a checklist marked Exhibit

18 -- One to your attorney to ensure that we are all

19  operating off of the same documents.  And at

20  this time I would ask her to verify the accuracy

21  of that checklist.

22       **ATTORNEY FOX:**  Yes, however I would be

23  commenting that we do have the letter served on

24  me today by the District Attorney of San

25  Francisco.

26       **PRESIDING COMMISSIONER PEREZ:**  I read

27  that as a neutral letter.

6

1      **ATTORNEY FOX:**  Yeah, it's a neutral

2    letter so I won't be objecting to it and I just

3    wanted to be sure that they did receive the

4    addendum.

5      **PRESIDING COMMISSIONER PEREZ:**  Yes.

6      **ATTORNEY FOX:**  Thank you.

7      **PRESIDING COMMISSIONER PEREZ:** Absolutely,

8    yes, and we received that as well.

9      **ATTORNEY FOX:**  So we will not be

10   objecting to that then.

11     **PRESIDING COMMISSIONER PEREZ:**  Okay, very

12   good.  Sir, during today's hearing you are not

13   required to admit to the offense nor are you

14   required to discuss the offense.  However, it is

15   important for you to understand that this panel

16   does accept true the findings of the court.  We

17   are not here to retry your case.  We are here to

18   determine whether or not you are suitable for

19   parole, okay.  Counsel, do you have any

20   preliminary objections?

21     **ATTORNEY FOX:**  No, we have none.

22     **PRESIDING COMMISSIONER PEREZ:**  Do you

23   have any additional documents to submit to this'

24   panel other than what's already been submitted?

25     **ATTORNEY FOX:**  Not at this time, however

26   we would reserve the right to submit additional

27   documentation if it appears they are not in the

7

1   file.

2        **PRESIDING COMMISSIONER PEREZ:**  Okay, very

3   good.  Will your client be speaking with us?

4        **ATTORNEY FOX:**  Yes he will.

5        **PRESIDING COMMISSIONER PEREZ:**  Okay, very

6   good then.  Sir, I do need to swear you in

7   before we begin.  If I could get you to raise

8   your right hand.  Do you solemnly swear or

9   affirm the testimony you provide today will be

10  the truth, the whole truth and nothing but the

11  truth?

12       **INMATE PERTSONI:**  I will.

13       **PRESIDING COMMISSIONER PEREZ:**  Very good.

14  Sir, I would like to start out by incorporating

15  into the record the offense summary outlined in

16  the February 2006 counselor's report page one

17  prepared by Correctional Counselor I B. Ebert,

18  E-B-E-R-T.  The record states that:

19            "On July 27, 1981 at 0300 hours

20            officers responded to a call from

21            communications of a shooting that

22            had just occurred at the Greek-

23            American Club at 161 Eddy Street

24            in San Francisco.  The club is a

25            place where Arabian, Albanian and

26            Greek-Americans hang out.  Upon

27            their arrival they found the

8

1        victim, later identified as Fari

2        Rapishti (phonetic) laying face

3        down in a pool of blood near the

4        snack bar.  He was pronounced dead

5        at the scene.  Nick Lambros

6        (phonetic), a witness to the

7        shooting stated that he was

8        working behind the counter with

9        approximately 12 to 14 patrons in

10       the club when the suspect, later

11       identified as Ali Pertsoni,

12       entered the front door to the club

13       and walked over to a location

14       where Rapishti was sitting.  After

15       the two were engaged in

16       conversation in a foreign language

17       Pertsoni produced a gun which he

18       used to shoot Rapishti.  Three

19       shots were fired and the first

20       shot was to the abdomen and the

21       second and third were located at

22       the right side of the back of the

23       head of Rapishti.  Pertsoni turned

24       and told the patrons not to move,

25       while pointing the gun at them,

26       then walked out of the club.  At

27       approximately 0300 hours Pertsoni

9

1          drove to Sunnyvale, California to

2          a friend's house by the name of

3          Mr. Bushadi (phonetic) and

4          remained there for several -- for

5          a few hours.  At approximately

6          7:30 Mr. Bushadi subsequently

7          reported the crime to the police,

8          stating that Pertsoni wished to

9          surrender.  On July 27, 1981, the

10         same day, at approximately 0900

11         hours Pertsoni was arrested

12         without incident."

13    Sir, is the information that I have read into

14    the record, is it accurate to the best of your

15    recollection?

16         **INMATE PERTSONI:**  Yes, but with respect

17    -- It was in the middle of the room.  The room

18    was -- The club was like this and the door was

19    there.  I go from door.  Mr. Rapishti, I guess

20    he was sitting in the corner there.  And I come

21    on this side because it was right in the center

22    of the club.

23         **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

24    he was sitting --

25         **INMATE PERTSONI:**  In the window on that

26    side.

27         **PRESIDING COMMISSIONER PEREZ:**  And you

10

1   walked in.

2        **INMATE PERTSONI:**  The door that side.

3        **PRESIDING COMMISSIONER PEREZ:**  And he got

4   up and you both met in the middle.

5        **INMATE PERTSONI:**  Yeah.  First, first I

6   knock on the door.

7        **PRESIDING COMMISSIONER PEREZ:**  Okay.

8        **INMATE PERTSONI:**  It was (indiscernible).

9   The people that work, they have to open the

10  door.  They open the door.  They have a machine,

11  you put a 25 cent quarter.  And I put in the

12  machine there and I ordered coffee for him.

13       **PRESIDING COMMISSIONER PEREZ:**  Okay.

14       **INMATE PERTSONI:**  And a baklava.

15       **PRESIDING COMMISSIONER PEREZ:**  And I put

16  it -- When I walk to go get the coffee and the

17  baklava but maybe 30 seconds, 50 seconds.  And I

18  walking.  That's why he, Mr. Rapishti, he stand

19  up, he come to me.

20       **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

21  I did read -- The information that you just

22  relayed to us I did read it in a more extensive

23  version in your legal summary.  This is simply,

24  just a summary of the offense.  And you had a

25  weapon on you that night; is that correct?

26       **INMATE PERTSONI:**  Yes ma'am.

27       **PRESIDING COMMISSIONER PEREZ:**  What kind

11

1    of a weapon did you have?

2        **INMATE PERTSONI:**  A .38-special.

3        **PRESIDING COMMISSIONER PEREZ:**  Okay.  Why

4    were you carrying a weapon, sir?

5        **INMATE PERTSONI:**  I was afraid of him.

6    To protect myself I thought at that time.

7        **PRESIDING COMMISSIONER PEREZ:**  Okay.  Let

8    me ask you this.  And I have read your file

9    extensively to include some of the briefs

10   provided by counsel as well as other attorneys

11   that you have had in the past.  And I understand

12   that you knew the victim in this particular case

13   and had known him for some time.

14       **INMATE PERTSONI:**  Yes ma'am.

15       **PRESIDING COMMISSIONER PEREZ:**  Can you

16   give me a background on your relationship with

17   this victim.  How long you had known him and

18   some of the interaction that you had previous

19   had with him.

20       **INMATE PERTSONI:**  I know him in Chicago.

21   I don't know him like, you know, but just we

22   meet each other.  Not, you know, was friends.  I

23   went in Chicago that club, you know, that most

24   people from Eastern Europe, the Balkans, you

25   know, go associate at.  I went there with my

26   friends and Rapishti was there.  But in our

27   community we know each other, you know, but you

12

1    don't know their names.  But the people point,
2    you know, like in the neighborhood and things
3    like that.
4          PRESIDING COMMISSIONER PEREZ:  So you
5    knew who he was.
6          INMATE PERTSONI:  Yeah, but I don't know
7    the person, the name.  I heard the name.  And my
8    friends they told me, Mr. Rapishti, and their
9    friends, they told him Mr. Ali Pertsoni, and he
10   look me and I look him.  And he stand up and
11   want to fight me, he threaten me, and I stand up
12   too.
13         PRESIDING COMMISSIONER PEREZ:  And this
14   is in Chicago?
15         INMATE PERTSONI:  In Chicago, yeah.
16         PRESIDING COMMISSIONER PEREZ:  Okay, go
17   ahead.
18         INMATE PERTSONI:  And my friends, they
19   stop me and his friends, they stop him.  And I
20   got out, you know.  They come in the middle.
21   And I went out.  I know when I told people that
22   Mr. Rapishti -- I don't mean -- Because he's not
23   here to defend himself.  I'm telling the truth.
24   And he had power back home.  He only he have to
25   call the phone call and my family die.  And I
26   left and I left Chicago with my wife.  In San
27   Francisco a friend of mine he have a restaurant,

13

1　Mike Bushate (phonetic).

2　　　　**PRESIDING COMMISSIONER PEREZ:** Okay, let

3　me stop you just one moment.

4　　　　**INMATE PERTSONI:** Okay.

5　　　　**PRESIDING COMMISSIONER PEREZ:** Because I

6　want to make sure I'm clear.

7　　　　**INMATE PERTSONI:** Yes ma'am.

8　　　　**PRESIDING COMMISSIONER PEREZ:** You at one

9　point lived in Chicago.

10　　　　**INMATE PERTSONI:** Yes.

11　　　　**PRESIDING COMMISSIONER PEREZ:** You and

12　the victim in this case knew of each other.

13　　　　**INMATE PERTSONI:** Yes.

14　　　　**PRESIDING COMMISSIONER PEREZ:** At some

15　point you and he were in some sort of

16　confrontation.

17　　　　**INMATE PERTSONI:** Yes.

18　　　　**PRESIDING COMMISSIONER PEREZ:** What was

19　the reason for the confrontation?

20　　　　**INMATE PERTSONI:** We having two different

21　beliefs.

22　　　　**PRESIDING COMMISSIONER PEREZ:** Two

23　different beliefs.

24　　　　**INMATE PERTSONI:** Yes.

25　　　　**PRESIDING COMMISSIONER PEREZ:** Okay, go

26　ahead.

27　　　　**INMATE PERTSONI:** He believed -- He was

14

1   Communist.

2          **PRESIDING COMMISSIONER PEREZ:**  He was a

3   Communist.

4          **INMATE PERTSONI:**  Communist.

5          **PRESIDING COMMISSIONER PEREZ:**  Back in

6   your home country?

7          **INMATE PERTSONI:**  Yeah, Tito.

8          **PRESIDING COMMISSIONER PEREZ:**  And you

9   were not.

10         **INMATE PERTSONI:**  I was not.

11         **PRESIDING COMMISSIONER PEREZ:**  Okay.

12         **INMATE PERTSONI:**  I was more for rights

13  for my people.  They was treated like second-

14  class citizens.  Hard to work, living.  It was

15  very bad.  That's why I was protesting, you

16  know, to have more rights, more everything.

17  That's why beliefs was different.

18         **PRESIDING COMMISSIONER PEREZ:**  Okay.  How

19  is it that you and this victim ended up in a

20  confrontation when you were in Chicago?

21         **INMATE PERTSONI:**  He followed everywhere.

22  He used to -- He used to go everywhere.  He was

23  in Chicago.  The fact he was living -- No,

24  excuse me, in New York.

25         **PRESIDING COMMISSIONER PEREZ:**  Okay.

26         **INMATE PERTSONI:**  He was staying in New

27  York.  And he come to Chicago, I guess, for me

15

1  or for somebody.

2      **PRESIDING COMMISSIONER PEREZ:**  Why would

3  you think he would come from New York to Chicago

4  for you?

5      **INMATE PERTSONI:**  He has wife at that

6  time.

7      **PRESIDING COMMISSIONER PEREZ:**  But why

8  did you think that?  You didn't know him.

9      **INMATE PERTSONI:**  No, I don't know him.

10     **PRESIDING COMMISSIONER PEREZ:**  But why

11  would you think he would come from New York to

12  Chicago all the way to get you, or because of

13  you?  Why would you think that?

14     **INMATE PERTSONI:**  Because from my

15  reputation.  The way I do work for my people, my

16  helping.  I collecting the money here for my

17  Albanian brothers and sisters.  I sending money

18  to people back home for medicine, for clothes

19  because it as bad there.  That's what I was

20  doing.

21     **PRESIDING COMMISSIONER PEREZ:**  Now what

22  you're saying, and correct me if I'm wrong, is

23  that you were very active in advocating for the

24  rights of your people back home.

25     **INMATE PERTSONI:**  Yes ma'am.

26     **PRESIDING COMMISSIONER PEREZ:**  In that

27  you were not a Communist but Mr. Rashipti

16

1   (phonetic) --

2         **INMATE PERTSONI:** No, Rapishti.

3         **PRESIDING COMMISSIONER PEREZ:** Was.

4         **INMATE PERTSONI:** Yes ma'am.

5         **PRESIDING COMMISSIONER PEREZ:** Okay.  And

6   so he was hostile towards you because of your

7   beliefs.

8         **INMATE PERTSONI:** Yes.

9         **PRESIDING COMMISSIONER PEREZ:** Okay.  And

10  you felt that he didn't like you and wanted to

11  cause you harm because of what you were doing

12  for your people in that you had totally separate

13  beliefs than his.

14        **INMATE PERTSONI:** Yes.

15        **PRESIDING COMMISSIONER PEREZ:** Communist

16  versus non-Communist.

17        **INMATE PERTSONI:** Yes ma'am.

18        **PRESIDING COMMISSIONER PEREZ:** Okay.  At

19  some point you said you and he had a

20  confrontation in Chicago.

21        **INMATE PERTSONI:** Yes.

22        **PRESIDING COMMISSIONER PEREZ:** Was this

23  the first time that you --

24        **INMATE PERTSONI:** Yes.

25        **PRESIDING COMMISSIONER PEREZ:** Okay, and

26  how did it -- What happened.  Tell me what

27  happened.

17

1          **INMATE PERTSONI:**  I left --

2          **PRESIDING COMMISSIONER PEREZ:**  He said,
3    you said.

4          **INMATE PERTSONI:**  You know, I left the
5    club.  And I went to my wife and I told my wife,
6    we got to live Chicago.  Because I don't want
7    trouble because deep in my heart I know he can
8    call phone, he can make more trouble for my
9    family.

10         **PRESIDING COMMISSIONER PEREZ:**  Okay, let
11   me back up.

12         **INMATE PERTSONI:**  That's why I left.

13         **PRESIDING COMMISSIONER PEREZ:**  I still
14   don't know what the confrontation was about
15   between yourself and the victim that caused you
16   to move from Chicago.

17         **INMATE PERTSONI:**  I was scared and he
18   threatened me.

19         **PRESIDING COMMISSIONER PEREZ:**  What
20   happened?

21         **ATTORNEY FOX:**  What did he say to you and
22   what did you say to him?

23         **INMATE PERTSONI:**  Yeah.  He tried to hurt
24   me that time.

25         **ATTORNEY FOX:**  How did he try to hurt
26   you?

27         **INMATE PERTSONI:**  Talking bad.

18

1        **PRESIDING COMMISSIONER PEREZ:**  Okay, so

2  he approached you and he said what?

3        **INMATE PERTSONI:**  Yeah.  He threaten me,

4  I'm going to hurt you.

5        **PRESIDING COMMISSIONER PEREZ:**  Okay, he

6  just walked up to you.

7        **INMATE PERTSONI:**  Yes.

8        **PRESIDING COMMISSIONER PEREZ:**  Had never

9  met you in his entire life, knew who you were

10  and threatened to kill you.

11        **INMATE PERTSONI:**  He know my reputation,

12  he know my name, he know me who I am.  And I

13  know him already who he was.

14        **PRESIDING COMMISSIONER PEREZ:**  Okay.

15        **INMATE PERTSONI:**  Because our community

16  talk each other, you know.

17        **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

18  he approached you and he said?

19        **INMATE PERTSONI:**  Yes.

20        **PRESIDING COMMISSIONER PEREZ:**  He said?

21        **ATTORNEY FOX:**  What did he say to you?

22        **PRESIDING COMMISSIONER PEREZ:**  What did

23  he say?

24        **INMATE PERTSONI:**  He said motherfucker.

25  Motherfucker.

26        **PRESIDING COMMISSIONER PEREZ:**  Go ahead

27  and say it.

19

1          **INMATE PERTSONI:**  Motherfucker.

2          **PRESIDING COMMISSIONER PEREZ:**  Okay.

3     Motherfucker what?

4          **INMATE PERTSONI:**  You know, it was

5     different beliefs.

6          **PRESIDING COMMISSIONER PEREZ:**  Tell me

7     what.

8          **ATTORNEY FOX:**  What did he say?  What did

9     he say to you that made you fear him?

10         **INMATE PERTSONI:**  Because I know his

11    reputation in the community.

12         **ATTORNEY FOX:**  No, no, no, no, his words.

13    Think back to the conversation, okay.

14         **INMATE PERTSONI:**  Yeah.

15         **ATTORNEY FOX:**  The son is in his face.

16         **PRESIDING COMMISSIONER PEREZ:**  Okay,

17    there you go.

18         **ATTORNEY FOX:**  Okay.  Think back to the

19    words he used.  And even if they're not good

20    words you should say them, okay.

21         **INMATE PERTSONI:**  Well, the only thing

22    that he say, motherfucker and he get off -- you

23    know, I didn't make conversation because I left.

24    That's the only thing he said.

25         **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

26    he called you a name.

27         **INMATE PERTSONI:**  Yeah.

20

1          **PRESIDING COMMISSIONER PEREZ**:  And you

2   got up and left.

3          **INMATE PERTSONI**:  Yes.

4          **PRESIDING COMMISSIONER PEREZ**:  Okay.  And

5   then you went home to your wife.

6          **INMATE PERTSONI**:  Yes.

7          **PRESIDING COMMISSIONER PEREZ**:  And then?

8          **INMATE PERTSONI**:  I told my wife, let's

9   go back.  Mr. Rapishti, he threaten me and I

10  know his reputation.  He have a reputation back

11  home, his name.

12         **PRESIDING COMMISSIONER PEREZ**:  Okay.  How

13  did he threaten you?  You said he called you an

14  MF and you got up and left.

15         **INMATE PERTSONI**:  Yes.

16         **PRESIDING COMMISSIONER PEREZ**:  How did

17  that -- How did he threaten you if those are the

18  only two words he said?

19         **INMATE PERTSONI**:  And I commented he

20  tried to jump me but the friends, they stop him.

21         **PRESIDING COMMISSIONER PEREZ**:  Okay.  So

22  you said he called you an MF and he tried to

23  assault you.

24         **INMATE PERTSONI**:  Yes.  Yes.

25         **PRESIDING COMMISSIONER PEREZ**:  How did he

26  try to assault you?  Did he take a swing at you,

27  did he pull a knife?

21

1        **INMATE PERTSONI:**  No, it was -- No, no,

2    he was -- he was really far away.  And his

3    friends, they hold him.  And my friends come in

4    the middle.  And then one friend he hold me, he

5    said, no Ali.  That's when I left.

6        **PRESIDING COMMISSIONER PEREZ:**  So you're

7    saying that as he's walking towards you he's

8    calling you a name and it appears that he's

9    about ready to assault you and his friends hold

10   him back.

11       **INMATE PERTSONI:**  Yes.  He was in a

12   table, the table -- he stand up.  My friends

13   they point me to Mr. Rapishti.  And his friends,

14   they point me -- they point him, excuse me, to

15   me.  And he stand up from the two of them and I

16   stand up.  And his friends got hold of him, my

17   friends go in the middle, one stopped me.  He

18   said to me, motherfucker.

19       **PRESIDING COMMISSIONER PEREZ:**  And what

20   reputation did Mr. Rapishti have?  What kind of

21   reputation did he have?

22       **INMATE PERTSONI:**  Well, I can't, because

23   he's not here today (inaudible).

24       **PRESIDING COMMISSIONER PEREZ:**  Sir, okay

25   let me back up for a second.  You said you had a

26   certain reputation of helping your people.

27       **INMATE PERTSONI:**  Yes.

22

1        **PRESIDING COMMISSIONER PEREZ:**  He had a

2   different reputation because he was a Communist.

3        **INMATE PERTSONI:**  Yes.

4        **PRESIDING COMMISSIONER PEREZ:**  And he

5   comes up to you and he calls you an MF and his

6   friends hold him back and from that moment you

7   want to get up and leave and move to a totally

8   different town because you're threatened by this

9   man.  If you're feeling threatened by him,

10  you're threatened -- The fact that he called you

11  an MF isn't, I wouldn't think would be

12  sufficient for you to move, to get up and leave.

13  Obviously there were other reasons, his

14  reputation or something that had occurred that

15  caused you to want to get up and move your

16  entire family from Chicago to San Francisco to

17  get away from this man.  What was his

18  reputation?

19       **INMATE PERTSONI:**  His reputation was

20  vicious, mean.  Wherever the Albanian going to

21  try to get money together to help one another,

22  he was going there to disturb, threaten them.

23       **PRESIDING COMMISSIONER PEREZ:**

24  Threatening who?

25       **INMATE PERTSONI:**  Any Albanian, any

26  Albanian, any brothers or sisters.  When they

27  get together, the community, he go in there to

23

1  disturb, threatening.

2        **ATTORNEY FOX:**  Disturb them why?

3        **INMATE PERTSONI:**  Disturbing people

4  because he don't want the Albanian community to

5  have a strong relation together and help our

6  people back home.

7        **ATTORNEY FOX:**  Did he have a reputation

8  back home also?

9        **INMATE PERTSONI:**  Yes, yes.

10        **ATTORNEY FOX:**  What was his reputation

11  there?

12        **INMATE PERTSONI:**  Reputation was there,

13  Communist.

14        **ATTORNEY FOX:**  Okay, now aside from

15  Communist what -- Did he do anything?

16        **INMATE PERTSONI:**  He was UDBA, ex-UDBA,

17  working for UDBA.

18        **ATTORNEY FOX:**  What is --

19        **INMATE PERTSONI:**  Like secret police.

20        **PRESIDING COMMISSIONER PEREZ:**  Okay.

21        **INMATE PERTSONI:**  He can go anyplace he

22  want back in Yugoslavia, at that time it was

23  Yugoslavia.  He can go anytime he want and

24  nobody can say nothing.  Those people there are

25  like --

26        **ATTORNEY FOX:**  Did he hurt anybody in

27  Yugoslavia?

24

1          INMATE PERTSONI:  I never see because I

2   don't know him there but yes, I heard he done a

3   lot of bad things to the other people.

4          PRESIDING COMMISSIONER PEREZ:  Okay, go

5   ahead.

6          ATTORNEY FOX:  Okay.  And I'm sorry for

7   interrupting.

8          PRESIDING COMMISSIONER PEREZ:  No, go

9   ahead.

10          ATTORNEY FOX:  When did you know he had

11   hurt people in Yugoslavia?

12          INMATE PERTSONI:  My friends.

13          ATTORNEY FOX:  Okay.  Did you know that

14   when you were in Chicago?

15          INMATE PERTSONI:  I know his name, his

16   reputation, but I never meet him.  This is the

17   first time that time.

18          ATTORNEY FOX:  I want you to listen to my

19   question, okay.

20          INMATE PERTSONI:  Okay.

21          ATTORNEY FOX:  Because I know you're

22   trying your best to answer.  When you were in

23   Chicago did you have an opinion as to whether

24   Mr. Rapishti was a violent man?

25          INMATE PERTSONI:  Yes.

26          ATTORNEY FOX:  And was that opinion that

27   he was violent?

25

1          **INMATE PERTSONI:**  Yes ma'am.

2          **ATTORNEY FOX:**  And was that from

3    listening to other people talk about his

4    reputation?

5          **INMATE PERTSONI:**  Yes.

6          **ATTORNEY FOX:**  Okay.  Does that help?

7          **PRESIDING COMMISSIONER PEREZ:**  Yes it

8    does.  Okay, so you go home to your wife and you

9    tell your wife, we have to leave.

10         **INMATE PERTSONI:**  Yes.

11         **PRESIDING COMMISSIONER PEREZ:**  And then

12   what happened?

13         **INMATE PERTSONI:**  And I left.  Got a car

14   and we drive to San Francisco.  I have a friend

15   of mine in Chicago, he have a friend in San

16   Francisco having a restaurant at that time.  He

17   call him here (inaudible).

18         **PRESIDING COMMISSIONER PEREZ:**  Okay, so

19   you up and moved.

20         **INMATE PERTSONI:**  Yeah.

21         **PRESIDING COMMISSIONER PEREZ:**

22   Immediately?

23         **INMATE PERTSONI:**  Yes.

24         **PRESIDING COMMISSIONER PEREZ:**  You came

25   to San Francisco, found a job in the restaurant.

26         **INMATE PERTSONI:**  Yeah.

27         **PRESIDING COMMISSIONER PEREZ:**  Got a

26

1   place to live.

2        **INMATE PERTSONI:**  Yes.

3        **PRESIDING COMMISSIONER PEREZ:**  Okay, go

4   ahead.

5        **INMATE PERTSONI:**  And I work for my

6   friend, my wife working.  Have an apartment the

7   same that he stayed, (indiscernible).  I started

8   a home.  Helping my mom and my father, my

9   family, my sisters.  They was very poor at that

10  time.  After I got there I got working and

11  having two day off.  It was five-day work, two

12  day off.  And I went there the next day, the

13  restaurant, because the Albanian people,

14  Italians, know.

15       **PRESIDING COMMISSIONER PEREZ:**  Okay,

16  another club.

17       **INMATE PERTSONI:**  No, yeah, the same

18  place.

19       **PRESIDING COMMISSIONER PEREZ:**  The same

20  club?

21       **ATTORNEY FOX:**  Where you were working?

22       **INMATE PERTSONI:**  Yeah.

23       **PRESIDING COMMISSIONER PEREZ:**  Where you

24  were working, okay.

25       **INMATE PERTSONI:**  But I have my day, two

26  day off, and (indiscernible) my language and my

27  Albanian brothers.  And the owner and other guys

27

1    they say, hey Ali, we have an Albanian brother

2    in prison, in jail and we trying to help to get,

3    collect some money.  And I say, what for is?

4    They say, well -- I have to say that?

5            **ATTORNEY FOX:**  Yes.

6            **PRESIDING COMMISSIONER PEREZ:**  Go ahead.

7            **INMATE PERTSONI:**  They say, he raped

8    American girl.  And I said, don't help him.  He

9    needs no help, he bringing shame to us, leave

10   him alone.  And I left.  But I feel if I go to

11   ask them who the name I could go in the police

12   station at that time and say, hey, don't let him

13   out.  Anyway, I left, I went home.  The next day

14   I come, I see Mr. Rapishti there.  And I say --

15           **PRESIDING COMMISSIONER PEREZ:**  You see

16   him where?

17           **INMATE PERTSONI:**  In the restaurant.

18           **PRESIDING COMMISSIONER PEREZ:**  In the

19   restaurant.

20           **INMATE PERTSONI:**  The same place I

21   working.

22           **PRESIDING COMMISSIONER PEREZ:**  Okay.

23           **INMATE PERTSONI:**  And my friends Mike

24   Bushate and Jim Saiti, they say Ali, come here,

25   we want to introduce with our new Albanian

26   brother.  And I said to them, we know each

27   other.  And I shake hands with him, how are you

28

1   doing, Mr. Rapishti, because I can't afford to

2   having trouble with him because of my family.

3   And we shake hands and we talk.  And he wanting

4   to go to a motel, I say, I give you a ride.  To

5   be nice I give him a ride.  In our culture, I

6   give him $20 because he no have it, $20 I gave

7   him, and he was bragging.

8       **PRESIDING COMMISSIONER PEREZ:**  He was

9   bragging?

10      **INMATE PERTSONI:**  Yeah.

11      **PRESIDING COMMISSIONER PEREZ:**  What was

12  he bragging about?

13      **INMATE PERTSONI:**  He raped a girl and

14  broke the virgin, the virginity.  And when I

15  drop him down -- he threaten me too in the car

16  at the same time.

17      **PRESIDING COMMISSIONER PEREZ:**  What did

18  he say?

19      **INMATE PERTSONI:**  Just, you know.

20      **PRESIDING COMMISSIONER PEREZ:**  What did

21  he say?

22      **INMATE PERTSONI:**  He say, how you think,

23  you know.  You know, all kind of things.

24      **PRESIDING COMMISSIONER PEREZ:**  What did

25  he say, sir?  I need to know what he said.

26      **ATTORNEY FOX:**  We don't know.

27      **INMATE PERTSONI:**  Okay, okay.

29

1          **ATTORNEY FOX:**  The words he used.

2          **INMATE PERTSONI:**  You know, he saying

3     what he do back home and what he can do with

4     everybody.

5          **ATTORNEY FOX:**  And what things were

6     those?

7          **INMATE PERTSONI:**  He looking me, you

8     know, and he staring me like that, you know.  He

9     say, maybe next time, he see next time, you

10    know.  In the Albanian culture, you know, just

11    looking, just put your face like that, you know.

12    I don't pay attention really that much.

13         **PRESIDING COMMISSIONER PEREZ:**  What did

14    he say, sir.

15         **INMATE PERTSONI:**  He say, well, he say,

16    the time -- one of these days your time will

17    come to you.

18         **ATTORNEY FOX:**  And what did that mean to

19    you?

20         **INMATE PERTSONI:**  To me maybe he going to

21    beat me up or other --

22         **PRESIDING COMMISSIONER PEREZ:**  Well why

23    would he say that?  You've given him a ride

24    home, you've given him 20 bucks.  Why would he

25    say, your day will come?

26         **INMATE PERTSONI:**  I don't know.

27         **ATTORNEY FOX:**  Did he know that you would

30

1  not help raise bail money?

2      **INMATE PERTSONI:**  Of course my Albanian

3  brothers they will told him, of course.

4      **ATTORNEY FOX:**  Okay.

5      **PRESIDING COMMISSIONER PEREZ:**  Okay.

6      **INMATE PERTSONI:**  Of course.

7      **ATTORNEY FOX:**  So he knew you wouldn't

8  help with the bail.

9      **INMATE PERTSONI:**  Yeah, I oppose that.

10      **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

11  he was charged with rape, he was in jail, right?

12      **INMATE PERTSONI:**  Yeah, yeah.

13      **PRESIDING COMMISSIONER PEREZ:**  And you

14  were asked to participate in raising the money

15  for bail to get him out.

16      **INMATE PERTSONI:**  Yes.

17      **PRESIDING COMMISSIONER PEREZ:**  And you

18  wouldn't do it.

19      **INMATE PERTSONI:**  No.

20      **PRESIDING COMMISSIONER PEREZ:**  Okay.

21  Then eventually he gets out and according to

22  your belief he finds out that you would not

23  participate in helping to raise his bail.

24      **INMATE PERTSONI:**  Yes ma'am, yes.

25      **PRESIDING COMMISSIONER PEREZ:**  Okay.  You

26  give him a ride home and you give him 20 bucks

27  and he tells you your day will come.

31

1        **INMATE PERTSONI:**  Yeah.

2        **PRESIDING COMMISSIONER PEREZ:**  Okay, go
3    ahead.

4        **INMATE PERTSONI:**  And I told him --

5        **PRESIDING COMMISSIONER PEREZ:**  You go
6    ahead, please.  It's easier than trying to do it
7    myself.

8        **INMATE PERTSONI:**  And I went -- I went in
9    the restaurant and I told my friends, what you
10   done?  And I explain who he was, Mr. Rapishti,
11   what he present.  But they didn't know anything.
12   Later on they found out the hard way but it was
13   too late.

14       **PRESIDING COMMISSIONER PEREZ:**  They found
15   out what the hard way?

16       **INMATE PERTSONI:**  Because he make a lot
17   of threats on them and the restaurant.

18       **PRESIDING COMMISSIONER PEREZ:**  He did
19   what?

20       **INMATE PERTSONI:**  He make a lot of
21   threats on them too.  Later on they got in
22   trouble with him too.  Later on after that he
23   went over there in the restaurant and he
24   threaten Mr. Jim Saiti.  He took the knife in
25   the kitchen in the restaurant and he wanted to
26   stab him.

27       **ATTORNEY FOX:**  How did you know about

32

1   that?

2         **INMATE PERTSONI:**  My friends tell me

3   because they work there, you know.

4         **ATTORNEY FOX:**  Okay.

5         **INMATE PERTSONI:**  Jim -- They scared and

6   Saiti hold him.  (Indiscernible) with the knife.

7   And he having gun.  The day after that he having

8   gun, he shoot the gun in the restaurant.  He

9   fall down.  He fall down.  And Mike the owner of

10  the restaurant, the people that go eat there,

11  they run away.  Another time he get his car and

12  Mr. Rapishti broke him car.

13        **ATTORNEY FOX:**  Was that Jack Saiti?

14        **INMATE PERTSONI:**  Yeah.

15        **ATTORNEY FOX:**  Okay, what happened with

16  the car?

17        **INMATE PERTSONI:**  He took his car and he

18  broke it.  He hit the car in front and in front

19  of the door and he gave to him.  And all those

20  people that help, later on they got hurt by him.

21        **PRESIDING COMMISSIONER PEREZ:**  Okay, let

22  me ask you this, sir.  How long were you in San

23  Francisco or how long were you and the victim in

24  San Francisco before this crime was committed?

25        **INMATE PERTSONI:**  1989, I believe.

26        **PRESIDING COMMISSIONER PEREZ:**  '89?  This

27  happened in '81.

33

1        **INMATE PERTSONI:** Oh, '79, excuse me,
2    '79, '79.

3        **PRESIDING COMMISSIONER PEREZ:** '79.
4    Okay, so you were in San Francisco --

5        **INMATE PERTSONI:** No, in Chicago.

6        **ATTORNEY FOX:** No, no. When you came to
7    San Francisco, okay.

8        **INMATE PERTSONI:** Yeah.

9        **ATTORNEY FOX:** How long after that did
10   Mr. Rapishti come?

11        **INMATE PERTSONI:** I believe about six
12   months.

13        **PRESIDING COMMISSIONER PEREZ:** Six
14   months, okay.

15        **INMATE PERTSONI:** Something like that.

16        **PRESIDING COMMISSIONER PEREZ:** And how
17   long was he in San Francisco before the crime
18   occurred?

19        **INMATE PERTSONI:** I don't know, I don't
20   know.

21        **PRESIDING COMMISSIONER PEREZ:** Okay, let
22   me back up. You said that, correct me if I'm
23   wrong.

24        **INMATE PERTSONI:** Yes ma'am.

25        **PRESIDING COMMISSIONER PEREZ:** That
26   Rapishti came about six months after you moved
27   to San Francisco.

34

1          **INMATE PERTSONI:**  Yes.

2          **PRESIDING COMMISSIONER PEREZ:**  Okay.

3   When did you move to San Francisco.

4          **INMATE PERTSONI:**  Six months after I say.

5   Six months after I left Chicago in San Francisco

6   I come.

7          **PRESIDING COMMISSIONER PEREZ:**  Okay, let

8   me try it again.

9          **INMATE PERTSONI:**  Okay.

10         **PRESIDING COMMISSIONER PEREZ:**  When did

11  you come to San Francisco?  What month, what

12  year?

13         **INMATE PERTSONI:**  I come -- I left in

14  1979, I don't know the month.

15         **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

16  when did Rapishti -- When did you learn that

17  Rapishti was in San Francisco?

18         **INMATE PERTSONI:**  In '80, in '80.

19         **PRESIDING COMMISSIONER PEREZ:**  In 1980,

20  okay.  And the crime occurred in '81.

21         **INMATE PERTSONI:**  Yes.

22         **PRESIDING COMMISSIONER PEREZ:**  Okay, so

23  it occurred about a year later.

24         **INMATE PERTSONI:**  Yes.

25         **PRESIDING COMMISSIONER PEREZ:**  Had you

26  seen him previous to the night of the offense,

27  the victim?

35

1        **INMATE PERTSONI:**  In San Francisco?

2        **PRESIDING COMMISSIONER PEREZ:**  In San

3    Francisco.

4        **INMATE PERTSONI:**  Yes.

5        **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

6    what was your interaction like with him?  Where

7    did you see him?

8        **INMATE PERTSONI:**  I see him the same

9    place I took his life, the same club.  I see

10   there before right there.

11       **PRESIDING COMMISSIONER PEREZ:**  Okay.  How

12   many times?

13       **INMATE PERTSONI:**  One, one.  All together

14   I see in Chicago one time, I see him in the

15   restaurant the second time.  The third time I

16   see in the club, he beat me up, and the fourth

17   time I kill him that day.

18       **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

19   you saw him once in Chicago.

20       **INMATE PERTSONI:**  Yeah.

21       **PRESIDING COMMISSIONER PEREZ:**  And three

22   times in San Francisco.

23       **INMATE PERTSONI:**  Yeah.  Excuse me, and

24   in Houston, Texas.  But I never talk to him in

25   Houston, Texas.

26       **PRESIDING COMMISSIONER PEREZ:**  Okay,

27   okay.  So total you saw him a total of four

36

1   times, okay.

2         **INMATE PERTSONI:**  Chicago, San Francisco.

3         **PRESIDING COMMISSIONER PEREZ:**  Okay,

4   that's fine.  And why did you commit this

5   offense on the day that you did?

6         **INMATE PERTSONI:**  I was scared him, I was

7   afraid of him and I done wrong.

8         **PRESIDING COMMISSIONER PEREZ:**  Okay.

9   What happened?

10        **ATTORNEY FOX:**  Just a little extra

11   background I think also.  Did he -- Did you ever

12   fight with him?

13        **INMATE PERTSONI:**  Yes.

14        **ATTORNEY FOX:**  And did he break your

15   nose?

16        **INMATE PERTSONI:**  Yeah, and my arm

17   bruised.

18        **ATTORNEY FOX:**  Okay.  Where did that

19   happen?

20        **INMATE PERTSONI:**  In the same place where

21   I kill before, the club.

22        **PRESIDING COMMISSIONER PEREZ:**  Okay.

23        **ATTORNEY FOX:**  Okay.  And did he ever

24   call your wife?

25        **INMATE PERTSONI:**  Yes.

26        **ATTORNEY FOX:**  And what effect on your

27   wife did that call have?

37

1          **INMATE PERTSONI:**  My wife, she was scared
2     and I said, don't pay attention.  That person
3     was drunk or drinking.

4          **ATTORNEY FOX:**  Okay.  But she knew it was
5     Rapishti?

6          **INMATE PERTSONI:**  After, yeah.

7          **ATTORNEY FOX:**  Okay.  And was she afraid?

8          **INMATE PERTSONI:**  A little bit but I got
9     her comfortable.

10         **ATTORNEY FOX:**  Okay.  I think there's a
11    missing part of the story.

12         **PRESIDING COMMISSIONER PEREZ:**  A few.

13         **ATTORNEY FOX:**  From Chicago did you go to
14    Houston?

15         **INMATE PERTSONI:**  No, from Chicago I come
16    to San Francisco.

17         **ATTORNEY FOX:**  Directly to San Francisco.
18    How did you wind up in Houston with
19    Mr. Rapishti?

20         **INMATE PERTSONI:**  Because after
21    Mr. Rapishti beat me up he throw me down from
22    the stairs, the second floor.  The next day my
23    Albanian brothers they say Rapishti wanted to --
24    the next time he going to kill me.  And I
25    believed that, you know, he can do that.  That's
26    why I left and I went to Houston, Texas.

27         **ATTORNEY FOX:**  Okay, so from San

38

1   Francisco you went to Houston?

2        **INMATE PERTSONI:**  Yes.

3        **ATTORNEY FOX:**  Okay.  And how long were

4   you in Houston?

5        **INMATE PERTSONI:**  About four months, five

6   months, something like that.

7        **ATTORNEY FOX:**  And did Mr. Rapishti

8   follow you to Houston at some point?

9        **INMATE PERTSONI:**  Yes.

10       **ATTORNEY FOX:**  And what happened in

11   Houston?

12       **INMATE PERTSONI:**  I never talked to him

13   but I try to go in the restaurant, the same

14   place I used to work.  Not full time but part

15   time.  In the street -- I stopped the car in the

16   street.  In the window -- I see him in the

17   window.  And I drive back home and I call my

18   friend, he still work there.  He said,

19   Mr. Rapisthi is a very angry man.  I said, I

20   know about him, I know.  That's why I went.

21       **ATTORNEY FOX:**  Did he say that

22   Mr. Rapishti was looking for you?

23       **INMATE PERTSONI:**  Yes.

24       **ATTORNEY FOX:**  And did you leave Houston

25   to get away from Mr. Rapishti?

26       **INMATE PERTSONI:**  Yes.

27       **ATTORNEY FOX:**  Okay.

39

1      **PRESIDING COMMISSIONER PEREZ:**  Okay.  On

2  the day of the offense the victim walked up to

3  you.

4      **INMATE PERTSONI:**  Yes.

5      **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

6  he said what?

7      **INMATE PERTSONI:**  I can only say -- I see

8  him together, you know.  He stand up and I was

9  afraid, you know, shocked.

10     **ATTORNEY FOX:**  Did you expect him to be

11 there when you went?

12     **INMATE PERTSONI:**  No, no, no, because I

13 was in Las Vegas with my wife.  And then from

14 Las Vegas I come on the same night and I drop my

15 wife home.  I told my wife, I'm going to go

16 drink some (inaudible) at a club on Eddy and

17 talk in my language.  And I went there.  I don't

18 know he was there.  Because if I know he was

19 there I never go there.

20     **PRESIDING COMMISSIONER PEREZ:**  Okay.  You

21 go there, you see him, you two meet up at some

22 point.

23     **INMATE PERTSONI:**  Yes.

24     **PRESIDING COMMISSIONER PEREZ:**  What does

25 he say?

26     **INMATE PERTSONI:**  He say, motherfucker,

27 your time is come, is come.

40

1      **PRESIDING COMMISSIONER PEREZ:**  Okay, and

2  then?

3      **INMATE PERTSONI:**  And he was putting the

4  hands down and I thought he going to pull a gun.

5  At that time I believe it and I pull my gun, my

6  gun, and I say, hold it man.  He come to me and

7  he say, motherfucker, I'm going to take that gun

8  and put in your ass.  And I having the gun in

9  hands.  If you having -- I still having the

10  power of the gun after all these years.

11      **PRESIDING COMMISSIONER PEREZ:**  Okay.  Why

12  don't you move the chair this way.  Okay, go

13  ahead.

14      **ATTORNEY FOX:**  Thank you, Mr. Montgomery.

15      **INMATE PERTSONI:**  And when he coming

16  through he grab the gun.

17      **PRESIDING COMMISSIONER PEREZ:**  He grabbed

18  the gun, go ahead.

19      **INMATE PERTSONI:**  For the barrel, the

20  gun, and he stick in his face.  He said, punk,

21  you not going to do nothing.  And he dropping

22  the gun and the gun go off.  I having the finger

23  in there.

24      **PRESIDING COMMISSIONER PEREZ:**  And you

25  pulled the trigger.

26      **INMATE PERTSONI:**  Yeah.  I having finger

27  in the trigger and the rest, the gun go of.

41

1        **PRESIDING COMMISSIONER PEREZ:**  Okay.  Did

2   you pull the trigger?

3        **INMATE PERTSONI:**  Yes.

4        **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

5   so according to the record the weapon was about

6   four to six inches from his abdomen at the time

7   that he was shot.

8        **INMATE PERTSONI:**  Yes.

9        **PRESIDING COMMISSIONER PEREZ:**  Is that

10  about right?

11       **INMATE PERTSONI:**  It was, yeah.  It was

12  close, yeah.

13       **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

14  then what happened?

15       **INMATE PERTSONI:**  And he -- At that time

16  I don't know nothing else.  He tried to falling

17  down.  I seen that and I lost, I don't know

18  nothing.

19       **PRESIDING COMMISSIONER PEREZ:**  Okay.

20  Because the record reflects that after he was

21  hit in the stomach and he went down that you

22  shot him in the head, and the first shot to the

23  head was about two inches from his head.  And

24  then you shot him a third time in the head.

25       **INMATE PERTSONI:**  Yes.

26       **PRESIDING COMMISSIONER PEREZ:**  Twice in

27  the head and once in the abdomen.

42

1      **INMATE PERTSONI:**  Yes, yes.  At that time
2    I don't know but I did.

3      **PRESIDING COMMISSIONER PEREZ:**  You don't
4    know?

5      **INMATE PERTSONI:**  I did, yeah.  At that
6    time I was scared and afraid.  I don't know that
7    time.

8      **PRESIDING COMMISSIONER PEREZ:**  Why did
9    you shoot him twice in the head after he was
10   shot in the abdomen?

11     **INMATE PERTSONI:**  I was scaring him.

12     **PRESIDING COMMISSIONER PEREZ:**  You were
13   scaring him?

14     **INMATE PERTSONI:**  I was scared of him.

15     **PRESIDING COMMISSIONER PEREZ:**  You were
16   scared of him, okay.

17     **INMATE PERTSONI:**  Yeah.

18     **PRESIDING COMMISSIONER PEREZ:**  You had
19   already shot him in the abdomen, he was already
20   going down.

21     **INMATE PERTSONI:**  Yes.

22     **PRESIDING COMMISSIONER PEREZ:**  Why did
23   you proceed to shoot him twice in the head after
24   he had already gone down?

25     **INMATE PERTSONI:**  I was scared of him and
26   I thought I fighting for my life and I could not
27   remember nothing.

43

1          **ATTORNEY FOX:**  Were you angry at him?

2          **INMATE PERTSONI:**  Yes.

3          **ATTORNEY FOX:**  So you were angry when you

4     shot him?

5          **INMATE PERTSONI:**  Yes.

6          **PRESIDING COMMISSIONER PEREZ:**  Now how is

7     it that you were fighting for your life when he

8     had already been shot in the stomach and was

9     down?  He wasn't a threat to you at that point,

10    right?

11         **INMATE PERTSONI:**  Yes.

12         **PRESIDING COMMISSIONER PEREZ:**  He was not

13    a threat to you?

14         **INMATE PERTSONI:**  No, he was threat to

15    me.  Yeah, of course he was threat.

16         **PRESIDING COMMISSIONER PEREZ:**  Okay, why

17    was he a threat to you if he had already been

18    shot and was going down?

19         **INMATE PERTSONI:**  But I don't know that

20    the bullet, if -- I don't know if the bullet hit

21    him or not the first time.  I don't know, I

22    don't know what happened.  I was --

23         **PRESIDING COMMISSIONER PEREZ:**  You saw

24    him go down.  You didn't assume the bullet must

25    have hit him, especially since you're right

26    there in front of him?

27         **INMATE PERTSONI:**  I did it, you know, I

44

1    admit it, but at that time I couldn't remember.

2            **PRESIDING COMMISSIONER PEREZ:**  Why didn't

3    you just run when you saw him go down.  It's

4    apparent that you should have known that you hit

5    him.  You pulled the trigger, he goes down.

6    It's pretty apparent that he's been shot.  Why

7    didn't you just run as opposed to shooting him

8    in the head twice after he's down?

9            **INMATE PERTSONI:**  You're right, I wish.

10           **PRESIDING COMMISSIONER PEREZ:**  Were you

11   drinking?

12           **INMATE PERTSONI:**  No, I never drink.

13           **PRESIDING COMMISSIONER PEREZ:**  Under the

14   influence of any drugs?

15           **INMATE PERTSONI:**  No, never.

16           **PRESIDING COMMISSIONER PEREZ:**  How do you

17   feel about this crime today, sir?

18           **INMATE PERTSONI:**  I feel bad.  I took my

19   Albanian brother's life.

20           **PRESIDING COMMISSIONER PEREZ:**  Did you

21   want to ask your client any other questions

22   regarding the commitment offense before we move

23   on?

24           **ATTORNEY FOX:**  No, I think we've pretty

25   well covered it.

26           **PRESIDING COMMISSIONER PEREZ:**  Okay.

27           **ATTORNEY FOX:**  Thank you.

45

1        **PRESIDING COMMISSIONER PEREZ:**  Let's go

2   ahead and move on then, sir.  Let's talk about

3   your criminal record.  What year did you come to

4   this country?

5        **INMATE PERTSONI:**  1975.

6        **PRESIDING COMMISSIONER PEREZ:**  Okay.  You

7   came to this country in 1975, sir, and the

8   record reflects that in 1976 you were arrested

9   in Chicago for aggravated battery, criminal

10  property damage, unlawful use of a weapon and

11  state ID card.  I don't know what that is.  And

12  you were subsequently released.

13       **INMATE PERTSONI:**  Yes.

14       **PRESIDING COMMISSIONER PEREZ:**  What was

15  the circumstances of this arrest?  What

16  happened?

17       **INMATE PERTSONI:**  In Chicago?

18       **PRESIDING COMMISSIONER PEREZ:**  Uh-hmm.

19       **INMATE PERTSONI:**  We having a

20  demonstration.

21       **PRESIDING COMMISSIONER PEREZ:**  Okay,

22  Albanians are having a demonstration.

23       **INMATE PERTSONI:**  Demonstrating, protestı

24       **PRESIDING COMMISSIONER PEREZ:**  What were

25  you protesting?

26       **INMATE PERTSONI:**  Protesting to have more

27  rights for my people.  It was going bad there.

46

1    To give to us --

2         PRESIDING COMMISSIONER PEREZ:   In this

3    country?

4         INMATE PERTSONI:   To protest -- No, we

5    was protesting in the embassy of Yugoslavia.

6         PRESIDING COMMISSIONER PEREZ:   I see, I

7    see.  Okay, go ahead.

8         INMATE PERTSONI:   Yeah, we was

9    protesting, walking around, you know, back and

10   forth.

11        PRESIDING COMMISSIONER PEREZ:   Did you

12   assault anybody?

13        INMATE PERTSONI:   Yes.

14        PRESIDING COMMISSIONER PEREZ:   Who did

15   you assault?

16        INMATE PERTSONI:   I assault an innocent

17   man.

18        PRESIDING COMMISSIONER PEREZ:   Because?

19        INMATE PERTSONI:   Because I was angry at

20   the time and he walk in the middle of the --

21        PRESIDING COMMISSIONER PEREZ:   Protest?

22        INMATE PERTSONI:   Protest and he put a

23   finger.

24        PRESIDING COMMISSIONER PEREZ:   Okay.

25        INMATE PERTSONI:   And other people,

26   Albanians that were there told him, you know,

27   why are you put that like that.  And I walk

47

1    there too and I took my gun and I shoot the

2    windows.

3         **PRESIDING COMMISSIONER PEREZ:**  You took a

4    gun and you shot him?

5         **INMATE PERTSONI:**  The windows.

6         **PRESIDING COMMISSIONER PEREZ:**  Shot the

7    window.

8         **INMATE PERTSONI:**  Yeah, of the car.

9         **PRESIDING COMMISSIONER PEREZ:**  Of his

10   car.

11        **INMATE PERTSONI:**  Yeah.

12        **PRESIDING COMMISSIONER PEREZ:**  What you

13   thought was his car.

14        **INMATE PERTSONI:**  Yeah.

15        **PRESIDING COMMISSIONER PEREZ:**  And those

16   charges were subsequently dismissed.

17        **INMATE PERTSONI:**  Yes.

18        **PRESIDING COMMISSIONER PEREZ:**  Okay.

19   What were you doing with a weapon?

20        **INMATE PERTSONI:**  I have the gun.  I know

21   how to (indiscernible).

22        **PRESIDING COMMISSIONER PEREZ:**  Did you

23   have it legally?  Did you buy it and register

24   it?

25        **INMATE PERTSONI:**  No, I buy it from the

26   street.

27        **PRESIDING COMMISSIONER PEREZ:**  From the

48

1  street.  Why did you have a need to have a

2  weapon?

3        **INMATE PERTSONI:**  I never have it before

4  and I thought --

5        **PRESIDING COMMISSIONER PEREZ:**  Why did

6  you have a need to have a weapon that wasn't

7  legal?

8        **INMATE PERTSONI:**  You're right.

9        **PRESIDING COMMISSIONER PEREZ:**  No, but

10  why?

11        **INMATE PERTSONI:**  My foolness (sic).

12        **PRESIDING COMMISSIONER PEREZ:**  What was

13  your thought back then?

14        **INMATE PERTSONI:**  My thought was just to

15  have to take care of me.

16        **PRESIDING COMMISSIONER PEREZ:**  To protect

17  you, sir?

18        **INMATE PERTSONI:**  Make me very -- Yeah,

19  protect myself, make me feel better.

20        **PRESIDING COMMISSIONER PEREZ:**  Okay.

21        **ATTORNEY FOX:**  Had anybody threatened you

22  before you bought the gun?

23        **INMATE PÉRTSONI:**  No.

24        **ATTORNEY FOX:**  No.  Why did you think you

25  needed a gun in Chicago?

26        **INMATE PERTSONI:**  Just to have, you know.

27        **ATTORNEY FOX:**  Did your friends have

49

1   guns?

2       **INMATE PERTSONI:**  Yes.

3       **ATTORNEY FOX:**  Okay.  And did they tell
4   you you should have one?

5       **INMATE PERTSONI:**  I don't know.  I don't
6   (inaudible).

7       **PRESIDING COMMISSIONER PEREZ:**  Okay.  In
8   1977, sir, you were arrested again in Chicago,
9   Illinois for aggravated assault and unlawful use
10  of a weapon.  Can you tell me what happened on
11  that day?

12      **INMATE PERTSONI:**  What year?

13      **PRESIDING COMMISSIONER PEREZ:**  1977,
14  February 17, 1977.

15      **INMATE PERTSONI:**  That's what it was, the
16  same one.  The year is different.

17      **PRESIDING COMMISSIONER PEREZ:**  Okay, one
18  was in 1976.  Were there two different arrests?

19      **INMATE PERTSONI:**  No, the same one.

20      **PRESIDING COMMISSIONER PEREZ:**  The same
21  one.  So the one in '77 is the same one, the one
22  that was dismissed?

23      **INMATE PERTSONI:**  That's the same one,
24  just the years, the years are different.

25      **PRESIDING COMMISSIONER PEREZ:**  Okay,
26  okay, but it's the same crime.  Is that what
27  you're saying?

50

1          **INMATE PERTSONI:**  Yeah.

2          **PRESIDING COMMISSIONER PEREZ:**  Okay.

3          **ATTORNEY FOX:**  Did you do it once or

4     twice?

5          **INMATE PERTSONI:**  One time.

6          **ATTORNEY FOX:**  Okay.

7          **PRESIDING COMMISSIONER PEREZ:**  In 1979 in

8     Chicago, Illinois you were arrested for

9     aggravated battery.

10          **INMATE PERTSONI:**  Yeah.

11          **PRESIDING COMMISSIONER PEREZ:**  Do you

12     recall the circumstances of that?

13          **INMATE PERTSONI:**  My friend.  I have a

14     cellie, a roommate, cellie, my friend.  He

15     having argument with another Albanian fellow.

16     The Albanian fellow, the brother call the

17     police.  The police come in our house, in our

18     apartment, they arrest us both.

19          **PRESIDING COMMISSIONER PEREZ:**  For what?

20          **INMATE PERTSONI:**  Because my friend, he

21     threaten that other person.  And the police come

22     and arrest us.  They pull me, they arrest me and

23     they let me out, they keep my friend.

24          **PRESIDING COMMISSIONER PEREZ:**  Okay.  You

25     didn't threaten this person?

26          **INMATE PERTSONI:**  No.

27          **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

51

1   then in 1982 -- excuse me.  In 1981 you were

2   arrested for assault with a deadly weapon.  You

3   were convicted and you were sentenced to 18

4   months probation and ten days in jail, right?

5           **INMATE PERTSONI:**  Yes.

6           **PRESIDING COMMISSIONER PEREZ:**  What

7   happened there?

8           **INMATE PERTSONI:**  I was driving a car and

9   I no having stop sign, the person having stop

10  sign and almost hit me in the car.  They coming

11  out from the car, they talking close to my

12  window.  And I open the car and I push them and

13  they fall down.

14          **PRESIDING COMMISSIONER PEREZ:**  Why did

15  you do that?

16          **INMATE PERTSONI:**  I thought he going to,

17  I thought he threaten me.

18          **PRESIDING COMMISSIONER PEREZ:**  You

19  thought he threatened you.

20          **INMATE PERTSONI:**  Yeah.

21          **PRESIDING COMMISSIONER PEREZ:**  He didn't

22  say anything?

23          **INMATE PERTSONI:**  Yeah, he talking, he

24  talking stupid.  You see, you almost hit my car

25  and things.  I just open the door and push him.

26          **PRESIDING COMMISSIONER PEREZ:**  And he

27  fell to the ground.

52

1          **INMATE PERTSONI:**  Yes.

2          **PRESIDING COMMISSIONER PEREZ:**  Okay.  Do

3    you have a criminal record back in your home

4    country?

5          **INMATE PERTSONI:**  No.

6          **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

7    the reason I ask that, sir, is because to this

8    country in 1975 and a year later you're already

9    getting arrested.

10         **INMATE PERTSONI:**  Yes.

11         **PRESIDING COMMISSIONER PEREZ:**  For

12    different offenses.

13         **INMATE PERTSONI:**  Yes.

14         **PRESIDING COMMISSIONER PEREZ:**  You're

15    telling me you have never committed a crime

16    until you came to this country.

17         **INMATE PERTSONI:**  Yes ma'am.

18         **PRESIDING COMMISSIONER PEREZ:**  Did you

19    ever commit a crime that you weren't caught for,

20    sir?  Did you ever commit crimes that you were

21    never caught for?

22         **INMATE PERTSONI:**  All the time I got

23    caught.

24         **PRESIDING COMMISSIONER PEREZ:**  Every time

25    that you've ever committed a crime you've been

26    caught.  Every time?

27         **INMATE PERTSONI:**  Yes ma'am.

53

1          **PRESIDING COMMISSIONER PEREZ:**  And you've

2   never committed crimes in your home country.

3          **INMATE PERTSONI:**  Never.

4          **PRESIDING COMMISSIONER PEREZ:**  Before

5   coming to the US.

6          **INMATE PERTSONI:**  Never.

7          **PRESIDING COMMISSIONER PEREZ:**  Sir, is

8   there anything else you would like to add

9   regarding your criminal history before we move

10  on?

11         **INMATE PERTSONI:**  I want to say I regret

12  it, what I did.

13         **PRESIDING COMMISSIONER PEREZ:**  Okay.

14         **INMATE PERTSONI:**  And I take full

15  responsibility, I not trying to find excuses.

16         **PRESIDING COMMISSIONER PEREZ:**  Okay, all

17  right, thank you, sir.  Now sir, you are 51.

18         **INMATE PERTSONI:**  Yes ma'am.

19         **PRESIDING COMMISSIONER PEREZ:**  Your

20  parents are deceased.

21         **INMATE PERTSONI:**  Yes.

22         **PRESIDING COMMISSIONER PEREZ:**  They died

23  in Yugoslavia.

24         **INMATE PERTSONI:**  Yes.

25         **PRESIDING COMMISSIONER PEREZ:**  Let's see.

26  Did they die three or four months before you

27  committed this offense?

54

1        **INMATE PERTSONI:**  Yes.

2        **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

3   are you one of 13 children or 10 children?

4        **INMATE PERTSONI:**  Thirteen.

5        **PRESIDING COMMISSIONER PEREZ:**  Thirteen,

6   okay.  And where do your siblings live?  Where

7   do they live?

8        **INMATE PERTSONI:**  Everyone in the States.

9        **PRESIDING COMMISSIONER PEREZ:**  Every

10  single one is in the States?

11       **INMATE PERTSONI:**  Yeah, except two

12  brothers stayed in Holland.

13       **PRESIDING COMMISSIONER PEREZ:**  They

14  stayed where?

15       **INMATE PERTSONI:**  In Holland, two

16  brothers.

17       **PRESIDING COMMISSIONER PEREZ:**  Okay, in

18  Holland, okay.

19       **INMATE PERTSONI:**  In Holland.  And they

20  write a letter for me.

21       **PRESIDING COMMISSIONER PEREZ:**  Okay.

22       **INMATE PERTSONI:**  Both are younger than

23  me.

24       **PRESIDING COMMISSIONER PEREZ:**  Okay.  Now

25  your brothers and sisters, do you have any that

26  live close in California?

27       **INMATE PERTSONI:**  Yes.  No, no, just my

55

1  wife.

2          **PRESIDING COMMISSIONER PEREZ:**  Just your

3  wife.

4          **INMATE PERTSONI:**  I no have nobody here.

5          **PRESIDING COMMISSIONER PEREZ:**  Okay.  Do

6  you keep in touch with your siblings via

7  telephone and letters?

8          **INMATE PERTSONI:**  Yes, I write letter.

9          **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

10  you are still married to the same woman that you

11  were married to when you got convicted?

12          **INMATE PERTSONI:**  Yes, yes.

13          **PRESIDING COMMISSIONER PEREZ:**  And you

14  have no children.

15          **INMATE PERTSONI:**  No.

16          **PRESIDING COMMISSIONER PEREZ:**  No

17  children.  And how did you meet your wife?

18          **INMATE PERTSONI:**  I meet in Chicago.

19          **PRESIDING COMMISSIONER PEREZ:**  In

20  Chicago, okay.

21          **INMATE PERTSONI:**  Yeah.

22          **PRESIDING COMMISSIONER PEREZ:**  You've

23  been married a long time.

24          **INMATE PERTSONI:**  Yeah.

25          **PRESIDING COMMISSIONER PEREZ:**  A long

26  time, many years.  And she is now working --

27  living in San Francisco and working.

56

1          INMATE PERTSONI:  Yeah, yeah.

2          PRESIDING COMMISSIONER PEREZ:  Does she

3   work for Kaiser?

4          INMATE PERTSONI:  Yeah.

5          PRESIDING COMMISSIONER PEREZ:  And what

6   does she do for Kaiser?

7          INMATE PERTSONI:  She work in the bills.

8          PRESIDING COMMISSIONER PEREZ:  In the

9   billing department?

10         INMATE PERTSONI:  She work with the

11  bills.

12         PRESIDING COMMISSIONER PEREZ: Accounting?

13         INMATE PERTSONI:  Yeah, accounting.

14         PRESIDING COMMISSIONER PEREZ: Accounting,

15  okay.  How is your relationship with her?

16         INMATE PERTSONI:  Beautiful.

17         PRESIDING COMMISSIONER PEREZ:  Okay.  She

18  has been real dedicated, stuck by your side

19  right?  Very good.  How would you describe your

20  upbringing in Yugoslavia?

21         INMATE PERTSONI:  It was rough.

22         PRESIDING COMMISSIONER PEREZ:  It was

23  rough.  Because?

24         INMATE PERTSONI:  Hard, poor.

25         ATTORNEY FOX:  Was there fighting?

26         INMATE PERTSONI:  Everything.  I don't

27  know how to describe it.

57

1          **ATTORNEY FOX:**  Well we have to have

2   words, okay.

3          **PRESIDING COMMISSIONER PEREZ:**  Well let

4   me ask you this.  I did read your file in which

5   you indicated that you were not, your family was

6   not Communist.

7          **INMATE PERTSONI:**  No.

8          **PRESIDING COMMISSIONER PEREZ:**  So as a

9   result your family did not have the same

10   economic advantages as those that were

11   Communist.

12          **INMATE PERTSONI:**  It's true.

13          **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

14   that you literally ate scraps.

15          **INMATE PERTSONI:**  Yes.

16          **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

17   you subsequently left your home at the age of

18   17.  Was it 17?

19          **INMATE PERTSONI:**  I was 19, I think.

20          **PRESIDING COMMISSIONER PEREZ:**  Nineteen,

21   okay.  And I read a statement in the record

22   which indicates that the reason that you left

23   your parents home was because you didn't want to

24   bring shame upon them.  Is that right?  What

25   does that mean?

26          **INMATE PERTSONI:**  Not shame, not shame it

27   was.  I know I bring it, true, because I was

58

1    protesting.  You know, I'm not like Martin

2    Luther King, peace be on him, like he was doing.

3    But I not was like him.

4         PRESIDING COMMISSIONER PEREZ:  You were

5    protesting.

6         INMATE PERTSONI:  I was protesting and

7    tried to do something for my people better, that

8    I was involved more with my people.  Every year

9    they have a demonstration bringing attention.

10        PRESIDING COMMISSIONER PEREZ:  Were you

11   thrown in jail in Yugoslavia because of those

12   protests?

13        INMATE PERTSONI:  I never was in jail but

14   they interrogate me.

15        PRESIDING COMMISSIONER PEREZ:  They

16   interrogated you?

17        INMATE PERTSONI:  Yeah, they interrogate

18   me many times.

19        PRESIDING COMMISSIONER PEREZ:  Okay.

20        ATTORNEY FOX:  What happened when they

21   interrogated you?

22        INMATE PERTSONI:  They beat you up.  Over

23   there it's different, it's not like here.

24        ATTORNEY FOX:  And that was the UDBA

25   police?

26        INMATE PERTSONI:  UDBA, yeah.

27        ATTORNEY FOX:  UDBA, I'm sorry.  And

59

1    that's part of Mr. Rapishti's background?

2          **INMATE PERTSONI:**  Yeah.

3          **PRESIDING COMMISSIONER PEREZ:**  Now why

4    did you eventually leave your home?

5          **INMATE PERTSONI:**  I was -- My family was

6    getting more.  And over there --

7          **PRESIDING COMMISSIONER PEREZ:**  They were

8    getting more what?

9          **INMATE PERTSONI:**  More heat, more in

10   trouble.

11         **PRESIDING COMMISSIONER PEREZ:**  Because of

12   your involvement in protests.

13         **INMATE PERTSONI:**  Yes, yes.

14         **PRESIDING COMMISSIONER PEREZ:**  Okay, go

15   ahead.

16         **INMATE PERTSONI:**  And over there, I don't

17   know if you guys believe or not, but over there

18   they bother your family.  Not like here, you

19   know.  I do crime, they punish me.  But they

20   punish my family.

21         **ATTORNEY FOX:**  How did they punish your

22   family?

23         **INMATE PERTSONI:**  Well dad, they can beat

24   him up, all kinds of things.  Come in the house,

25   destroy your house.

26         **ATTORNEY FOX:**  And did they do that?

27         **PRESIDING COMMISSIONER PEREZ:**  They did

60

1  to my father.  My brother told me the

2  Communists, they call my father and they take

3  him, they beat him up.  But my father he never,

4  he never tell us.

5        PRESIDING COMMISSIONER PEREZ:  How did

6  your parents die?

7        INMATE PERTSONI:  My information my

8  father died from cancer, having cancer in a

9  hospital.  You know, they don't have it over

10  there.  They don't have treatment for hospitals,

11  you know, medication.  My mom have a heart

12  attack.

13        PRESIDING COMMISSIONER PEREZ:  Okay.  Now

14  you came -- You were a refugee, so to speak,

15  when you were accepted in the US.

16        INMATE PERTSONI:  Yes.

17        PRESIDING COMMISSIONER PEREZ:  Are you a

18  citizen?

19        INMATE PERTSONI:  No.

20        PRESIDING COMMISSIONER PEREZ:  Okay.  You

21  were here on what?  What kind of status?

22        INMATE PERTSONI:  Green card, green card.

23        PRESIDING COMMISSIONER PEREZ:  Green

24  card, okay.  You have a US INS hold?

25        INMATE PERTSONI:  Yes.

26        PRESIDING COMMISSIONER PEREZ:  Sir, is

27  there anything else that you'd like to add

61

1  regarding your personal factors before we move
2  on?

3      INMATE PERTSONI:  Like you mean --
4      PRESIDING COMMISSIONER PEREZ:  Life
5  before CDC.  What do you think is important for
6  this panel to know about your life before you
7  were committed to the Department?

8      INMATE PERTSONI:  I come here United
9  States, I was blessed and grateful.  At that
10  time, my time, I was one of the lucky men to
11  come to this country.  I having good job.  They
12  treat -- I have better treatment here than back
13  home.  They give me everything and I appreciate
14  it, American people.  Having job I send money
15  home, I help my family there.  I was doing good.
16  But I was young, hurt my people.  And I was
17  thinking I'm doing good at the time to protest
18  and helping.  It's just I got caught in wrong
19  thing.

20      PRESIDING COMMISSIONER PEREZ:  Okay.  In
21  terms of your parole plans, sir, I will note
22  that it is your plan to, if you're not deported,
23  to live with your wife in San Francisco upon
24  your release.

25      INMATE PERTSONI:  Yes ma'am.
26      PRESIDING COMMISSIONER PEREZ:  Okay.  And
27  I do note, sir, in reviewing your file that you

62

1  have over 50 letters of support. So given the
2  number of letters of support I will not be
3  reading them into the record. But I will note
4  that those letters of support are from various
5  friends and acquaintances that you have made
6  throughout the years to include the directors
7  and founders of various organizations that
8  provide classes and self-help programs within
9  the institutions. We note that there is a
10  letter of support from the mayor of Kosovo as
11  well as the judge, the public prosecutor in that
12  area as well. To include victims'
13  organizations, your siblings, a number of
14  cousins, nieces and nephews, to include a
15  petition with over 80 signatures in which all
16  these individuals are very much supportive of
17  your release to parole. And I will note that
18  these letters are from individuals not only in
19  Kosovo but here in the States as well. All
20  rooting for and indicating that they are very
21  supportive of your release to parole. Is that
22  accurate, sir?
23       **INMATE PERTSONI:** Yes ma'am.
24       **PRESIDING COMMISSIONER PEREZ:** Okay.
25  What is your employment plan if you are not
26  deported? Where will you work?
27       **INMATE PERTSONI:** I got a job working for

63

1    real estate for a handyman.

2         PRESIDING COMMISSIONER PEREZ:  Working

3    for who?

4         INMATE PERTSONI:  From a friend of mine.

5         PRESIDING COMMISSIONER PEREZ:  What's his

6    name?

7         INMATE PERTSONI:  Bujan (phonetic).  He

8    got a letter there.

9         ATTORNEY FOX:  Do you have the letter?

10        INMATE PERTSONI:  Yes.

11        PRESIDING COMMISSIONER PEREZ:  Why don't

12   you tell me.

13        INMATE PERTSONI:  Bujan, a handyman for

14   the real estate.  He's got 26 years owning the

15   business.

16        PRESIDING COMMISSIONER PEREZ:  Okay, and

17   that's in the San Francisco area?

18        INMATE PERTSONI:  Yeah.

19        PRESIDING COMMISSIONER PEREZ:  You don't

20   have to pull it out.  If you know what it says

21   you don't have to pull it out because it's all

22   in here.

23        INMATE PERTSONI:  Okay, okay, okay.

24        PRESIDING COMMISSIONER PEREZ:  You have a

25   number of job offers.

26        INMATE PERTSONI:  Yes.

27        PRESIDING COMMISSIONER PEREZ:  Okay.  So

64

1   what I'm trying to find out is if you were to be

2   released and not deported what is the job offer

3   that you would accept?

4        **INMATE PERTSONI:**  I accept the work for

5   him.

6        **PRESIDING COMMISSIONER PEREZ:**  Okay, and

7   what kind of work would you be doing?

8        **INMATE PERTSONI:**  Cleaning up the houses,

9   painting the houses, put the furniture inside.

10  When people coming to see the house to buy I be

11  there.

12       **PRESIDING COMMISSIONER PEREZ:**  I see.

13  What kind of -- Would this be full time

14  employment?

15       **INMATE PERTSONI:**  Yes.

16       **PRESIDING COMMISSIONER PEREZ:**  Okay, and

17  how long have you known this man?

18       **INMATE PERTSONI:**  I know his brother.

19       **PRESIDING COMMISSIONER PEREZ:**  His

20  brother.

21       **INMATE PERTSONI:**  Yeah, and my wife meet

22  them.

23       **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

24  if that job offer falls through in San Francisco

25  what's your backup job offer?  What's the second

26  job you would take if this one doesn't work out?

27       **INMATE PERTSONI:**  I work in the

65

1   restaurants.

2          **PRESIDING COMMISSIONER PEREZ:** Okay, what
3   restaurant?

4          **INMATE PERTSONI:** I'm a cut meat butcher.

5          **PRESIDING COMMISSIONER PEREZ:** Okay. Is
6   there a particular job offer you have for that?

7          **INMATE PERTSONI:** Any kind of restaurant
8   I can do any kind of job in a restaurant.

9          **PRESIDING COMMISSIONER PEREZ:** Okay.

10         **INMATE PERTSONI:** No problem.

11         **PRESIDING COMMISSIONER PEREZ:** Do you
12  have a specific job offer where they are
13  offering you a job as a butcher?

14         **INMATE PERTSONI:** No.

15         **PRESIDING COMMISSIONER PEREZ:** No, okay.
16  Now you worked in the butcher shop within CDC.

17         **INMATE PERTSONI:** Yes.

18         **PRESIDING COMMISSIONER PEREZ:** Okay, and
19  how many years did you do that?

20         **INMATE PERTSONI:** I work in Lock Mill
21  (phonetic) Main and Solano.

22         **PRESIDING COMMISSIONER PEREZ:** How many
23  months total?

24         **INMATE PERTSONI:** I work a couple of
25  years. I don't know how many months but I work
26  about maybe, three, four or five years.
27  Something like that. I don't know but many,

66

1   many years.

2          **PRESIDING COMMISSIONER PEREZ:** Okay, so

3   you have a lot of experience.

4          **INMATE PERTSONI:** Yes.

5          **PRESIDING COMMISSIONER PEREZ:** Okay, very

6   good. If you are deported where will you live?

7          **INMATE PERTSONI:** I'm going to live with

8   your brother.

9          **PRESIDING COMMISSIONER PEREZ:** Your

10  brother. Which brother is that?

11         **INMATE PERTSONI:** Naim.

12         **ATTORNEY FOX:** Can you spell that.

13         **INMATE PERTSONI:** N-A-I-M.

14         **PRESIDING COMMISSIONER PEREZ:** And where

15  does he live?

16         **INMATE PERTSONI:** He live in a house, my

17  father house and my mother. The old house. But

18  they joined the old house, they got a new one.

19  They built a new one.

20         **PRESIDING COMMISSIONER PEREZ:** Okay. And

21  that's in Kosovo?

22         **INMATE PERTSONI:** Yes.

23         **PRESIDING COMMISSIONER PEREZ:** Okay. And

24  what is your backup plan if that one doesn't

25  work out?

26         **INMATE PERTSONI:** I got -- I got a lot of

27  jobs there.

67

1       **PRESIDING COMMISSIONER PEREZ:**  No, no,

2   no, what's your backup residence plan?

3       **INMATE PERTSONI:**  Well I got brothers,

4   other brothers.

5       **PRESIDING COMMISSIONER PEREZ:**  Another

6   brother.  And he lives in Kosovo as well?

7       **INMATE PERTSONI:**  Yeah.

8       **PRESIDING COMMISSIONER PEREZ:**  And what

9   is his name?

10      **INMATE PERTSONI:**  Gni,

11      **ATTORNEY FOX:**  And how do we spell it?

12      **INMATE PERTSONI:**  G-N-I, Gni.

13      **PRESIDING COMMISSIONER PEREZ:**  That's

14  fine, that's okay.  What about your employment

15  plan?  What is your first -- I know you've got a

16  number of offers in Kosovo.  What is the one

17  employment that you would accept if you were to

18  be deported?

19      **INMATE PERTSONI:**  My really goal always I

20  want to do in my life back home, everything, I

21  want to go and work with the victims.  Help my

22  brothers and sisters.

23      **PRESIDING COMMISSIONER PEREZ:**  Do you

24  have a full time job offer for a victims' group?

25      **INMATE PERTSONI:**  Yes, yes.

26      **PRESIDING COMMISSIONER PEREZ:**  And what

27  is the name of the organization?

68

1          **INMATE PERTSONI:**  It's a women's rights.

2          **PRESIDING COMMISSIONER PEREZ:**  Okay, I

3    saw that in the file.

4          **INMATE PERTSONI:**  Yeah.

5          **PRESIDING COMMISSIONER PEREZ:**  Okay, and

6    that's full time employment?

7          **INMATE PERTSONI:**  Yes.

8          **PRESIDING COMMISSIONER PEREZ:**  Okay.  How

9    much --

10         **INMATE PERTSONI:**  Or working for United

11   Nations.

12         **PRESIDING COMMISSIONER PEREZ:**  How much

13   will you be paid?

14         **INMATE PERTSONI:**  I don't know.

15         **PRESIDING COMMISSIONER PEREZ:**  But that

16   would be full time employment?

17         **INMATE PERTSONI:**  Yes.

18         **PRESIDING COMMISSIONER PEREZ:**  Because I

19   did note in the file that they are offering you

20   employment.

21         **INMATE PERTSONI:**  Yes.

22         **PRESIDING COMMISSIONER PEREZ:**  What is

23   your backup employment plan in Kosovo?

24         **INMATE PERTSONI:**  I can work butcher with

25   my friend.

26         **PRESIDING COMMISSIONER PEREZ:**  Okay, and

27   what friend is that?

69

1          **INMATE PERTSONI:**  Bjari (phonetic).

2          **ATTORNEY FOX:**  How would we spell that?

3    Maybe we'll do the spelling at the end of the

4    hearing.

5          **PRESIDING COMMISSIONER PEREZ:**  You know

6    what, it's in there.

7          **ATTORNEY FOX:**  Okay.

8          **PRESIDING COMMISSIONER PEREZ:**  It's in

9    there, okay.

10          **ATTORNEY FOX:**  For the transcriber.

11          **PRESIDING COMMISSIONER PEREZ:**  So you

12    have plenty of resources undoubtedly from

13    looking at your file.

14          **INMATE PERTSONI:**  Yes.

15          **PRESIDING COMMISSIONER PEREZ:**  You have

16    lots and lots of resources, especially in

17    Kosovo.  What vocations have you completed

18    within the institution?

19          **INMATE PERTSONI:**  Dry cleaning.

20          **PRESIDING COMMISSIONER PEREZ:**  Okay.

21          **INMATE PERTSONI:**  And I work in Industry

22    with wood, spray the --

23          **PRESIDING COMMISSIONER PEREZ:**  Furniture

24    finisher?

25          **INMATE PERTSONI:**  Yes.

26          **PRESIDING COMMISSIONER PEREZ:**  How long

27    did you do that?

70

1       **INMATE PERTSONI:**  I work there in the

2   '90s.

3       **PRESIDING COMMISSIONER PEREZ:**  How many

4   months total?

5       **INMATE PERTSONI:**  I work from about '93

6   to '97, I believe.

7       **PRESIDING COMMISSIONER PEREZ:**  Okay.

8       **INMATE PERTSONI:**  I believe '97 or '96.

9       **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

10  you have some experience as a butcher, you have

11  completed vocational dry cleaning and you have

12  about four years as a furniture finisher.

13      **INMATE PERTSONI:**  Yes ma'am.

14      **PRESIDING COMMISSIONER PEREZ:**  Okay.  Do

15  you think you're going to be deported?

16      **INMATE PERTSONI:**  Yes.

17      **PRESIDING COMMISSIONER PEREZ:**  Yes, okay.

18  Is your wife prepared too?

19      **INMATE PERTSONI:**  Yes.  She went there.

20      **PRESIDING COMMISSIONER PEREZ:**  Where is

21  she from?

22      **INMATE PERTSONI:**  She's a Japanese-

23  American from United States.  '

24      **PRESIDING COMMISSIONER PEREZ:**  Oh, she's

25  Japanese, okay, okay.

26      **INMATE PERTSONI:**  Yeah.

27      **PRESIDING COMMISSIONER PEREZ:**  She's

71

1  prepared to move?

2      **INMATE PERTSONI:**  Yes, she went there and

3  she more exciting.

4      **PRESIDING COMMISSIONER PEREZ:**  Okay, very

5  good.

6      **ATTORNEY FOX:**  She's actually prepared a

7  letter she would like me to read at the end of

8  the hearing and I'll do that.

9      **PRESIDING COMMISSIONER PEREZ:**  Okay,

10  absolutely.  Sir, is there anything else,

11  keeping in mind we've reviewed all your

12  numerous, numerous letters, is there anything

13  else that you would like to add regarding your

14  residence or employment plans that we haven't

15  already discussed?

16      **INMATE PERTSONI:**  I have everything --

17  Whatever the papers say, I go there.  The truth,

18  I want to go home, work there.  I want to go be

19  with my wife, see my family and help my people.

20  I don't know how long -- I'm still healthy right

21  now.  My heart, I don't know how long it going

22  to last.  I want to go and do everything I can

23  positive to help these people.  I want to repair

24  what I did wrong.  At least I can make something

25  good.  Because I know those people, what they

26  went through, you know.  I know their feelings.

27  I can -- I can help them because I got

72

 1  experience I learned here in United States.
 2  They give me so much love.  Like I having heart
 3  attack and they took me, they save my life.
 4  They took me in the hospital.  And the sergeant
 5  call me, the watch commander call me in the
 6  hospital and he say, all the staff is praying
 7  for you.  They help me.  A lot of American
 8  people they put faith in me, they train me.  I
 9  learn the tools that going to help me back home.
10  If I need them I'm going to contact them.  I
11  want to go out there and bring some peace of
12  mind to my people.  That's one of my dreams,
13  with my wife (inaudible).
14       **PRESIDING COMMISSIONER PEREZ:**  Okay, very
15  good, very good sir.  Sir, pursuant to Penal
16  Code Section 3042 notices were sent to agencies
17  that would have a direct interest in your case
18  such as the Public Defender's Office, the
19  District Attorney's Office, law enforcement and
20  the Superior Court.  And we do note for the
21  record we did receive one response from the
22  District Attorney of the County of San
23  Francisco.  This letter is dated January 30,
24  2006 from Albert K. Murray, Assistant District
25  Attorney and the letter is quite neutral.  They
26  point out an error in the psychological report,
27  what they perceive to be an error that they ask

73

1  be corrected.  And furthermore the District

2  Attorney indicates that with that caveat the San

3  Francisco District Attorney is prepared to

4  simply submit the matter to the discretion of

5  the Board.  So they're not saying yes or no,

6  they're leaving it up to the Board.  Okay?  And

7  that was the only response we received for

8  today's hearing.  And we note that we don't have

9  a district attorney here today representing San

10  Francisco.  They had the option to be here but

11  opted instead to send this letter, okay.  At

12  this time Commissioner Morris will talk with you

13  about everything you have done in the prison

14  since your last hearing, okay.

15       **DEPUTY COMMISSIONER MORRIS:**  Okay,

16  Mr. Pertsoni, this is your number six,

17  subsequent hearing number six.  Your last

18  hearing was October 19 of 2004 and at that time

19  you suffered a one year denial.  Let me go

20  through your custody movement through CDC.  It

21  looks like you were received May 8 of '84 at CMF

22  and then August of '84 you transferred to San

23  Quentin.  In May of '86 you went to DVI and then

24  May of '93 you returned to San Quentin and

25  you've been here since that time.

26       **INMATE PERTSONI:**  Yes.

27       **DEPUTY COMMISSIONER MORRIS:**  Sound about

74

1  right?

2       **INMATE PERTSONI:**  Yes.

3       **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now I

4  see you have a classification score of 19 and

5  that's the lowest score that you can have as a

6  lifer.  I'm looking at a gang sheet, the A-12,

7  and the A-12 is clear.  That tells me that

8  you've had no gang association in the

9  institution whatsoever.

10      **INMATE PERTSONI:**  No.

11      **DEPUTY COMMISSIONER MORRIS:**  All right.

12  How did you manage to avoid that?

13      **INMATE PERTSONI:**  Well, stay away from

14  trouble.  I don't associate with them, be by

15  myself.  Talk with some good, good inmates.  All

16  people.  And stick with and associate with the

17  good people.

18      **DEPUTY COMMISSIONER MORRIS:**  Okay.

19      **INMATE PERTSONI:**  Do your programs.

20      **DEPUTY COMMISSIONER MORRIS:**  Okay.  You

21  don't have any -- I don't see any enemies.  No

22  enemies in the institution?

23      **INMATE PERTSONI:**  No.

24      **DEPUTY COMMISSIONER MORRIS:**  Okay.  I'm

25  also looking at disciplinaries.  It looks like

26  your last disciplinary was 1986.  And this was

27  at -- You were at Tracy at DVI.  Involved in a

75

1   fight.   What was that about?

2        **INMATE PERTSONI:**  We was -- We was

3   working in the dental lab.  I was a janitor in

4   dental lab.  And an inmate, he wanted to have

5   his friend there.  And I no like him to stay

6   there because I want to go work, I want to go to

7   school at that time.  The supervisor give me a

8   115 because I went late.  The (indiscernible)

9   open the doors.  And I went there and I said to

10  my supervisor, excuse me.  I said, they just let

11  the doors to my job right now.  If the police

12  open the door I go to eat and go to work, if

13  they no open I don't have the power.  And I went

14  to lieutenant, the hearing.  The lieutenant

15  dismiss and I got the job.  And the person, he

16  attacked me, he hit me and I hit him.  The

17  police pulled us.

18       **DEPUTY COMMISSIONER MORRIS:**  I also

19  notice that your last negative chrono is dated

20  April 5 of '89 and this was a minor infraction.

21  Your cell did not meet with the compliance

22  standards.  Something about the bedcovers.

23       **INMATE PERTSONI:**  Yeah.

24       **DEPUTY COMMISSIONER MORRIS:**  Okay.

25       **INMATE PERTSONI:**  They have the sheet,

26  you know the sheet.

27       **ATTORNEY FOX:**  What did you do with the

76

1    sheet?

2        INMATE PERTSONI:  No, it was only because

3    I was reading and writing letter and I wanted my

4    cellie to leave, you know.  Because my cellie,

5    you know, (inaudible) do not disturb.  Having

6    more peace of mind I writing letter.

7        DEPUTY COMMISSIONER MORRIS:  So you put

8    the sheet up to --

9        INMATE PERTSONI:  Yes sir.

10       DEPUTY COMMISSIONER MORRIS:   -- like

11   divide.

12       INMATE PERTSONI:  Yeah.

13       DEPUTY COMMISSIONER MORRIS:  But you

14   can't do that.

15       INMATE PERTSONI:  Yeah.

16       DEPUTY COMMISSIONER MORRIS:  Staff can't

17   see.

18       INMATE PERTSONI:  Yeah, and I find out.

19       DEPUTY COMMISSIONER MORRIS:  Okay, all

20   right.  The point is, you haven't had any

21   disciplinaries or negative chronos for many

22   years.  The last disciplinary was almost 20

23   years ago.  Okay.  I also note, I see a couple

24   of chronos in the C File that talk about the

25   Adult Basic Education test score.

26       INMATE PERTSONI:  Yes.

27       DEPUTY COMMISSIONER MORRIS:  I see you

77

1   tested -- The last one I see is '04 and I'm sure

2   you probably tested before then.  But in '04,

3   July of '04, you tested at eighth grade third

4   month.

5          INMATE PERTSONI:  Yeah.

6          DEPUTY COMMISSIONER MORRIS:  And then

7   March 29 of '05 you tested at sixth grade fourth

8   month.  What happened?

9          INMATE PERTSONI:  I don't pay attention

10  that time, you know.  I rush fast.

11         DEPUTY COMMISSIONER MORRIS:  Okay.  How

12  far did you go in school?

13         INMATE PERTSONI:  Back home?

14         DEPUTY COMMISSIONER MORRIS:  Uh-hmm.

15         INMATE PERTSONI:  Third grade.

16         DEPUTY COMMISSIONER MORRIS:  Third grade.

17  Now can I assume that you learned to read in

18  your language?

19         INMATE PERTSONI:  Yeah, I know how to

20  read.

21         DEPUTY COMMISSIONER MORRIS:  And write?

22         INMATE PERTSONI:  Yes.

23         DEPUTY COMMISSIONER MORRIS:  Okay.  Now

24  when you came to the US in '75 were you able to

25  speak the language in '75?

26         INMATE PERTSONI:  No.

27         DEPUTY COMMISSIONER MORRIS:  Okay.  Were

78

1    you able to read at that point?

2              INMATE PERTSONI:  No.

3              DEPUTY COMMISSIONER MORRIS:  Okay.  So

4    how long did it take you to learn the language?

5              INMATE PERTSONI:  Many years.

6              DEPUTY COMMISSIONER MORRIS:  Many years?

7              INMATE PERTSONI:  Many years.

8              DEPUTY COMMISSIONER MORRIS:  Now in '76

9    or '77 you were involved in demonstrations.

10              INMATE PERTSONI:  Yes.

11              DEPUTY COMMISSIONER MORRIS:  And these

12   demonstrations were all in your native language?

13              INMATE PERTSONI:  Yes.

14              DEPUTY COMMISSIONER MORRIS:  Okay.  You

15   came to prison in '84.

16              INMATE PERTSONI:  In '82.

17              DEPUTY COMMISSIONER MORRIS:  Excuse me,

18   in '82.  You went to jail in '82, you came to

19   prison in '84.

20              INMATE PERTSONI:  In '81 I got arrested

21   in San Francisco.

22              DEPUTY COMMISSIONER MORRIS:  Okay.

23              INMATE PERTSONI:  In '82 they find me

24   guilty and I come in '82 in CDC.

25              DEPUTY COMMISSIONER MORRIS:  Okay.  Well,

26   I've got '84.

27              INMATE PERTSONI:  Oh, in San Quentin I

79

1   come in '84.  Yeah, you're right, you're right,

2   you're right.

3        **DEPUTY COMMISSIONER MORRIS:**  Received in

4   state prison 5/8 of '84.  But that's another

5   matter, we'll settle that apart from this

6   discussion.

7        **INMATE PERTSONI:**  Okay.

8        **DEPUTY COMMISSIONER MORRIS:**  So we're

9   pretty close there.  I'm sure you had a lot of

10  jail time before you got -- the commitment and

11  then received in CDC and that's probably the

12  difference.  Have you taken any more, any ABE or

13  adult basic education classes at all?

14       **INMATE PERTSONI:**  Yes, I going to -- I

15  going to Open Phonics.

16       **DEPUTY COMMISSIONER MORRIS:**  Okay.

17       **INMATE PERTSONI:**  I complete that.  I

18  going to school, the dry cleaning vocational

19  education.  I got that dry cleaning vocation.

20       **DEPUTY COMMISSIONER MORRIS:**  Let's stay

21  with the school stuff.  I saw a chrono that

22  talked about the phonics.

23       **INMATE PERTSONI:**  Yeah.

24       **DEPUTY COMMISSIONER MORRIS:**  But how

25  about just the course work.

26       **INMATE PERTSONI:**  Yeah.

27       **DEPUTY COMMISSIONER MORRIS:**  You speak

80

1   the language pretty well so I'm sure you had to
2   take some adult basic education courses.
3           INMATE PERTSONI:  Yes, yes.
4           DEPUTY COMMISSIONER MORRIS:  Or English
5   as a Second Language, ESL classes.
6           INMATE PERTSONI:  Yes, yes.
7           DEPUTY COMMISSIONER MORRIS:  You did all
8   that.
9           INMATE PERTSONI:  Yeah.
10          DEPUTY COMMISSIONER MORRIS:  Okay,
11  because you're doing a good job today.
12          INMATE PERTSONI:  Thank you.
13          DEPUTY COMMISSIONER MORRIS:  Have you
14  taken the GED pre-test at all?
15          INMATE PERTSONI:  No.
16          DEPUTY COMMISSIONER MORRIS:  Have you
17  thought about that?
18          INMATE PERTSONI:  Yes.
19          DEPUTY COMMISSIONER MORRIS:  Okay.  And
20  what's your plan for that?
21          INMATE PERTSONI:  I want to take it but I
22  got to go home.  I'm going to have to speak my
23  own language.  I have to go and learn my own
24  language.  The only language I'm going to speak
25  with my wife, and my wife is learning Albanian.
26  I like to put more on, more, you know, to learn
27  English.  But I got to go home, I have to start

81

1    my own language.  Get more skills because the

2    language changed there, probably for most

3    things.

4         **DEPUTY COMMISSIONER MORRIS:**  The

5    government has changed considerably.

6         **INMATE PERTSONI:**  Yeah, yeah, it's

7    better, democrat.

8         **DEPUTY COMMISSIONER MORRIS:**  The language

9    has changed, culture changed.  Anything?

10        **INMATE PERTSONI:**  Culture is much better

11   now because United States, thanks God, United

12   States and United Nations, they got a lot of

13   influence from western.  Yeah, it's democrat

14   country.

15        **DEPUTY COMMISSIONER MORRIS:**  And I asked

16   that because you mentioned several times about

17   wanting to go back to Yugoslavia.  I guess it

18   was Yugoslavia.

19        **INMATE PERTSONI:**  Kosovo.

20        **DEPUTY COMMISSIONER MORRIS:**  Kosovo.

21        **INMATE PERTSONI:**  Yeah.

22        **DEPUTY COMMISSIONER MORRIS:**  And be

23   involved.  It sounds like re-involve yourself in

24   that political stuff.  And it kind of feels to

25   me like that involvement was a large part of the

26   reason why you're here today.

27        **INMATE PERTSONI:**  Yes.

82

1      **DEPUTY COMMISSIONER MORRIS:** Has your

2   thinking changed any -- has there been any

3   movement or any shift in your thinking with

4   regard to what you can or cannot do politically?

5   What are the limits?

6      **INMATE PERTSONI:** Thinking. I don't want

7   to get involved with protest. I don't want to

8   get involved with the politics. The only thing

9   I want to get involved with, the children, the

10  women, before the war and during the war. After

11  war they got hurt because they have a lot of

12  rapes there, a lot of massacre.

13     **DEPUTY COMMISSIONER MORRIS:** Is it okay

14  to arm yourself in Kosovo?

15     **INMATE PERTSONI:** It's not going to be

16  for me. I not going to arm myself never.

17     **DEPUTY COMMISSIONER MORRIS:** Is it okay

18  culturally to arm yourself?

19     **INMATE PERTSONI:** I don't think so, no, I

20  don't think so.

21     **DEPUTY COMMISSIONER MORRIS:** Was it okay

22  when you were 18, 19 years old?

23     **INMATE PERTSONI:** No, it not was okay.

24     **DEPUTY COMMISSIONER MORRIS:** Okay. And

25  it wasn't okay when you got to the United

26  States.

27     **INMATE PERTSONI:** Yes, yes.

83

1        **DEPUTY COMMISSIONER MORRIS:** Okay.

2        **INMATE PERTSONI:** Yes sir.

3        **DEPUTY COMMISSIONER MORRIS:** And I say

4    all that to acknowledge that there are some

5    cultural differences and some adjustments that

6    are going to have to be made.

7        **INMATE PERTSONI:** Yes.

8        **DEPUTY COMMISSIONER MORRIS:** And before

9    you can get to Kosovo you need to do some things

10   here, and you've done some things.

11       **INMATE PERTSONI:** Yes sir.

12       **DEPUTY COMMISSIONER MORRIS:** Okay. So

13   you haven't done anything else academically.

14   You were thinking about that GED pre-test,

15   you're thinking about it. I think you're going

16   to do pretty well. Vocations, now I do see

17   certifications in the file.

18       **INMATE PERTSONI:** Yes.

19       **DEPUTY COMMISSIONER MORRIS:** I see a

20   certification dated May 26 of '05 where you

21   completed vocational dry cleaning. So you spent

22   several years working on that.'

23       **INMATE PERTSONI:** Yes sir.

24       **DEPUTY COMMISSIONER MORRIS:** Okay. There

25   must be what, about 30 components to that?

26       **INMATE PERTSONI:** Yes.

27       **DEPUTY COMMISSIONER MORRIS:** There's a

84

1  lot of work to do in that, okay.  I also see

2  that you have a certification in your file, and

3  that certificate is dated April 11 of '05, with

4  respect to furniture finish.

5        **INMATE PERTSONI:**  Yes.

6        **DEPUTY COMMISSIONER MORRIS:**  So it's

7  interesting to me that you got the certification

8  in '05 and you had so much work experience

9  through the '90s, '93 through '97.

10       **INMATE PERTSONI:**  Yes.

11       **DEPUTY COMMISSIONER MORRIS:**  What took so

12  long to get the certification?

13       **INMATE PERTSONI:**  I took it before.  I

14  believe a Board Member the first time I went, I

15  forget the name the Board Member, he said to me,

16  you work in Industry.  You can get some kind of

17  papers?  And I never interested to having papers

18  because, you know, I thought you just have to

19  see what I change myself, you know.  What I do

20  myself.  And I was talking to some lifers and

21  some staff.  I says, you know, having papers to

22  show.  They say yeah, we can do it.  You work,

23  you change the computers.  We say you was good

24  worker, you done good work.  They say, you got

25  it coming, I said thank you.

26       **DEPUTY COMMISSIONER MORRIS:**  Okay.

27       **INMATE PERTSONI:**  And they give to me.

85

1          **DEPUTY COMMISSIONER MORRIS:**  Okay, all

2  right.  Have you considered any other vocations

3  at all?  You completed vocational dry cleaning

4  in '05, you worked in PIA a long time.  Are you

5  still working in PIA?

6          **INMATE PERTSONI:**  No, I work in the dry

7  cleaning.

8          **DEPUTY COMMISSIONER MORRIS:**  You work in

9  the dry cleaning now.

10          **INMATE PERTSONI:**  Yeah.

11          **DEPUTY COMMISSIONER MORRIS:**  Okay.  And I

12  saw a number of supervisory work reports all

13  average or above average work reports.  You

14  talked about -- I didn't see anything in the

15  file that talked about -- it broke out the work

16  record in the institution.  Now I didn't, I

17  didn't check the other part of the C File.  This

18  one, this file goes back to about the mid-90s.

19  You've got another file that goes back through

20  the top of the '90s through the '80s.  What kind

21  of work have you done in the institution?  Work

22  for the institution.  You talked about butcher,

23  have you done anything else?

24          **INMATE PERTSONI:**  I work landscaping.

25          **DEPUTY COMMISSIONER MORRIS:**  Landscaping,

26  okay.  How long did you work landscaping?

27          **INMATE PERTSONI:**  It was -- They call it

86

1   landscaping.

2         **DEPUTY COMMISSIONER MORRIS:**  Was it yard

3   crew?

4         **INMATE PERTSONI:**  Yard crew, yeah.

5         **DEPUTY COMMISSIONER MORRIS:**  Okay.

6         **INMATE PERTSONI:**  Yeah, yard crew, yeah.

7         **DEPUTY COMMISSIONER MORRIS:**  Anything

8   else?

9         **INMATE PERTSONI:**  I work many years for

10  that.  I work butcher.  I went to school at that

11  time.  I work in dental lab.

12        **DEPUTY COMMISSIONER MORRIS:**  Okay.

13  That's where you had the altercation.

14        **INMATE PERTSONI:**  Yeah.

15        **DEPUTY COMMISSIONER MORRIS:**  Okay.  All

16  right.  Let me ask you about --

17        **ATTORNEY FOX:**  I think the lunch crew

18  also.

19        **INMATE PERTSONI:**  Yes, yeah, in the

20  kitchen, yeah.

21        **DEPUTY COMMISSIONER MORRIS:**  The kitchen?

22        **INMATE PERTSONI:**  Yeah.

23        **DEPUTY COMMISSIONER MORRIS:**  The old

24  culinary crew.

25        **ATTORNEY FOX:**  Yes.

26        **DEPUTY COMMISSIONER MORRIS:**  All right.

27  Let me ask you about your history of drug use.

87

1  Any drugs or alcohol in your background?

2       **INMATE PERTSONI:** Never.

3       **DEPUTY COMMISSIONER MORRIS:** Never used

4  any drugs?

5       **INMATE PERTSONI:** Never sir.

6       **DEPUTY COMMISSIONER MORRIS:** Not drink?

7       **INMATE PERTSONI:** No.

8       **DEPUTY COMMISSIONER MORRIS:** Nothing like

9  that?

10      **INMATE PERTSONI:** No.

11      **DEPUTY COMMISSIONER MORRIS:** Okay. Now I

12  see a number of chronos having to do with this

13  victim offender group that you participated in.

14      **INMATE PERTSONI:** Yes.

15      **DEPUTY COMMISSIONER MORRIS:** And I note,

16  I'm noting particularly the groups that you have

17  participated in since your last hearing, which

18  was October of '04. I see several positive and

19  even laudatory chronos having to do with this

20  victim offender group. I see a chrono dated

21  August 10, I see another chrono dated September

22  7 of '05. I see another group here, the letters

23  K-A-T-A-R-G-E-O. How do you pronounce that?

24      **INMATE PERTSONI:** Lifer --

25      **DEPUTY COMMISSIONER MORRIS:** KATARGEO?

26      **ATTORNEY FOX:** Oh, KATARGEO.

27      **INMATE PERTSONI:** KATARGEO, KATARGEO.

88

1       **DEPUTY COMMISSIONER MORRIS:**  KATARGEO,

2   okay.  And that's an acronym for something else.

3       **INMATE PERTSONI:**  Yes.

4       **DEPUTY COMMISSIONER MORRIS:**  Probably, as

5   I recall, that's one of the oldest self-help

6   rehabilitation groups.

7       **INMATE PERTSONI:**  Yeah.

8       **DEPUTY COMMISSIONER MORRIS:**  It covers a

9   lot of things, anger management, family

10  relationships, communication, those kinds of

11  things.  How you interact with other people.

12  And you did very well in those groups.  You

13  continued to participate in those groups and

14  you're doing very well.  I also see a letter --

15  And I think the Chair mentioned one of those

16  letters from the director of that group who

17  speaks very highly of your participation as

18  well.

19      **INMATE PERTSONI:**  Yeah.

20      **DEPUTY COMMISSIONER MORRIS:**  So I saw

21  laudatories dated 10/18 of '05, development of

22  positive attitudes.  As well as the KATARGEO

23  laudatories dated 10/17 of '05 and 6/30 of '05.

24  Regarding the continuation of the self-help

25  groups you also participated in developing

26  positive attitudes and I see several chronos

27  again regarding that.

89

1        **INMATE PERTSONI:**  Yeah.

2        **DEPUTY COMMISSIONER MORRIS:**  So that

3    tells me you participated with some regularity.

4    There is another group with the acronym TRUST,

5    T-R-U-S-T, another self-help group.  And I

6    counted one, two, three, four, at least four

7    positive chronos regarding that participation as

8    well.

9        **ATTORNEY FOX:**  There is also a letter

10    dated January 11 of last year that talks about

11    his participation in that.

12        **DEPUTY COMMISSIONER MORRIS:**  All right.

13    And I am looking at a TRUST Fellows letter

14    directed to the Board.  And it does talk about

15    workshops provided at San Quentin for this TRUST

16    development of incarcerated men.  You

17    participated in 2004.  And that's signed by the

18    national director, Gary Mendez (phonetic).

19        **ATTORNEY FOX:**  Thank you.

20        **DEPUTY COMMISSIONER MORRIS:**  Any other

21    self-help programs that I overlooked?  Have you

22    participated in anything else that I have not

23    talked about?  Does that cover it?

24        **INMATE PERTSONI:**  I done Men Alive

25    before.

26        **DEPUTY COMMISSIONER MORRIS:**  Yes, that's

27    previous.

90

1          **INMATE PERTSONI:**  Yeah.

2          **DEPUTY COMMISSIONER MORRIS:**  You did not
3   do that during this period.

4          **INMATE PERTSONI:**  No.

5          **DEPUTY COMMISSIONER MORRIS:**  You do have
6   a history of Men Alive, I saw that.

7          **INMATE PERTSONI:**  Yeah.

8          **DEPUTY COMMISSIONER MORRIS:**  I saw those
9   chronos and I saw the certificate as well.

10          **INMATE PERTSONI:**  Yeah, yeah.

11          **DEPUTY COMMISSIONER MORRIS:**  I also saw a
12   letter of recognition from the Legislature,
13   Gloria Moreno.

14          **INMATE PERTSONI:**  Yeah, yeah.

15          **DEPUTY COMMISSIONER MORRIS:**  Okay.
16   They're commending you for your participation in
17   institution programming.  Okay, so we've talked
18   about disciplinaries, we've talked about
19   academics, vocations, your work record, self-
20   help.  Is there anything else we need to talk
21   about specific to post-conviction?  Anything
22   else you need to share with this panel regarding
23   anything that you have done since incarceration?
24   Anything else, counsel?

25          **ATTORNEY FOX:**  Just one question.  I
26   notice there's a state prison escape bulletin
27   with Mr. Pertsoni's name on it.  And I don't

91

1   think that should be considered.

2   **DEPUTY COMMISSIONER MORRIS:**  Well, you

3   shouldn't see that anyway.  That's all part of

4   the C File.  And that's a document that's part

5   of the standard if there's any movement outside

6   the institution, I'm sure.

7   **ATTORNEY FOX:**  Okay.  Yeah, I just --

8   **DEPUTY COMMISSIONER MORRIS:**  If he

9   overpowers one of those gentlemen moving him

10  around then they can immediately send that kind

11  of thing out.

12  **ATTORNEY FOX:**  I just didn't want that

13  out there because it starts a fire sometimes and

14  then --

15  **DEPUTY COMMISSIONER MORRIS:**  No, you

16  should have never seen that.

17  **ATTORNEY FOX:**  Okay, then I move to

18  strike my past comments.

19  **DEPUTY COMMISSIONER MORRIS:**  Okay.

20  That's something that was part of the C File.

21  It just fell out.  What is that?

22  **ATTORNEY FOX:**  Just a little housekeeping

23  regarding when he was received into CDC, that's

24  all.

25  **DEPUTY COMMISSIONER MORRIS:**  Okay.  Well,

26  I'm not going to -- I'm not going to change

27  anything that I have said about that.

92

1    **ATTORNEY FOX:** Okay.

2    **DEPUTY COMMISSIONER MORRIS:** Because what

3  I have done is entered information off of the

4  CDC 112.

5    **ATTORNEY FOX:** Okay, okay.

6    **DEPUTY COMMISSIONER MORRIS:** So if

7  there's any adjustments then when Mr. Pertsoni

8  needs to do is submit a request for interview to

9  the case records manager and he or she will make

10  any corrections or changes on the 112.

11    **ATTORNEY FOX:** All right, I just wanted

12  to make sure that it was complete and accurate.

13    **DEPUTY COMMISSIONER MORRIS:** There will

14  be no entries on of these documents in the C

15  File.

16    **ATTORNEY FOX:** Okay.

17    **DEPUTY COMMISSIONER MORRIS:** Let me just

18  move on then to the psych report for a moment.

19  Now there is a psych report generated by Michel

20  Inaba, psychologist. And that report is dated

21  January 20 of '06. And I notice -- Let's see

22  here. I'm going to go straight to current

23  diagnostic impressions. Under Axis I this is

24  characterized as having adult antisocial

25  behavior by history. Under Axis Ii there is no

26  diagnosis. Under Axis III he has cardiovascular

27  disease and you're taking medication for that?

93

1          **INMATE PERTSONI:**  I got it right here.

2          **DEPUTY COMMISSIONER MORRIS:**  You don't

3     need to pull it out, that's okay.  Under Axis IV

4     the stressors are the life sentence and cultural

5     displacement.  Under Axis V there is a Global

6     Assessment of Functioning score of 90.  And

7     Inaba goes on to say in the paragraph that

8     follows, in diagnostic impressions she says that

9     Mr. Pertsoni does not have symptoms of a mental

10    disorder.  He requires no treatment for mental

11    problems at this time and has no known history

12    of mental health treatment.  With that I'm going

13    to go back to page number one under psychiatric

14    and medical history.  Under section two the

15    second sentence states that you were

16    hospitalized for psychiatric observation in

17    Chicago in '79 and that was as the result of

18    that shooting that you talked about earlier.

19          **INMATE PERTSONI:**  Yes.

20          **DEPUTY COMMISSIONER MORRIS:**  Okay, there

21    were no injuries.  You shot the car, shot the

22    cab.

23          **INMATE PERTSONI:**  Yeah, yeah.

24          **DEPUTY COMMISSIONER MORRIS:**  Okay.  And

25    that was another political demonstration that

26    you were involved in.

27          **INMATE PERTSONI:**  Yes.

94

1        **DEPUTY COMMISSIONER MORRIS:**  And those

2    charges were eventually dismissed.  Then you

3    went from there and picked up another weapons

4    arrest in '81.

5        **INMATE PERTSONI:**  Yes.

6        **DEPUTY COMMISSIONER MORRIS:**  All right.

7    The last sentence in that paragraph says that in

8    1988 he was evaluated and noted to have an

9    emotionally unstable personality, explosive,

10    improved.  How would you -- How would you

11    describe yourself today in terms of some of

12    those comments that she talks about?  Emotional

13    instability, unstable personality,

14    explosiveness, improved.

15        **INMATE PERTSONI:**  Well, I learned my

16    culture and I learned a new culture.  Because my

17    culture taught showing the expression, talk with

18    the hands, with the face.  And now I learn

19    another culture.  To talk I don't have to

20    express myself or talk with the hands.  I learn

21    two cultures.  Because in my culture when you

22    talk, you said the word, you said the action at

23    the same time, you know.  Example, if you just

24    give permission, I say hi, you know.  Hi, you

25    know.  Things like that to show your expression.

26        **DEPUTY COMMISSIONER MORRIS:**  Okay.  There

27    are some cultural differences.

95

1          **INMATE PERTSONI:**  Yeah.

2          **DEPUTY COMMISSIONER MORRIS:**  But there's

3    some similarities too.  And there are some

4    things that are socially unacceptable no matter

5    what the culture.

6          **INMATE PERTSONI:**  I learned this culture

7    is much better to deal with.

8          **DEPUTY COMMISSIONER MORRIS:**  You can't

9    shoot people --

10         **INMATE PERTSONI:**  No.

11         **DEPUTY COMMISSIONER MORRIS:**  -- because

12   you're mad at them.

13         **INMATE PERTSONI:**  Yes.

14         **DEPUTY COMMISSIONER MORRIS:**  Or they have

15   a different opinion.

16         **INMATE PERTSONI:**  Yes.

17         **DEPUTY COMMISSIONER MORRIS:**  All right.

18   Under assessment of dangerousness on page four

19   Inaba states under Section A.  And she's talking

20   about in a controlled setting.  She says that:

21         "Mr. Pertsoni has one rules

22         violation for a fist fight during

23         his entire period of

24         incarceration.  Based on his

25         institutional adjustment and

26         record Mr. Pertsoni would be

27         expected to continue to function

96

1          in a nonviolent manner in a

2          controlled environment."

3    And I'm going to move down to the last

4    paragraph.  It starts with:

5          "Mr. Pertsoni's only risk factor

6          for future violence is his past

7          history of violence.  His tendency

8          to react with violence as a young

9          man was a result of socialization

10         in a politically volatile

11         environment where he perceived

12         much injustice and threat to his

13         safety and the safety of his loved

14         ones.  This prepared him to act

15         violently to correct injustices or

16         establish safety carried over in

17         his life as a newly arrived

18         immigrant to the United States.

19         He no longer feels that he has to

20         act in the role of a protector or

21         enforcer.  Part of this is due to

22         change in political climate, part

23         to age and maturity and part to

24         learning new skills and

25         acculturation."

26   Now the next sentence is somewhat fragmented, in

27   my mind.  I think what she intended to say is

97

1    that your case has several positive factors

2    associated with a low incidence of recidivism

3    for violent behavior.  On page five the second

4    paragraph she states that:

5            "It seems that Mr. Pertsoni would

6            be more likely to maintain gains

7            documented in his institutional

8            records.  He is strongly religious

9            and does not espouse any

10           antisocial values.  He not only

11           has no substance abuse history but

12           also has never engaged in the use

13           of intoxicants.  Other than one

14           fight in prison his violent

15           behavior seems to have occurred

16           solely in a political context."

17   That she says here no longer exists.  I'm

18   hearing you say that you still have a lot of

19   political sensitivity but you intend to do some

20   things differently.

21           **INMATE PERTSONI:**  Different.  I want to

22   do helping people programs.  Heal people, heal

23   my people, heal those kids that got hurt.

24   That's what I want to do, it is not the politic.

25           **DEPUTY COMMISSIONER MORRIS:**  Okay.

26           **INMATE PERTSONI:**  I want to do the same

27   thing like the groups.  Helping to get healed

98

1   who got hurt, victims, everything I want to do.

2           **DEPUTY COMMISSIONER MORRIS:**  Okay.  Inaba

3   goes on to say that:

4           "The problems with aggression,

5           impulse control and grandiosity

6           that resulted in the crime for

7           which Mr. Pertsoni is incarcerated

8           seemed to be well within

9           Mr. Pertsoni's control at all

10          times."

11  And she says this opinion is based on previous

12  evaluations.  Now here's where I kind of have a

13  problem with that paragraph because I go to the

14  last sentence as she says that:

15          "Given Mr. Pertsoni's

16          institutional adjustment and

17          continued progress he would not be

18          expected to maintain his gains

19          when released to the community."

20          **ATTORNEY FOX:**  Mr. Morris, there has been

21  an addendum to that.

22          **DEPUTY COMMISSIONER MORRIS:**  Okay.

23          **ATTORNEY FOX:**  That clears up, I think,

24  the -- a scrivener's error.

25          **DEPUTY COMMISSIONER MORRIS:**  Okay, a

26  transcriber's error?

27          **ATTORNEY FOX:**  Yes, yeah.

99

1          **DEPUTY COMMISSIONER MORRIS:** Okay. So

2     would not is incorrect and the intent was that

3     he would be expected to maintain those gains.

4     Let's see, do I have that here? Yes, I do see

5     the correction, thank you.

6          **ATTORNEY FOX:** You're welcome.

7          **DEPUTY COMMISSIONER MORRIS:** And I had

8     overlooked the correction.

9          **ATTORNEY FOX:** Thank you.

10          **DEPUTY COMMISSIONER MORRIS:** And the

11     correction is the last page attached to the

12     evaluation and that correction is dated 1/24/06

13     and signed by psychologist Michel Inaba. Let me

14     just move to page number six, the last paragraph

15     where she talks about her recommendation. She

16     says that:

17               "If released from prison he could

18               be expected to be positively

19               engaged in employment and to

20               participate in community life and

21               in life with his extended family.

22               He understands the negative

23               consequences of trying to solve a

24               problem with violence and has

25               gained skills to handle conflict

26               effectively without resorting to

27               violence. Based on his

100

1    institutional record he can be

2    expected to conform to any

3    conditions of parole.  Overall his

4    risk for future violence would

5    appear to be lower than average.

6    He would be expected to maintain

7    his gains either in the US or his

8    homeland following release from

9    prison."

10   And again, these are the comments as authored by

11   Michel Inaba, psychologist.  And this document

12   is dated January 19, '06.  Having heard those

13   comments, counsel and Mr. Pertsoni, do you take

14   exception to any of that or do you want to add

15   to that?

16        **ATTORNEY FOX:**  Well, I'd just like to

17   emphasize that the global assessment of

18   functioning is 90 and in the past it has been as

19   high as 97.  So this is someone who can get

20   along well I think in society with a global

21   assessment functioning that high.  Is there

22   anything you would like to add about that?

23        **INMATE PERTSONI:**  I agree with you guys?

24        **DEPUTY COMMISSIONER MORRIS:**  Pardon me?

25        **INMATE PERTSONI:**  I agree with you guys.

26        **ATTORNEY FOX:**  Okay, thank you.

27        **DEPUTY COMMISSIONER MORRIS:**  All right,

101

1  absent additional testimony specific to post-

2  conviction factors I yield to the Chair.

3      **PRESIDING COMMISSIONER PEREZ:**  Thank you.

4  Sir, in reviewing your legal documents I note

5  that it was alleged that in Chicago in 1976 you

6  attempted to assassinate an individual that you

7  thought was the Yugoslavian ambassador.

8      **INMATE PERTSONI:**  Yes.

9      **PRESIDING COMMISSIONER PEREZ:**  Can you

10  tell me what happened.

11     **INMATE PERTSONI:**  I thought he was

12  Yugoslavian ambassador.  But that person, they

13  shot him in Texas in a car.

14     **PRESIDING COMMISSIONER PEREZ:**  Okay.  Is

15  it because you thought he was an ambassador or

16  not?

17     **INMATE PERTSONI:**  No, no, no.

18     **PRESIDING COMMISSIONER PEREZ:**  Okay.

19  Because there was an indication that you shot

20  and you ended up getting his finger.

21     **INMATE PERTSONI:**  The glass, the glass a

22  finger.  The glass in the car, it hit a finger.

23  But no.

24     **PRESIDING COMMISSIONER PEREZ:**  You shot

25  the window and the glass hit his finger.

26     **INMATE PERTSONI:**  Yeah, yeah.

27     **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

102

1 you didn't think he was an ambassador?

2          **INMATE PERTSONI:**  No.

3          **PRESIDING COMMISSIONER PEREZ:**  Were you

4 shooting at him trying to kill him?

5          **INMATE PERTSONI:**  No, I try to scare him.

6          **PRESIDING COMMISSIONER PEREZ:**  Was he in

7 the vehicle at the time you shot the window out?

8          **INMATE PERTSONI:**  Yes.

9          **PRESIDING COMMISSIONER PEREZ:**  Okay,

10 which window did you shoot out?

11          **INMATE PERTSONI:**  I shoot the car, the

12 second window.

13          **PRESIDING COMMISSIONER PEREZ:**  The back

14 window?

15          **INMATE PERTSONI:**  Yeah.

16          **PRESIDING COMMISSIONER PEREZ:**  And where

17 was this individual?

18          **INMATE PERTSONI:**  I believe he was on

19 other side.

20          **PRESIDING COMMISSIONER PEREZ:**  In the

21 back?

22          **INMATE PERTSONI:**  In the back of the car,

23 the window, yeah.  In the back on other side,

24 yeah.

25          **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

26 he's in the back seat on this side.

27          **INMATE PERTSONI:**  Yeah, yeah.

103

1          **PRESIDING COMMISSIONER PEREZ:**  And you
2    shoot the window out on this side.

3          **INMATE PERTSONI:**  No, facing the car.
4    The car is this, all right.  The back seat is
5    here.  The guy was -- They person was on this
6    side and I was this side.

7          **PRESIDING COMMISSIONER PEREZ:**  So you
8    shot the back window.

9          **INMATE PERTSONI:**  Yeah.

10         **PRESIDING COMMISSIONER PEREZ:**  And he was
11   on the other side in the back of the car.

12         **INMATE PERTSONI:**  Yeah, and face to face
13   like that.

14         **PRESIDING COMMISSIONER PEREZ:**  Okay.
15   What you're describing to me is that you were
16   shooting at the window.  He's in the back seat
17   but he's on the other side of the back seat.

18         **INMATE PERTSONI:**  Yes.

19         **PRESIDING COMMISSIONER PEREZ:**  Which
20   would suggest to me you were trying to shoot
21   him.

22         **INMATE PERTSONI:**  Yes.

23         **PRESIDING COMMISSIONER PEREZ:**  Were you
24   trying to shoot him?

25         **INMATE PERTSONI:**  No, I not trying to
26   shoot him but I shoot.

27         **PRESIDING COMMISSIONER PEREZ:**  Okay.  Did

104

1  you know he was there?

2      INMATE PERTSONI:  Yes.

3      PRESIDING COMMISSIONER PEREZ:  Okay, so

4  you were shooting a window with another person

5  on the other side and you're indicating you were

6  not trying to shoot him.

7      INMATE PERTSONI:  I shoot on him.

8      ATTORNEY FOX:  Well did you aim at him?

9      INMATE PERTSONI:  Yeah.

10     ATTORNEY FOX:  Did you intend to hit him

11 with the bullet?

12     INMATE PERTSONI:  No, no, just only to

13 hit the window.

14     PRESIDING COMMISSIONER PEREZ:  So what

15 did you think was going to happen when you aim a

16 weapon at someone whose in a vehicle in a back

17 seat and you pull the trigger?

18     INMATE PERTSONI:  You're right.  I take

19 responsibility.

20     PRESIDING COMMISSIONER PEREZ:  Were you

21 trying to kill him, sir?

22     INMATE PERTSONI:  No.

23     PRESIDING COMMISSIONER PEREZ:  Okay.

24 Because this report --

25     INMATE PERTSONI:  It not was my

26 intention (inaudible).

27     PRESIDING COMMISSIONER PEREZ:  It

105

1   indicates that the investigation was pursued

2   under the protection of the Foreign Officials

3   Act of the United States government.   During an

4   interview with the defendant he admitted

5   shooting at the, quote, ambassador hoping to

6   kill him.   You also admitted making threats

7   concerning the Yugoslav ambassador when he was

8   arrested by the Chicago police.   Okay.   Do you

9   understand why it's -- the logic is off just a

10  little bit?

11         INMATE PERTSONI:   Yes.   Yeah, I file the

12  charges.   I call the FBI.   At that time it was

13  Mr. King the FBI in charge there.   I say,

14  Mr. King, the FBI threaten me.   He said, let's

15  go, I file charges.   I don't know how to do the

16  charges.   They did that, file charges for me.

17         PRESIDING COMMISSIONER PEREZ:   Okay.

18  Have you ever been in a mental institution?

19         INMATE PERTSONI:   No.

20         PRESIDING COMMISSIONER PEREZ:   Okay.   But

21  that's in the report as well.

22         INMATE PERTSONI:   No.

23         PRESIDING COMMISSIONER PEREZ:   You have

24  never been in a mental institution?

25         INMATE PERTSONI:   Never.

26         PRESIDING COMMISSIONER PEREZ:   Okay.   At

27  this time I would like to give your attorney the

106

1    opportunity to ask questions.

2          **ATTORNEY FOX:**  No, no questions.

3          **DEPUTY COMMISSIONER MORRIS:**  No, none.

4          **PRESIDING COMMISSIONER PEREZ:**  Closing.

5          **ATTORNEY FOX:**  Yes.

6          **INMATE PERTSONI:**  I got -- Excuse me, the

7    mental things.  That time in Chicago.  They

8    don't know how to speak my language that time

9    and they put me in a room and they bring in the

10   translator.  After that they let me out.

11         **PRESIDING COMMISSIONER PEREZ:**  Okay,

12   thank you.  Counsel.

13         **ATTORNEY FOX:**  Okay.  What I would like

14   to do if it's all right is I'll give my comments

15   and then read a letter from his wife.  And then

16   if Mr. Pertsoni has anything to add I'll let him

17   do that.

18         **PRESIDING COMMISSIONER PEREZ:**  Okay.

19         **ATTORNEY FOX:**  Oh behalf of -- First of

20   all thank you very much for allowing us to

21   comment.  And on behalf of Mr. Pertsoni I would

22   request that the panel find him suitable and set

23   a date for his release because he does not pose

24   a risk of harm to the community for the

25   following reasons.  Turning to the Board report

26   it is supportive.  His institutional adjustment

27   has been very good with the one 115 over ten

1   years ago.  He's not been a behavior problem and
2   has upgraded to the best of his ability as
3   opportunities present themselves.  He has become
4   conversant in English but perhaps that has an
5   effect on his testing scores and his time
6   management.  Which I think he indicated he ran
7   out of time taking the last test, which is why
8   the years are different.  He's obtained lots of
9   self-help.  I don't know how else to describe
10  it.  Almost everything that's offered he's
11  availed himself of.  He has improved his
12  community here in the institution by working, by
13  upgrading vocationally and obtaining two
14  certificates, one in dry cleaning the other in
15  furniture, as well as amassing a lengthy work
16  history.  So this is a man who stays busy and
17  contributes to the smooth moving and operation
18  in the institution.  I think we've discussed
19  very well the psychiatric concerns that have
20  been raised.  And I know having read about it
21  that sometimes people don't speak the language
22  and are viewed to be mentally ill until a
23  translator can get in and actually say what's
24  transpiring by translating.  Let's see, turning
25  to his institutional adjustment.  We're talking
26  about that, he's done very well.  Turning to his
27  parole plans, he has consistent, sustained

108

1   support from his entire family and a large part

2   of communities both in the United States here

3   locally in California and also in Kosovo, which

4   is where ultimately he will probably go.  And he

5   has verifiable, realistic plans in both

6   locations as far as residence and work.  And I

7   hesitate to do this but I feel that I must,

8   given the documented violent misconduct by the

9   victim in this case.  And this is with due

10  respect to Mr. Rapishti and his family.  But I

11  think in the report or in the C File, whether

12  it's in the slow packet or not I don't know,

13  there is documented violence by Mr. Rapishti

14  against a number of people whom he violently

15  assaulted, including stabbing.  And that was

16  from New York in 1997.  It should be 1977 I

17  think.  And then the Oakland police report

18  regarding his rape of Ms. Rasmanchi (phonetic).

19          **DEPUTY COMMISSIONER MORRIS:**  (Inaudible).

20          **ATTORNEY FOX:**  Okay.

21          **DEPUTY COMMISSIONER MORRIS:**  I have to

22  turn the tape over.

23          (The tape was turned over.)

24          **DEPUTY COMMISSIONER MORRIS:**  Okay, we're

25  back on record, counsel.

26          **ATTORNEY FOX:**  Thank you.  So we have a

27  stabbing event in New York and then a rape in

109

1   Oakland.  And then let's see.  Mr. Pertsoni has

2   talked about the assaults on Mr. Saiti and also

3   Mr. Seti's (phonetic) car that was wrecked.  And

4   then also the assault by Mr. Rapishti against

5   Mr. Pertsoni prior to the homicide in this case,

6   which resulted in Mr. Pertsoni getting a broken

7   nose.  And then a follow-up call from

8   Mr. Rapishti to Mr. Pertsoni's wife.  So

9   although this would be an imperfect self-defense

10  it just doesn't amount to a self-defense.  But

11  the mental state is there.  The background was

12  there.  It was in Mr. Pertsoni's mind at the

13  time of the killing that this was a very

14  dangerous man.  Although there are different

15  ways that the situation should have been handled

16  it's not unreasonable to believe that

17  Mr. Pertsoni was truly in fear for his life and

18  did, in fact, intend to stop Mr. Rapishti and in

19  fact killed him to do that.  And it's important

20  to note that he did turn himself in as well.  He

21  fled to a local town, Sunnyvale, but then turned

22  himself in after that.  So it was a tragedy to

23  everybody concerned.  I think he has resolved

24  not to take the law into his own hands.  With

25  his advanced age and declining health, although

26  those two things specifically are not sole

27  reasons to find suitability I think they are

110

1    reasonable aspects to consider.  And he is

2    sincere as he talks with you here today.  So

3    I'll submit based on that saying that it would

4    be reasonable to find Mr. Pertsoni suitable

5    because he doesn't pose a risk to the community.

6    And I would like to read the letter his wife

7    wrote and it's dated August 29 of 2005.  Excuse

8    me.

9              "This is a support letter for my

10             husband, Ali Pertsoni, who will be

11             going before you Board Members.

12             My name is Yuriko (phonetic).  My

13             husband and I have been together

14             for over 30 years.  I am presently

15             working at Kaiser Permanente in

16             San Francisco.  I have a full time

17             steady job and steady income.  I

18             have been there for over eight

19             years.  Before that I was working

20             for a doctor for 15 years until he

21             retired.  And before that I have

22             worked in Illinois and in Texas.

23             I have worked over 35 years.  I

24             have a place of residence in San

25             Francisco and have been living

26             here in the same building for 25

27             years.  Always my husband has a

111

1       place to stay with me when he is

2       released because he is my other

3       half and I love him very much.  My

4       true desire is to go to Kosovo

5       with my husband when he is

6       released, at which time I will

7       retire since I have been working

8       all these years and have a

9       retirement plan.  I have been

10      visiting my husband for over 24

11      years every week on weekends.  On

12      my vacation time from work I come

13      on Friday to visit him also.  He

14      has expressed to me all the time

15      he is very sorry what happened to

16      Mr. Rapishti.  My husband has very

17      deep remorse for what he did.

18      Every year my husband fasts.  When

19      he fasts he does it for

20      Mr. Rapishti and his family.  In

21      the year 2003 I went to Jakova,

22      spelled J-A-K-O-V-A, City in

23      Kosovo and spent time there with

24      my husband's family.  While I was

25      there I saw the overwhelming

26      support that my husband has in his

27      city from the mayor, the judge,

112

```
 1          the district attorneys, his family
 2          members and relatives and friends
 3          all asking about when he will
 4          return to Kosovo.  They all show
 5          great support for offers of jobs
 6          and especially support for his
 7          return.  My husband has so much
 8          love and devotion to his family,
 9          the same devotion and love he has
10          given me all these years.  I also
11          saw the love, strong bond and
12          devotion that his family and
13          relatives showed for my husband
14          and for me.  Both our desire and
15          goal is to return to Kosovo and to
16          help and serve the community of
17          Jakova."
18  Same spelling.  Or should I say the familiar
19  spelling?
20          "While here in Kosovo I made plans
21          and gave the design for the room
22          to be built for us, which is to be
23          added to his brother's house.
24        \ This room is now finished and
25          ready for us.  My husband's
26          deepest and sincere desire is to
27          go back to Kosovo permanently.  He
```

113

1    has always expressed to me all

2    these years to return to his

3    country.  My husband has

4    participated in many programs in

5    the prison which have benefited

6    him in positive ways.  With all

7    this experience he has gained in

8    these programs he can use all of

9    these skills to help the people in

10   his country.  We are both old now.

11   All I ask is that you please give

12   my husband a second chance and let

13   him return to his country.  My

14   husband's goal and my goal are the

15   same in that we return to Kosovo

16   together.  I pray that you give my

17   husband a second chance.

18       Sincerely."

19   And then it's signed Yuriko Pertsoni.  So I'll

20   submit based on that.  Is there anything you'd

21   like to add?

22       **PRESIDING COMMISSIONER PEREZ:**  Sir, would

23   you like to tell us?  This is your opportunity

24   before we recess for deliberations to allow you

25   to tell us, if you'd like, why you feel that you

26   are suitable for parole.

27       **INMATE PERTSONI:**  I have a deep remorse

114

1   for his family, his mom and dad.   I took his

2   son.   His mom and dad was beautiful family.   My

3   mom and dad was beautiful family.   We took a

4   wrong -- We make a wrong decision.   I make a

5   wrong decision and I take full responsibility.

6   I not trying to find excuses.   I took the law in

7   my own hands.   If I haven't this mind then never

8   would happen.   And I learn.   I see in him -- I

9   thinking about it all these years, my Albanian

10  brother.   I bring so much suffering and pain to

11  them and my family, to my wife all these years.

12  I never going to -- I never going to carry any

13  kind of weapon.   I never going to take the law

14  in hands, never.   No matter what I going to let

15  the police do their job, no matter here or home.

16  I can go and talk with the right people,

17  complaints and solve the problems nice way.   I'm

18  sorry I done that, cause problems to United

19  States.   Taxpayers pay the money.   I cause all

20  these problems.   They give me good opportunity

21  to learn many things to help me here and help my

22  family back home.   I want to celebrate they free

23  my country.   Now I want to go home and help them

24  the same way I got help here.   I got the tools

25  and I can do that with your help.   And I assure

26  you, you're having a good decision for me I

27  never let you guys down.   You going to be proud

115

1  of me.  You're going to hear that I'm going to

2  help those -- Because our women, they don't

3  talk.  They're raised (inaudible), their

4  culture.  I learned this new culture now.  And I

5  can have the room, the chairs, to help them, to

6  cure them.  Please.

7        **PRESIDING COMMISSIONER PEREZ:**  Thank you,

8  sir.  We will now recess for deliberations.  The

9  time is 10:22 a.m.

10       **ATTORNEY FOX:**  Thank you.

11                **R E C E S S**

12                --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

116

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER MORRIS:**  Okay, we're

4    back on record.

5    **PRESIDING COMMISSIONER PEREZ:**  Sir, the

6    panel has reviewed all information received from

7    the public and relied on the following

8    circumstances in concluding that you are

9    suitable for parole and that you would not pose

10   an unreasonable risk of danger to society or a

11   threat to public safety if released from prison

12   at this time.  Sir, one of the factors that we

13   did take into consideration in our decision

14   today -- Well before I read the decision let me

15   just read into the record that we took into

16   consideration the gravity of the commitment

17   offense.  We took into the consideration your

18   criminal history.  We took into consideration

19   all of the factors and information in your

20   Central File to include the record before us, to

21   include all the documents provided to us at the

22   last minute by the institution and there were

23   some documents that were received late.  So I do

24   want to note for the record that we seriously

25   considered all factors, mainly the gravity of

26   the commitment offense as well your criminal

27   **ALI PERTSONI   C-48947   DECISION PAGE 1   02/08/06**

117

1    record.  We found that you were suitable, sir,

2    in that the record indicates that you have a

3    stable social history as exhibited by reasonably

4    stable relationships with others despite the

5    fact that you were raised in Yugoslavia at a

6    time when the country was in significant

7    disarray and not stable.  And despite that, sir,

8    we do find that you have been able to maintain

9    reasonable, stable relationships.  And we note

10   for the record that throughout the years it does

11   appear that you have maintained contact with

12   your family, to include others that have

13   supported you throughout the years.  To include

14   the fact that you have been married to the same

15   woman throughout your entire incarceration.  A

16   lady that knew you before the crime was

17   committed and who subsequently married you and

18   has remained with you and remained strong

19   throughout all of these years.  Furthermore,

20   sir, we find that while in prison you have

21   enhanced your ability to function within the law

22   upon your release through your participation in

23   educational programs.  And we note that although

24   you do not have a GED it appears to be not as a

25   result of you not making the effort, it appears

26   to be a language and a time barrier issue as the

27   **ALI PERTSONI   C-48947   DECISION PAGE 2   02/08/06**

118

1  reasons why you have not been able to complete

2  your GED.  But it certainly isn't because you

3  have not taken a number of courses within the

4  institution.  And it certainly has not been

5  because you have not upgraded yourself

6  educationally in that you have.  Furthermore we

7  find that you have, again, enhanced your ability

8  to function within the law via your

9  participation in a variety of self-help and

10  therapy programs to include Alternatives to

11  Violence Project, Basic Alternatives to

12  Violence, Men Alive, Center Force, Developing

13  Positive Attitudes, KATARGEO, the victim

14  offender group, the TRUST program, as well as a

15  number of other programs that you participated

16  in throughout your incarceration.  Furthermore,

17  sir, we find that you have approximately 37

18  laudatory chronos in your file to include nine

19  laudatory chronos that you received during this

20  review period alone, which has been about a

21  year.  Furthermore, sir, we find that you have

22  enhanced your ability to support yourself in the

23  community in that the record does reflect that

24  you have completed vocational dry cleaning as

25  well as developed marketable skills in the area

26  of -- as a butcher as well as a furniture

27  **ALI PERTSONI   C-48947   DECISION PAGE 3   02/08/06**

119

1  finisher.  We find, sir, that you committed the

2  crime as a result of significant stress in your

3  life in that appears that you were fearful of

4  the victim as the result of your belief that the

5  victim was capable of violence and had

6  demonstrated that in the past.  Not only towards

7  others but as the result of alleged threats that

8  he had made towards yourself and your

9  girlfriend, who is now your wife, as a result of

10  your culturally divergent views on Yugoslavia

11  and other politically charged issues, all

12  relating back to culture and Yugoslavia.

13  Furthermore we note that because of maturation,

14  growth, greater understanding and advanced age

15  the probability of recidivism have been reduced

16  greatly in that at the time of the offense you

17  were 27 years of age, the record does reflect

18  that you are 51.  We find, sir, that you have

19  realistic parole plans which include numerous,

20  numerous job offers, particularly in Yugoslavia

21  as well as significant family support.  We note

22  that you have over 50 letters of support from

23  folks not only in Yugoslavia but in California

24  as well.  We note that there is one particular

25  document in which a petition was signed by over

26  80 individuals, which are very supportive of

27  **ALI PERTSONI   C-48947    DECISION PAGE 4    02/08/06**

120

1   your release.  And we find that there are

2   letters in the file, recent letters in the file

3   supporting your release from friends, from the

4   mayor of Kosovo, from a judge in Kosovo, from

5   the public prosecutor, from other attorneys,

6   from victims organizations, from your siblings,

7   sister-in-law, cousins, nieces and nephews, your

8   wife as well as other individuals who are very

9   supportive of your release.  So you certainly

10  would not have a -- You certainly have a very,

11  very strong network.  Not only within California

12  but also in Yugoslavia.  A very supportive

13  network.  We also find that you have maintained

14  positive institutional behavior, which indicates

15  significant improvement in self-control in that

16  we find that you have only received one CDC 115

17  and that was in 1986 for fist fighting.  But

18  since then, sir, the record does not reflect

19  that you have incurred any 115s.  You also show

20  signs of remorse and you have indicated that you

21  understand the nature and magnitude of the

22  offense and that you accept responsibility for

23  your criminal behavior and have a desire to

24  change towards good citizenship.  And quite

25  frankly, sir, this panel finds that some of your

26  behavior can be attributed to some extent to

27  **ALI PERTSONI  C-48947   DECISION PAGE 5   02/08/06**

121

1    your upbringing in Yugoslavia during a time in

2    our history where there was a lot of instability

3    within that country as well as a result of

4    cultural beliefs and issues.  Sir, we did take

5    into consideration the last two psychological

6    reports.  The most recent having been dated

7    January 19, 2006, prepared by CDC contract

8    psychologist Michel Lynn Inaba, I-N-A-B-A, in

9    which the psychologist indicates that:

10              "It would seem that Mr. Pertsoni

11              would be more than likely to

12              maintain gains documented in his

13              institutional record.  He is

14              strongly religious and does not

15              espouse any antisocial values.  He

16              not only has no substance abuse

17              history but also has never engaged

18              in the use of intoxicants.  Other

19              than one fist fight in prison his

20              violent behavior seems to have

21              occurred solely in a political

22              context that no longer exists.

23              Mr. Pertsoni has a set of

24              religious and cultural values that

25              place high value on community and

26              family support and cohesion and

27    **ALI PERTSONI   C-48947   DECISION PAGE 6   02/08/06**

122

1          prohibit criminal behaviors.  He

2          feels that he has harmed his

3          family and his culture through his

4          actions and seeks to redress that

5          harm.  This includes making amends

6          to the victim's family.  He has

7          thought about appropriate ways of

8          doing this.  Mr. Pertsoni stated

9          that has learned to trust

10         authority and has learned to use

11         the appropriate authorities for

12         help when needed.  He would be

13         able to return to a country where

14         this would now be possible.  If

15         released from prison he would be

16         expected to be positively engaged

17         in employment and to participate

18         in community life and life with

19         his extended family.  He

20         understands the negative

21         consequences of trying to solve a

22         problem with violence and has

23         gained skills to handle conflict

24         effectively without resorting to

25         violence.  Based on his

26         institutional record he can be

27  **ALI PERTSONI  C-48947  DECISION PAGE 7  02/08/06**

123

1          expected to conform to any

2          conditions of parole.  Overall his

3          risk for future violence would

4          appear to be lower than average.

5          He would be expected to maintain

6          his gains either in the US or his

7          homeland following release from

8          prison."

9    Sir, we also did take into consideration the

10   psychological report that was prepared in August

11   2002 by forensic psychologist Steven Walker, W-

12   A-L-K-E-R, in which he indicates:

13          "The index offense presents as a

14          crime of instrumental violence and

15          was committed by the inmate on an

16          individual who was known to have

17          attacked the inmate in the past

18          and who also had reportedly

19          threatened the inmate's wife.

20          According to the inmate, however,

21          there was no premeditation

22          involved in the offense as he had

23          just returned from a vacation and

24          had no knowledge that the victim

25          was in town.  He did admit to

26          carrying a loaded gun into the

27   **ALI PERTSONI   C-48947   DECISION PAGE 8   02/08/06**

124

1  club on the night in question and

2  cannot provide an alternative

3  explanation as to why.  The inmate

4  had a history of violent behavior,

5  including the access to weapons as

6  noted in his arrest history.

7  However, for the most part his

8  criminal behavior has been related

9  either to the political turmoil

10  and his personal bias regarding

11  the governance of his homeland or

12  an association with language and

13  cultural barriers he experienced

14  as an immigrant.  Those factors

15  have greatly modulated downward

16  over time."

17 And that was in 2002.  I'd like to read into the

18 record very briefly, just for our investigations

19 division, the plans that Mr. Pertsoni has made.

20 In the event that he's released to parole and

21 deported to Yugoslavia.  In reading this again

22 into the record for the benefit of the

23 investigations division who will verify

24 Mr. Pertsoni's parole plans, not only in

25 Yugoslavia as well as California.  In the event

26 that Mr. Pertsoni is deported it is his plan to

27 **ALI PERTSONI  C-48947    DECISION PAGE 9    02/08/06**

125

1  live with his brother, Naim Perteshoni, P-E-R-T-

2  E-S-H-O-N-I, and his wife.  How do you pronounce

3  it?

4          INMATE PERTSONI:  Lumia.

5          PRESIDING COMMISSIONER PEREZ:  Lumia

6  Perteshoni.  And we have a letter to that

7  effect.  The top of the letter states: Landi L-

8  A-N-D-I Auto Taxi, Ruga.

9          INMATE PERTSONI:  Yeah, Ruga, the street.

10          PRESIDING COMMISSIONER PEREZ:  Ruga?  How

11  do you pronounce it?

12          INMATE PERTSONI:  Ruga means the street.

13          PRESIDING COMMISSIONER PEREZ:  Okay, Ruga

14  Deshmore?

15          INMATE PERTSONI:  Yeah, Deshmore.

16          PRESIDING COMMISSIONER PEREZ:  In Jakova.

17          INMATE PERTSONI:  Yeah.

18          PRESIDING COMMISSIONER PEREZ:  Kosovo.

19  And this letter is dated -- Is it December 8,

20  2005?  And then we also have -- And that is an

21  offer of residence in which your brother and

22  your sister-in-law indicate, I have my own taxi

23  business and have my own house.  We built a room

24  for my brother and my sister-in-law.  My sister-

25  in-law came to Kosovo on vacation in the year

26  2003, at which time she made the plans and the

27  **ALI PERTSONI  C-48947   DECISION PAGE 10  02/08/06**

126

1    design for the room.  Now the room is completed

2    and ready for them.  And we do note that as a

3    backup plan it is your plan to live with your

4    other brother.

5        **INMATE PERTSONI:**  Yeah.

6        **PRESIDING COMMISSIONER PEREZ:**  Gni

7    Perteshoni.

8        **INMATE PERTSONI:**  Yeah.

9        **PRESIDING COMMISSIONER PEREZ:**  And this

10   letter is also in the file and it is dated

11   December 8, 2005.  And we also have a letter

12   from his wife, your sister-in-law, in which she

13   supports your plan to live with them in the

14   event that your initial residence plan with your

15   brother falls through for whatever reason.  In

16   terms of your employment plans, sir, we note for

17   the record that you have numerous employment

18   offers in Yugoslavia.  However, it is your

19   choice from what I understand, according to

20   counsel, that you would be accepting a position

21   with Visioni (phonetic).

22       **INMATE PERTSONI:**  Yes.

23       **PRESIDING COMMISSIONER PEREZ:**  Visioni.

24   And we have a letter in the file to that effect

25   and it's dated July 28, 2005, which states,

26   employment offer for Mr. Ali Pertsoni.  And at

27   **ALI PERTSONI  C-48947    DECISION PAGE 11  02/08/06**

127

1  the bottom of the letter it states that we look

2  forward to having Mr. Pertsoni as our staff

3  member.  And it appears that you would be

4  working with the treatment of traumatized women.

5  That you would be assisting and providing self-

6  help programs and such in order to help them

7  overcome some of the trauma as a result of the

8  effects of the trauma that they have suffered in

9  their home country.  You also have a second job

10  offer.  This would be your fallback offer in the

11  event that something happened with the first,

12  and that would be with the Kosovo Youth Council

13  where you would be working with at-risk youth.

14  This letter is dated July 28, 2005 in which the

15  executive director Rezart Hoksha (phonetic).

16        **INMATE PERTSONI:**  Rezart, yeah.

17        **PRESIDING COMMISSIONER PEREZ:**  Indicates,

18  we look forward to having Mr. Ali Pertsoni as

19  our staff member.  And then we also have a third

20  job offer, this would be your third option, and

21  that would be to work with (indiscernible) in

22  his butcher shop.  And he owns a butcher shop;

23  is that correct, sir?

24        **INMATE PERTSONI:**  Yes.

25        **PRESIDING COMMISSIONER PEREZ:**  And that

26  again is in Kosovo.  And again we have letters

27  **ALI PERTSONI  C-48947   DECISION PAGE 12  02/08/06**

128

1    to confirm all three of those job offers as well

2    as the residence offers.  Sir, in the event that

3    you are not deported it is your plan to live

4    with your wife in San Francisco.  And we have a

5    letter to that effect dated August 29, 2005 from

6    your wife Yuriko.

7         **INMATE PERTSONI:**  Yuriko, yeah.

8         **PRESIDING COMMISSIONER PEREZ:**  Pertsoni.

9    In which she indicates, I have a place and

10   residence in San Francisco and have been living

11   here in the same building for 25 years.  Always

12   my husband has a place to stay with me when he

13   is released.  And she as well confirms that you

14   also have a place to live where you and she

15   would move to with your brother in the event you

16   are deported.  In terms of job offers here in

17   California, sir, we note that you have a job

18   offer from Pierre Bujan.

19        **INMATE PERTSONI:**  Bujan.

20        **PRESIDING COMMISSIONER PEREZ:**  And where

21   is Burlingame located?

22        **INMATE PERTSONI:**  Near San Francisco.

23        **PRESIDING COMMISSIONER PEREZ:**  Okay, so

24   it's within the area.

25        **INMATE PERTSONI:**  Yeah.

26        **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

27   **ALI PERTSONI   C-48947   DECISION PAGE 13   02/08/06**

129

1    this letter is dated December 1, 2005.  And he

2    indicates that he is in the real estate business

3    in that area and has been in that business for

4    over 26 years and that he is prepared to hire

5    you as a handyman for the properties that he is

6    selling in order to get them ready for sale upon

7    your release to parole.  And as a backup plan,

8    sir, we have another job offer -- this isn't

9    necessarily a job offer but it's an organization

10   who has made it clear that they are prepared to

11   assist you in obtaining employment upon your

12   release to parole.  And that they indicate that,

13   I personally believe that -- that they will

14   guarantee that they will make every effort they

15   can to help you find employment upon your

16   release to parole, given the skills that you

17   have gained within the institution.  So that is

18   certainly another option in the event that the

19   first one falls through.  Sir, let me at this

20   time explain the length of your confinement.

21   The record reflects that you were convicted of

22   murder first with a firearm, Penal Code Section

23   187 and PC 12022.5.  The offense was committed

24   on July 27, 1981.  The term is derived from the

25   matrix located in the California Code of

26   Regulations, Title 15.  Don't worry, afterwards

27   **ALI PERTSONI   C-48947    DECISION PAGE 14   02/08/06**

130

1   your counsel will explain this to you if you

2   don't understand.  We used Section 2403(b),

3   first-degree murder, offense committed on or

4   after November 8, 1978.  The panel finds that

5   category 2-B is appropriate in that you did have

6   a prior relationship to some extent, you knew

7   the victim, and that the victim died as a result

8   of your actions.  We assess the middle term of

9   28 years.  Twenty-eight years times 12 months is

10  336 months.  You were received by the Department

11  in 1984 and for 20 years you have remained

12  disciplinary-free.  In other words, no 115s.  We

13  took the one year in which you received the 115,

14  we gave you no credit for that, but we gave you

15  credit for the rest of the years.  So every year

16  that you have remained disciplinary-free we have

17  given you 4 months credit.  So we gave you 4

18  months credit for 20 years, that's a total of 80

19  months.  We subtracted that from 336, which

20  brings your base term -- your term, your total

21  term down to 256 months, which equals 21 years

22  and 4 months.  Okay?  So you are -- I think

23  you're there.  I think you're there.  Somebody

24  else in records is going to do the actual

25  calculations.  If you're not there you're very,

26  very close, okay, 21 years 4 months.

27  **ALI PERTSONI  C-48947   DECISION PAGE 15  02/08/06**

131

1      **DEPUTY COMMISSIONER MORRIS:** We used the
2  -- The start of the life term was in '84.
3      **PRESIDING COMMISSIONER PEREZ:** Yes, your
4  life term began in '84. And typically --
5      **DEPUTY COMMISSIONER MORRIS:** That's the
6  date we used.
7      **PRESIDING COMMISSIONER PEREZ:** And that's
8  what we used. The rules call for us to use when
9  your life term began and not when you were
10 received by the Department. Any mistakes that
11 we have made, somebody else is going to correct
12 them. And hopefully they will be in your favor
13 and it will be less, okay. This is just a draft
14 because we're not records folks. We could
15 easily have made a mistake on the amount of time
16 that we gave you. There's no reason for us to
17 order you to the county of San Francisco because
18 that is your county of last legal residence.
19 Because you were living in San Francisco so that
20 is not an issue. In the meantime we are going
21 to assess special conditions of parole. We
22 don't find that you have a history of using
23 alcohol at all. We don't find that you have a
24 history of using drugs. Is that correct?
25     **INMATE PERTSONI:** Yes.
26     **PRESIDING COMMISSIONER PEREZ:** We don't
27 **ALI PERTSONI  C-48947  DECISION PAGE 16  02/08/06**

132

1    know -- There is an indication in the file that

2    the victim had no family in this country.

3    Nevertheless we are going to impose a special

4    condition of parole that you do not have contact

5    with the family of the victim in this particular

6    case.  This decision is not final.  And what

7    that means is that because this is a murder case

8    the Governor's Office can do a number of things.

9    Once he receives this case he can allow you to

10   be released; he can reverse it, he can say, no;

11   or he can return it back to the Board and say, I

12   want the Board to look at it a second time.

13   Currently there are eight Board Members.  Those

14   eight Board Members would look at the case and

15   by majority they would decide whether or not you

16   should be released or not.  If the Governor

17   returns it back to the Board the decision of the

18   Board would be final, either for you to be

19   released or for this case to be reversed.  Do

20   you understand that?  So there's four things the

21   Governor can do, typically he does one of three.

22   He either lets you out and that's the end of it,

23   he reverses it and says no for whatever reasons

24   he finds reasonable, or he returns it back to

25   the Board and says, look at it a second time and

26   then they make the final decision.  Sir, I

27   **ALI PERTSONI   C-48947    DECISION PAGE 17   02/08/06**

133

1  recognize we have covered a lot of information.

2  Do you have any questions?

3       **INMATE PERTSONI:** Thank you.

4       **PRESIDING COMMISSIONER PEREZ:**

5  Commissioner Morris.

6       **DEPUTY COMMISSIONER MORRIS:** No, nothing

7  additionally. Other than let me just kind of

8  respond to counsel's question earlier regarding

9  the receipt date versus the life term start

10  date. And during my discussion as it relates to

11  post-conviction factors when I talked about

12  Mr. Pertsoni's custody history I did talk about

13  the 6/18/1982 reception date at CMF. However,

14  during the course of the discussion I started to

15  talk about the life term start date, which was

16  '84. You tried to give me a document

17  encouraging me to use the '82 date.

18       **ATTORNEY FOX:** Right.

19       **DEPUTY COMMISSIONER MORRIS:** And I told

20  you that I would use the date on the A-12. My

21  mistake was thinking it was -- I'm looking at my

22  notes. I wrote down the wrong figure. My notes

23  say '82 but the correct information is, in fact,

24  on the A-12. And that's unchanged.

25       **ATTORNEY FOX:** Thank you.

26       **DEPUTY COMMISSIONER MORRIS:** But I just

27  **ALI PERTSONI  C-48947  DECISION PAGE 18  02/08/06**

134

1   wanted to acknowledge that.

2        **ATTORNEY FOX:**  Thank you, I appreciate

3   it.  I was confused.

4        **DEPUTY COMMISSIONER MORRIS:**  You tried to

5   tell me but I wasn't listening.

6        **ATTORNEY FOX:**  Thank you.

7        **PRESIDING COMMISSIONER PEREZ:**  Sir, we do

8   wish you the best of luck.

9        **INMATE PERTSONI:**  Thank you.

10       **PRESIDING COMMISSIONER PEREZ:**  It's going

11  to be a few months before you find out what's

12  going to happen with this case so it's not going

13  to happen right away.  Okay?  Good luck to you,

14  sir.  This concludes this hearing.  The time is

15  11:23 a.m.

16       **INMATE PERTSONI:**  Thank you.  Thank you.

17       **DEPUTY COMMISSIONER MORRIS:**  It's not

18  over yet.

19                    --oOo--

20

21

22

23  **PAROLE GRANTED**                    JUN 0 8 2006

24  **THIS DECISION WILL BE FINAL ON:** _____

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **ALI PERTSONI  C-48947   DECISION PAGE 19  02/08/06**

135

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, RAMONA COTA, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 134, and which

recording was duly recorded at CALIFORNIA STATE

PRISON, SAN QUENTIN, SAN QUENTIN, CALIFORNIA, in the

matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING

OF ALI PERTSONI, CDC NO. C-48947, ON FEBRUARY 8, 2006,

and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 25, 2006, at Sacramento County,

California.



RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**